ARCHER & GREINER, P.C.                           Hearing Date:  August 14, 2019
630 Third Avenue                                 Hearing Time:  2:00 P.M.
New York, New York 10017
Tel: (212) 682-4940
Allen G. Kadish
Harrison H.D. Breakstone
Email: akadish@archerlaw.com
        hbreakstone@archerlaw.com

*Counsel for Park Monroe Housing Development*
*Fund Corporation, Northeast Brooklyn Partnership*
*and 984-988 Greene Avenue Housing Development*
*Fund Corporation, Debtors and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re:                                           Chapter 11

PARK MONROE HOUSING DEVELOPMENT                  Case No. 1-19-40820 (CEC)
    FUND CORPORATION, *et al.,*                  (Jointly Administered)

            Debtors.

---------------------------------------------------------x

## DEBTORS' RESPONSE AND OBJECTION TO MOTION OF THE CITY OF NEW YORK FOR (I) STAY RELIEF TO PERMIT FORECLOSURE OF DEBTORS' REAL PROPERTY OR, IN THE ALTERNATIVE, (II) DISMISSAL OF THE CASE, OR (III) APPOINTMENT OF A CHAPTER 11 TRUSTEE

TO THE HONORABLE CARLA E. CRAIG,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

PARK MONROE HOUSING DEVELOPMENT FUND CORPORATION ("**Park Monroe**"), NORTHEAST BROOKLYN PARTNERSHIP ("**NBP**") and 984-988 GREENE AVENUE HOUSING DEVELOPMENT FUND CORPORATION ("**Greene Avenue**," each a "**Debtor**" and collectively, the "**Debtors**"), debtors and debtors-in-possession, by their counsel, Archer & Greiner, P.C., as and for their objection to the *Motion of the City of New York for (i) Stay Relief to Permit Foreclosure of Debtor's Real Property or, in the Alternative, (ii) Dismissal of the*

*Case, or (iii) Appointment of a Chapter 11 Trustee* [Docket No. 83] (the "**Motion**"), respectfully represents as follows (the "**Objection**"):

## I.

## PRELIMINARY STATEMENT

1.    The Debtors filed these cases to protect their properties and take advantage of an opportunity in Chapter 11 to sell or refinance for the benefit of the Debtors, creditors, tenants and the community.  The Debtors continue to operate their buildings and Chapter 11 cases as debtors-in-possession in furtherance of their respective strategies.  Each Debtor's respective Chapter 11 strategy is expected to provide a meaningful return to all creditors and further the interests of the Debtors, creditors, tenants and the community.  The Debtors require the protection of the automatic stay during the pendency of these Chapter 11 cases in order to preserve resources and further pursue their Chapter 11 strategies.  Further, the Debtors should be afforded more time in Chapter 11 in order to propose and confirm their respective Chapter 11 plans.  As the Debtors progress towards their proposal and confirmation of their Chapter 11 plans of reorganization, and continue to manage their operations and Chapter 11 cases, there is no cause for the appointment of a trustee.

## II.

## THE MOTION

2.    The Motion filed by the city of New York (the "**City**") requests an order (i) vacating the automatic stay pursuant to 11 U.S.C. § 362(d) to permit the City to continue its foreclosure of the Debtors' real properties, or in the alternative (ii) dismissing the bankruptcy cases filed by the Debtors pursuant to 11 U.S.C. § 1112(b) or converting the case to Chapter 7, or (iii) appointing a Chapter 11 Trustee.  The Motion should be denied in its entirety.[1]

---

[1]  Capitalized terms not defined herein are as used in the Motion.

## III.

## THE DEBTORS

### A.    The Debtors

1.    On February 11, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of title 11 of the Bankruptcy Code.

2.    The Debtors continue in possession of their property and continue to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    No trustee or committee has been appointed in these cases.

4.    The Debtors are each current on monthly operating reports and United States Trustee fees.

5.    On March 12, 2019, the Debtors filed a motion for an order to authorize the use of cash collateral [Docket No. 22].  The Debtors have used cash collateral on consent of the City.

6.    On March 12, 2019, the Debtors filed a motion for an order granting authority to continue utility services and to provide an adequate assurance payment to the Debtors' utility providers [Docket No. 23].  The Court entered an order granting the motion on June 10, 2019 [Docket No. 63].

7.    On March 12, 2019, the Debtors filed a motion for an order granting authority to maintain and enter into an insurance premium financing agreement [Docket No. 23].  The Court entered an order granting the motion on June 10, 2019 [Docket No. 64].

8.    On May 2, 2019, the Bankruptcy Court entered an order setting a General Bar Date of July 1, 2019 at 5:00 p.m., for persons and entities, and August 12, 2019 at 5:00 p.m., for Governmental Units, thereby setting the deadlines by which each Debtor's creditors must file proofs

of claim for alleged liabilities not paid and/or damages incurred arising from or related to periods prior to the Petition Date [Docket No. 51]. As of the General Bar Date there were claims filed in a secured amount of $7,878,925.26 for Park Monroe, $3,370,659.58 for NBP and $2,284,423.43 for Greene Avenue. Claims were filed in an unsecured amount of $57,833.18 for Park Monroe, $67,666.64 for NBP and $28,319.05 for Greene Avenue.

9.      On May 24, 2019, the Debtors filed the *Debtors' Motion for an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and to Solicit Acceptances Thereto* [Docket No. 57]. On July 11, 2019, the Court entered the *Order Extending Debtors' Exclusive Periods to File Chapter 11 Plans and to Solicit Acceptances Thereto* [Docket No. 89], which maintained and extended each Debtor's exclusivity period (i) to file their respective plans of reorganization through and including September 9, 2019 and (ii) to solicit acceptances to their respective plans through and including November 8, 2019.

10.     On May 24, 2019, the Debtors and certain represented tenants filed the *Stipulation and Order Between Debtors and Tenants Regarding Adjournment of Housing Court Cases* [Docket No. 56] adjourning all Non-Pay Actions until July 1, 2019 or thereafter.

11.     On June 24, 2019, the Debtors filed an application to retain Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP as Special Real Estate Transactional Counsel [Docket No. 77].

12.     On June 24, 2019, the Debtors filed an application to retain Sperber, Denenberg & Kahan, P.C. as Special Landlord-Tenant Counsel [Docket No. 78].

13.     On June 26, 2019, a hearing was held on certain represented tenants' motion for relief from stay. At the hearing the Debtors and the represented tenants reached an agreement that was announced on the record and remains subject to final negotiations on a formal stipulation and order.

14.     On July 26, 2019, NBP filed an application to retain CPEX Real Estate as Real Estate

Broker [Docket No. 107].

**B.      *Park Monroe's Business Operations***

15.     Park Monroe is a not-for-profit corporation organized under the laws of New York on

or about June 22, 2006.  Park Monroe owns and operates five residential buildings, totaling 72 units

that are approximately 75% leased:

| Address | Units | Neighborhood |
|---------|-------|--------------|
| 477 Saratoga Avenue a/k/a 1352-1354 East New York Avenue Brooklyn, New York 11212 | 10 | Brownsville |
| 1350 Park Place Brooklyn, New York 11213 | 19 | Brownsville |
| 180 Grafton Street Brooklyn, New York 11212 | 16 | Brownsville |
| 257 Mother Gaston Boulevard Brooklyn, New York 11212 | 8 | Brownsville |
| 249-251 Mother Gaston Boulevard Brooklyn, New York 11212 | 19 | Brownsville |

16.     On February 26, 2015, Park Monroe entered into mortgages with the City totaling

$6,124,549.09.  Sometime after the entry into the mortgages with the City, Park Monroe entered into

a regulatory agreement with the City including terms specific to support regulated low income

housing.

17.     On October 31, 2017, the City commenced a commercial foreclosure action in the

Supreme Court of the State of New York, County of Kings, against Park Monroe and several other

parties titled *City of New York v. Park Monroe Housing Development Fund Corporation, New York*

*State Department of Taxation and Finance, New York City Environmental Control Board; City of*

*New York Department of Finance; The People of the State of New York, and "John Does" #'s 1-100*

*(No. 521089/2017).*

18.     Thereafter, on the Petition Date, Park Monroe filed a voluntary petition for relief

under Chapter 11 of title 11 of the Bankruptcy Code.  As of the Petition Date there was no judgment in the foreclosure action.

19.     Park Monroe's Chapter 11 strategy focuses around consummating a sale of its buildings, pursuant to a Chapter 11 plan, in an amount sufficient to provide a meaningful return to all creditors.

## C.    NBP's Business Operations

20.     NBP is a for-profit limited liability partnership organized under the laws of New York on or about August 29, 1991.  NBP owns and operates five residential buildings and an additional lot, totaling 40 units that are over 90% leased:

| Address | Units | Neighborhood |
|---|---|---|
| 409 Kosciuszko Street<br>Brooklyn, New York 11221 | 3 | Bedford-Stuyvesant |
| 403 Kosciuszko Street<br>Brooklyn, New York 11221 | 13 | Bedford-Stuyvesant |
| 399 Kosciuszko Street<br>Brooklyn, New York 11221 | 12 | Bedford-Stuyvesant |
| 397 Kosciuszko Street<br>Brooklyn, New York 11221 | Lot | Bedford-Stuyvesant |
| 675 Halsey Street<br>Brooklyn, New York 11233 | 6 | Stuyvesant Heights |
| 671 Halsey Street<br>Brooklyn, New York 11233 | 6 | Stuyvesant Heights |

21.     NBP entered into mortgages with the City totaling $2,848,843.00.  Sometime after the entry into the mortgages with the City, NBP entered into a regulatory agreement with the City including terms specific to support regulated low income housing.

22.     On October 31, 2017, the City commenced the Foreclosure Action in the Supreme Court of the State of New York, County of Kings against the Debtor and several other parties titled *City of New York v. Northeast Brooklyn Partnership, New York State Department of Taxation and Finance, New York City Environmental Control Board; City of New York Department of Finance;*

*Betty J. Cox d/b/a JS Secretarial Services; and "John Does" #'s 1-100 (No. 521090/2017).*

23.    Thereafter, on the Petition Date, NBP filed a voluntary petition for relief under Chapter 11 of title 11 of the Bankruptcy Code.  As of the Petition Date there was no judgment in the foreclosure action.

24.    NBP's Chapter 11 strategy focuses around consummating a sale of its property, pursuant to a Chapter 11 plan, in an amount sufficient to provide a meaningful return to all creditors.

**D.    *Greene Avenue's Business Operations***

25.    Greene Avenue is a not-for-profit corporation organized under the laws of New York on or about April 1, 1994.  Greene Avenue owns and operates two residential buildings, totaling 32 units that are over 85% leased:

| Address | Units | Neighborhood |
|---|---|---|
| 984 Greene Avenue Brooklyn, New York 11221 | 16 | Bedford-Stuyvesant |
| 988 Greene Avenue Brooklyn, New York 11221 | 16 | Bedford-Stuyvesant |

26.    Greene Avenue entered into mortgages with the City totaling $937,434.78.  Sometime after the entry into the mortgages with the City, Greene Avenue entered into a regulatory agreement with the City including terms specific to support regulated low income housing.

27.    On October 31, 2017, the City commenced a commercial foreclosure action in the Supreme Court of the State of New York, County of Kings, against the Debtor and several other parties titled *City of New York v. 984-988 Greene Avenue Housing Development Fund Corporation, New York State Department of Taxation and Finance, New York City Environmental Control Board; City of New York Department of Finance; and "John Does" #'s 1-100 (No. 521091/2017).*

28.    Thereafter, on the Petition Date, Greene Avenue filed a voluntary petition for relief under Chapter 11 of title 11 of the Bankruptcy Code.  As of the Petition Date there was no judgment

in the foreclosure action.

29.     Greene Avenue's Chapter 11 strategy focuses around a refinancing of its current mortgage with the City in an amount sufficient to pay all creditors in full and by which Greene Avenue would maintain ownership of its buildings and continue towards fully leasing them up.

## IV.

## LEGAL STANDARDS

### A.     The Automatic Stay Should Not Be Lifted

30.     The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 502 (1986).  The stay is "designed to give the debtor time to organize its affairs—which includes protection from having to defend claims brought against the estate." *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986).

31.     Section 362(d) of the Bankruptcy Code, addressing relief from the automatic stay, provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> >
> > (A)   the debtor does not have an equity in such property; and
> > (B)   such property is not necessary to an effective reorganization.

32.     The City seeks relief from the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code for "cause" and Section 362(d)(2) of the Bankruptcy Code alleging lack of equity

in each Debtor's property and that the respective property is not necessary for an effective reorganization.

33.    The City has the burden of showing that continuation of the stay would cause some affirmative harm to its interest in the property. *See Capital Communications Federal Credit Union v. Boodrow (In re Boodrow)*, 126 F.3d 43, 53 (2d Cir. 1997).

34.    Stay relief is available to a party with an interest in estate property when the party's interest is not adequately protected. *See 3 Collier on Bankruptcy* ¶ 362.07[3][b]. The term "adequate protection" is not defined in the Bankruptcy Code, but Section 361 "gives examples of what might constitute adequate protection and, at least in one instance, of what will not constitute adequate protection." *Id.* Specifically, adequate protection may be provided by:

> (1) requiring the trustee [or debtor-in-possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

35.    The provision of the "indubitable equivalent" of the secured creditor's interest in the property is sufficient adequate protection. One common way of meeting the "indubitable equivalent" standard in section 361(3) is through the existence of an equity cushion. An equity cushion in

property "provides adequate protection if it is sufficiently large to ensure that the secured creditor will be able to recover its entire debt from the security at the completion of the case." *In re Elmira Litho, Inc.,* 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994). Adequate protection exists if the value of the secured creditor's collateral exceeds the value of its claim and the difference is either great enough to absorb interest accrual or the debtor is servicing the post-petition debt. Such "[a]n equity cushion exists if the value of the collateral available to the creditor exceeds by a comfortable margin the amount of the creditor's claim." *3 Collier on Bankruptcy* ¶ 362.07[3][d][i]. The Debtors properties are insured for values in excess of the debt.

36.     Beyond the lack of adequate protection, the Second Circuit has observed that "[n]either the statute nor the legislative history defines the term 'for cause.'" *See In re Mazzeo,* 167 F.3d 139, 142 (2d Cir. 1999), *citing Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.),* 907 F.2d 1280, 1285 (2d Cir. 1990). Thus Congress noted that the "facts of each request will determine whether relief is appropriate under the circumstances." *Mazzeo,* 167 F.3d at 142, *citing* H.R.Rep. No. 95-595, at 343-44 (1977).

37.     When determining whether relief from the stay should be granted, the moving party has the initial burden of proving that "cause" exists. *In re RYYZ, LLC,* 490 B.R. 29, 37 (Bankr. E.D.N.Y. 2013); *see also In re New York Medical Group, P.C.*, 265 B.R. 408, 413 (Bankr. S.D.N.Y. 2001) (*citing Sonnax,* 907 F.2d at 1285; *Mazzeo,* 167 F.3d at 142).

38.     In determining whether the stay should be modified or terminated for cause, courts in this Circuit either (1) analyze the twelve factors enumerated by the Second Circuit in *Sonnax*, or (2) engage in fact-intensive inquiries which appear to be loosely based on the *Sonnax* factors. *See In re Project Orange Associates, LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010); *see also Sonnax,* 907 F.2d at 1285.

39.     The United States Court of Appeals for the Second Circuit has identified the following twelve factors to be considered in determining whether "cause" exists to grant the relief from the automatic stay to continue litigation in another forum:

(i)     whether relief would result in a partial or complete resolution of the issues;

(ii)    lack of connection with or interference with the bankruptcy case;

(iii)   whether the other proceeding involves the debtor as a fiduciary;

(iv)    whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(v)     whether the debtor's insurer has assumed full responsibility for defending it;

(vi)    whether the action primarily involves third parties;

(vii)   whether litigation in another forum would prejudice the interests of other creditors;

(viii)  whether the judgment claim arising from the other action is subject to equitable subordination;

(ix)    whether movants success in the other proceeding would result in a judicial lien avoidable by the debtor;

(x)     the interests of judicial economy and the expeditious and economical resolution of litigation;

(xi)    whether the parties are ready for trial in the other proceeding; and

(xii)   the impact of the stay on the parties and the balance of harms.

*Sonnax,* 907 F.2d at 1286 (*quoting In re Curtis*, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984)).

40.     The City has failed to establish that these factors weigh in favor of lifting the stay or that there is an absence of adequate protection.  The movant bears the initial burden to show cause

for lifting the automatic stay, and if the movant fails to satisfy that initial burden, the Court should deny the request for relief without requiring the debtors to demonstrate that the continued protection of the automatic stay is proper. *Sonnax*, 907 F.2d at 1285. Because the City has not satisfied its burden of establishing "cause" under section 362(d)(1), the Motion should be denied.

41.	Pursuant to, but not limited to, the second, fourth and seventh factor, relief from the automatic stay should not be granted as the foreclosure proceedings in the state court undoubtedly are intertwined with the Debtors' Chapter 11 cases and any resolution in the state court would prejudice all other creditors. In consideration of the dramatic effect that the foreclosure proceedings could have on the Debtors and their creditors in relation to the relative harm the City will experience as a result of any delay, relief from the automatic stay should not be granted to the City to pursue a foreclosure judgment. Instead, a balance of the factors supports maintenance of the automatic stay in order to allow the Debtors to pursue their strategies in the interests of all creditors.

42.	The Debtors submit that the City's general allegations do not support a finding of "cause." The Debtors are pursuing plans to capitalize on their respective assets for the benefit of their estates. The Debtors filed Chapter 11 to obtain the benefit of the automatic stay and use the Chapter 11 process in order to reorganize and deal with their creditors' claims in one forum. As set forth herein, each Debtor is preparing, and expects to propose, a confirmable plan that provides for satisfaction of the City's mortgages and payment of all post-petition real property taxes and water and sewer charges, as well as a meaningful return for all creditors.

43.	The City's mortgages were placed to support a low-income housing regime in New York City, not to capitalize as an investor. Thus, the primary focus here should not be on the economic equation but whether each Debtor is providing the housing services to its constituents.

**B.    *The Cases Should Not Be Converted or Dismissed***

44.    Section 1112(b) of the Bankruptcy Code provides that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."

45.    Section 1112(c) of the Bankruptcy Code prohibits the conversion of a Chapter 11 case to a Chapter 7 liquidation if the debtor is "not a moneyed, business, or commercial corporation." *See In re Bronx Miracle Gospel Tabernacle Word of Faith Ministries*, No. 17-11395, 2018 WL 2386815, at \*3 (Bankr. S.D.N.Y. May 24, 2018); *see also In re Mandalay Shores Ass'n*, 22 B.R. 202 (Bankr. M.D. Fla. 1982).

46.    Although the statute does not define these phrases, they have acquired a specific meaning by judicial interpretation to encompass only those corporations organized as not-for-profit. A not-for-profit corporation may not be the subject of an imposed conversion from Chapter 11 to Chapter 7.  Consequently, conversion is not an option for Park Monroe and Greene Avenue.  The Debtors do not consent to conversion of their bankruptcy cases.  Therefore, this aspect of the Motion is moot and should be denied as to Park Monroe and Greene Avenue.

47.    Section 1112(b)(4) of the Bankruptcy Code lists sixteen nonexclusive examples of "cause," including substantive or continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation.

48.    The Court has wide discretion to determine whether "cause" exists.  *In re GEL, LLC,* 495 B.R. 240, 246 (Bankr. E.D.N.Y. 2012).  If cause is found, the Court must convert or dismiss a case, but the decision whether to convert a Chapter 11 case is within the discretion of the court.  *See In re The 1031 Tax Group LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007); *In re Hampton Hotel*

*Investors, L.P.,* 270 B.R. 346 (Bankr. S.D.N.Y. 2001).

49.    The moving party bears the "burden of demonstrating cause by a preponderance of the evidence*." GEL*, 495 B.R. at 245.

50.    The City cites to section 1112(b)(4)(A) and 1112(b)(4)(I) alleging that there is a substantial or continuing loss to or diminution of the estate coupled with the absence of a real likelihood of rehabilitation to warrant dismissal (or conversion, where applicable) of the Debtors' cases.

51.    It is well established that in order for cause to exist both elements must be established. *See In re 221-06 Merrick Blvd. Assocs. LLC,* 2010 Bankr. LEXIS 4431, at *4 (Bankr. E.D.N.Y. 2010) (*citing 1031 Tax Group, LLC,* 374 B.R. at 88 (Bankr. S.D.N.Y. 2007)).  The movant must prove not only that there is a continuing loss to the estate, but also must prove an absence of a reasonable likelihood of rehabilitation. *See In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003).

52.    Despite the City's allegations regarding the Debtors' motives, negotiations have been ongoing regarding transactions that would comply with all applicable regulations and continue each building's use as affordable housing subject to each respective regulatory agreement.  This process takes time as the Debtors operate in the affordable housing market where there is a small community of lenders and buyers.  The Debtors are confident that the counter-parties presented will be acceptable to the City.

53.    There is no absence of a reasonable likelihood of rehabilitation within a reasonable time.  The Debtors have complied with material requirements and fully intend to continue to do so. Despite the City's baseless claims that the amount owed under each Debtor's mortgage prohibits any potential for a sale or refinancing and therefore any reorganization, the Debtors are in earnest

pursuing their strategies and will present their reorganization strategies in their Chapter 11 plans.

### C. A Trustee Should Not Be Appointed

54.     Under sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code, the City bears the burden of proving by clear and convincing evidence that "cause" exists for the appointment of a Chapter 11 trustee and that such appointment is in the best interests of the estate.

   i.   *Section 1104(a)(1)*

55.     Section 1104(a)(1) provides that a trustee may be appointed "for cause:"

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

56.     The appointment of a Chapter 11 trustee is an "extraordinary remedy." *In re Euro-American Lodging* Corp., 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007); *In re Adelphia Comm'ns Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006). There is a strong presumption that a debtor should remain in possession. *1031 Tax Group*, 374 B.R. at 85; *Ionosphere*, 113 B.R. at 167. The party seeking appointment of a trustee must prove the need for a trustee by "clear and convincing evidence." *Euro-American*, 365 B.R. at 426; *Adelphia,* 336 B.R. at 656; *Ionosphere*, 113 B.R. at 168; *see also In re G-I Holdings, Inc.*, 385 F.3d 313, 317-19 (3d Cir. 2004).

   ii.  *Section 1104(a)(2)*

57.     Section 1104(a)(2) provides that a trustee may be appointed "in the interests of creditors:"

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

Under this section, a court must determine that the appointment of a Chapter 11 trustee is in the best interests of each of the three statutorily identified constituencies-- creditors, equity security holders and other parties-in-interest.  11 U.S.C. § 1104(a)(2); 7 *Collier on Bankruptcy* ¶1104.02[3][d][i].

58.    Courts should weigh the costs and benefits of appointing a trustee in making a determination, *see* 7 *Collier on Bankruptcy* ¶1104.02[3][d][ii], and "engage[ ] in a fact-driven analysis, principally balancing the advantages and disadvantages of taking such a step, mindful of the many cases . . . that have held that appointment of a trustee is an extraordinary remedy, and should be the exception, rather than the rule." *Adelphia*, 336 B.R. at 658.

59.    In the usual Chapter 11 case, the debtor remains in possession throughout reorganization because "current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." *In re V. Savino Oil & Heating Co.,* 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989).

60.    There are significant and obvious costs to appointing a trustee, including the costs of the trustee itself, his or her professionals, the time it will take the trustee and his or her professionals to acquaint themselves with the Debtors and the cases, and the deprivation of the Debtors' fundamental bankruptcy rights to operate as debtors-in-possession.

61.    Each Debtor is on a path to conduct transactions and return value to creditors.  The Debtors should be allowed time to present these transactions to the Court, their creditors and their tenants.  The movant bears the initial burden to show cause for appointment of trustee, and since the movant fails to satisfy that initial burden, the Court should deny the request for relief.  Because the

16

City has not satisfied its burden, this Motion should be denied.

## V.

### **RESPONSE**

62.    Two of the Debtors are not-for-profits and all three are controlled and managed by a parent organization, Northeast Brooklyn Housing Development Corporation ("**NEB**"), a not-for-profit, the mission of which is to provide affordable rental housing to low-income residents of Central Brooklyn.  The Debtors, NEB, the City and the tenants are all in pursuit of the same goals – the maintenance of affordable housing in these Brooklyn neighborhoods.

63.    NEB, property manager for the Debtors, was incorporated in January 1985 as a §501-c(3) not-for-profit organization with a mission to provide affordable rental housing to low-income residents of Central Brooklyn, with an initial focus on advocacy through block associations, merchant and tenant organizing. The organization's housing development experience began in earnest in 1988 with a grant from the New York State Housing Trust Fund Corporation to develop a 16-unit limited-equity cooperative. To date, NEB has planned, joint-ventured, and developed over 2000 housing units of which 1082 are owned by the organization, as well as nearly 17,000 square feet of commercial space throughout the central Brooklyn community.  This volume represents over $109 million in capital investments, and, according to NEB, created nearly 600 new local jobs in central Brooklyn.

64.    Each Debtor's respective Chapter 11 strategy is expected to provide a meaningful return to creditors and further the interests of the Debtors, creditors, tenants and the community.

#### A.    *Violations and Repairs*

65.    The City alleges that certain of the Debtors' buildings have outstanding

violations and other issues that have been ignored.  As the Debtors' property manager and janitorial service provider, NEB has consistently attended to the repairs in the Debtors' buildings.  Several of the buildings are older buildings that require constant maintenance which the Debtors and NEB are committed to providing.  Certain buildings serve the city's formerly homeless and at-risk populations.  Inevitably, certain tenants fail to take care of their units and building.  Additionally, certain tenants resist providing access to the Debtors' superintendents and service providers, greatly limiting the ability of the Debtors to make repairs and maintain violation-free buildings. Nevertheless the Debtors have programs in place to continue to do so.

66.     The Debtors' property manager employs on-site superintendents who assess and perform repairs or retain third party independent contractors as needed.

67.     The Debtors consistently work towards achieving and maintaining violation-free buildings.  Inevitably this is only possible with the cooperation of the tenants and the City.  Also inevitably certain tenants are entrenched in disputes in housing court around non-payment of rent. These disputes are part of doing business but the withholding of rent disrupts the Debtors' operations and causes devotion of resources to housing court litigation rather than to focusing on building maintenance.

68.     The City alleges that the Debtors' properties have hundreds of open housing violations.  The Debtors still suggest these do not paint a proper picture regarding violations representing items that actually have been repaired and alleviated but that have not cleared in the City's system.  Conflicts between the Debtors and the City have existed, including the City's failure to clear violations once repairs are made, and provide subsidies according to law.  Nevertheless, these parties must work together in the best interests of all constituents.

69.     Additionally, dating back to before the Petition Date, during the pre-petition

foreclosure action, the City had withheld Section 8 payments as a result of an alleged administrative error.  The Section 8 payments recently were released to the Debtors.  The delay on these Section 8 payments is indicative of the bureaucratic process that hampers the Debtors' ability to demonstrate when work has been done but the City has not effectively cleared violations.

70.      This is an ongoing process, as with any portfolio of residential buildings.  The Debtors are preparing another report on building maintenance and repairs.  The Debtors are aware of and have systematically addressed necessary repairs.  The Debtors are living in a Chapter 11 "fish-bowl" where emphasis on transparency and communication with constituencies has resulted in stepped up repairs.

**B.**      ***Chapter 11 Strategy***

71.      All of the Debtors' efforts have continually been focused on operating their buildings, including the collection of rent and the conduct of repair and maintenance of the buildings, and maximizing the value of their estates paving the way to resolution under Chapter 11 plans.  In order to maximize the value of their estates for the benefit of their creditors, the Debtors must continue as debtors-in-possession and execute their Chapter 11 plans.

72.      Despite the City's allegations that the Debtors seek to sell their buildings absent regulations, the sale transactions that Park Monroe and NBP expect to effectuate pursuant to Chapter 11 plans are to a purchaser that intends to continue operating the buildings as regulated, affordable housing.  The sale transactions will be subject to all current low income housing restrictions.  The sales are expected to be "as is," "where is" with all residential leases remaining in place.  Park Monroe and NBP's proposed purchaser is expected to pay a purchase price sufficient to provide a meaningful return to all creditors, including on the City's mortgages.  Greene Avenue, a not-for-profit, effectuating its mission, is aiming to (i) refinance and replace the City's mortgage in

order to restructure its secured obligations and pay its unsecured creditors, (ii) lease up its buildings, and (iii) repair, maintain and operate its buildings in the ordinary course.[2]

73.     Throughout the Debtors' cases they have been communicating with the tenants and the City.  Chapter 11 provides the Debtors an opportunity to turn the page.  The Debtors have continuously worked toward developing and executing their Chapter 11 plans to the benefit of each Debtor's estate, their respective creditors and tenants.  Each Debtor is preparing, and expects to propose, a confirmable plan that provides for satisfaction of the City's mortgages and payment of all post-petition real property taxes and water and sewer charges, as well as a meaningful return for all creditors and should be entitled to devote its resources towards its operations and execution of its Chapter 11 plan.

74.     As set forth in the Motion, the Debtors are aware that their transactions will need certain approvals including the City and in the case of the non-profit sales, the state.  The Debtors are striving to propose transactions that will address and resolve points of contention in pre-petition litigation and that the City should support.

75.     The City does not hold a foreclosure judgment against the Debtors.  Therefore, any of the relief sought by the City would only provide it the opportunity to continue to pursue a foreclosure to the disadvantage of all of the other creditors.

76.     The Debtors see the Motion as exerting unfair pressure on them to sell or refinance and they are in the process of doing so, for the benefit of the City and all creditors.  This is now a fiduciary process, larger than the City's foreclosure alone.

77.     Each Debtor is entitled to the time and a process under the Bankruptcy Code,

[2] The City suggests that the Debtors should be treated as single asset real estate.  The Debtors own a combined 12 buildings all over Central Brooklyn.  Even each individual Debtor owns multiple buildings.  Each Debtor is treated individually with its own debt structure and operational agreements.  Each portfolio was acquired at different times through different transactions.

to execute its Chapter 11 strategy and seek to confirm a plan.  The Debtors are undertaking such activities and intend to comply with and take full advantage of their opportunities under the Bankruptcy Code and seek additional time as Chapter 11 debtors-in-possession to do so.  NEB is an experienced operator, understands the opportunities here and is acting accordingly.  If the Debtors believed they could not sell or refinance, they would so inform the Court.

78.    Each Debtor is optimistic regarding its respective Chapter 11 strategy and expects to provide a meaningful return to all creditors and further the interests of the Debtors, creditors, tenants and the community.

# VI.

## <u>CONCLUSION</u>

79.    For the foregoing reasons, the City has failed to satisfy its burden to establish (i) cause to lift the automatic stay, or, in the alternative, (ii) cause to dismiss the cases or appoint a trustee.  Accordingly, the Motion should be denied, and the Court should require that the automatic stay remain in place as it relates to the City as the Debtors continue to pursue their Chapter 11 reorganization strategies.

WHEREFORE, the Debtors respectfully request that the Court (i) deny the Motion, and (ii) grant such other and further relief as may be just and proper.

Dated:  New York, New York
       August 7, 2019

ARCHER & GREINER, P.C.

By:   s/ Allen G. Kadish
    Allen G. Kadish
    Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017
Tel:  (212) 682-4940
Email: akadish@archerlaw.com
      hbreakstone@archerlaw.com

*Counsel for Park Monroe Housing Development Fund Corporation, Northeast Brooklyn Partnership and 984-988 Greene Avenue Housing Development Fund Corporation, Debtors and Debtors-in-Possession*

216793948v5