## EXHIBIT A

**Sale Contract**

**AGREEMENT**

**OF**

**PURCHASE AND SALE**

**DATED AUGUST 13,  2019**

# TABLE OF CONTENTS

<div align="right">**Page No**.</div>

ARTICLE 1 - Basic Information ......................................................................................... 1

    1.1    Certain Basic Terms. ............................................................................................ 1
    1.2    Closing Costs ....................................................................................................... 2
    1.3    Notice Addresses: ................................................................................................ 3

ARTICLE 2 - Property ..................................................................................................... 3

    2.1    Property Description. ........................................................................................... 3

ARTICLE 3 - Earnest Money ........................................................................................... 4

    3.1    Deposit. ................................................................................................................ 4
    3.2    Form; Failure to Deposit ...................................................................................... 5
    3.3    Disposition of Earnest Money .............................................................................. 5
    3.4    Duties of Escrow Agent ....................................................................................... 5

ARTICLE 4 - Due Diligence ............................................................................................ 6

    4.1    Due Diligence ...................................................................................................... 6
    4.2    Service Contracts and Other Contracts ............................................................... 6
    4.3    Proprietary Information; Confidentiality ............................................................. 6
    4.4    No Representation or Warranty by Seller ............................................................ 7
    4.5    Purchaser's Responsibilities ................................................................................ 7
    4.6    Purchaser's Agreement to Indemnify .................................................................. 8

ARTICLE 5 - Title and Survey ........................................................................................ 8

ARTICLE 6 - Operations and Risk of Loss ..................................................................... 9

    6.1    Ongoing Operations. ........................................................................................... 9
    6.2    Damage .............................................................................................................. 10
    6.3    Condemnation. ................................................................................................... 11

ARTICLE 7 - Closing ................................................................................................... 12

    7.1    Closing ............................................................................................................. 12
    7.2    Conditions to Parties' Obligation to Close ....................................................... 12
    7.3    Seller's Deliveries. ............................................................................................ 12
    7.4    Purchaser's Deliveries ....................................................................................... 15
    7.5    Closing Statements ............................................................................................ 15
    7.6    Possession ......................................................................................................... 15
    7.7    Delivery of Books and Records……………………………………………………15

ARTICLE 8 - Prorations, Deposits, Commissions ....................................................... 15

    8.1    Prorations. ......................................................................................................... 15
    8.2    Closing Costs ..................................................................................................... 16
    8.3    Final Adjustment After Closing ........................................................................ 16
    8.4    Tenant Deposits. ............................................................................................... 16

8.5      Commissions............................................................................................................. 16

ARTICLE 9 - Representations and Warranties ............................................................... 17

9.1      Seller's Representations and Warranties.................................................................. 17
9.2      Purchaser's Representations and Warranties............................................................ 22
9.3      Survival of Representations and Warranties. ........................................................... 23

ARTICLE 10 - Default and Remedies ............................................................................. 24

10.1     Seller's Remedies. .................................................................................................. 24
10.2     Purchaser's Remedies............................................................................................. 24

ARTICLE 11 - Disclaimers, Release and Indemnity ..................................................... 24

11.1     Disclaimers By Seller............................................................................................. 24
11.2     Sale "As Is, Where Is." .......................................................................................... 25
11.3     Seller Released from Liability ................................................................................ 26
11.4     "Hazardous Materials" Defined. ............................................................................ 26
11.5     Survival. ................................................................................................................. 26

ARTICLE 12 - Miscellaneous ......................................................................................... 27

12.1     Parties Bound; Assignment. ................................................................................... 27
12.2     Headings. ............................................................................................................... 27
12.3     Invalidity and Waiver............................................................................................. 27
12.4     Governing Law. ..................................................................................................... 27
12.5     Survival. ................................................................................................................. 27
12.6     Entirety and Amendments....................................................................................... 27
12.7     Reserved................................................................................................................. 28
12.8     Confidentiality ....................................................................................................... 28
12.9     Notices. .................................................................................................................. 28
12.10    Construction. .......................................................................................................... 28
12.11    Calculation of Time Periods................................................................................... 28
12.12    Execution in Counterparts...................................................................................... 29
12.13    No Recordation....................................................................................................... 29
12.14    Further Assurances. ................................................................................................ 29
12.15    Discharge of Obligations........................................................................................ 29
12.16    No Third Party Beneficiary .................................................................................... 29
12.17    [omitted.] ............................................................................................................... 29
12.18    Seller's Cooperation with Purchaser……………………………………………….30
12.19    Limited Partner Consent…..…………………………………………………….30

JOINDER BY ESCROW AGENT................................................................................... 32

LIST OF EXHIBITS ......................................................................................................... 33

EXHIBIT A – Property Description ......................................................................... A - 1

EXHIBIT B – Service Contracts............................................................................... B - 1

EXHIBIT C – Property Documents .......................................................................... C - 1

EXHIBIT D – Bargain and Sale Deed ........................................................................ D - 1

EXHIBIT E – Assignment of Leases, Rents and Arrears .......................................... E - 1

EXHIBIT F – Notice To Tenants................................................................................ F - 1

EXHIBIT G – Residential and Commercial Rent Roll.............................................. G - 1

# AGREEMENT OF PURCHASE AND SALE

This Agreement of Purchase and Sale ("Agreement") is made and entered into by and between Purchaser and Seller.

# RECITALS

**A.**    Defined terms are indicated by initial capital letters. Defined terms shall have the meaning set forth herein, whether or not such terms are used before or after the definitions are set forth.

**B.**    Purchaser desires to purchase the Property and Seller desires to sell the Property, all upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual terms, provisions, covenants and agreements set forth herein, as well as the sums to be paid by Purchaser to Seller, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Purchaser and Seller agree as follows:

# ARTICLE 1 - Basic Information

### 1.1 Certain Basic Terms.

The following defined terms shall have the meanings set forth below:

1.1.1    **Seller**:  Northeast Brooklyn Partnership ( "Seller"), a  New York limited partnership.

1.1.2    **Purchaser: 27 BED STUY LLC**.

1.1.3    **Purchase Price:**  $4,300,000.00, (i.e. $107,500.00 per unit).

1.1.4    **Earnest Money**: $300,000.00  (the  "Earnest Money")

| | | |
|---|---|---|
| 1.1.5 | **Title Company**: | All New York Title Agency, Inc.<br>222 Bloomingdale Road, Ste. 306<br>White Plains, NY 10605 |
| | Attention:<br>Telephone:<br>Email: | Joseph S. Petrillo, Esq.<br>914-686-5600<br>jpetrillo@allnyt.com |
| 1.1.6 | **Escrow Agent**: | Abrams Fensterman, Fensterman,<br>Eisman, Formato, Ferrara, Wolf<br>& Carone, LLP |
| | | 1 MetroTech Center, Suite 1701 |

|              |                   | Brooklyn, NY 11201 |
|              | Attention:        | Mark J. Caruso, Esq. |
|              | Telephone:        | 718-215-5300 X 504 |
|              | Email:            | mcaruso@abramslaw.com |

**1.1.7 Broker**:        CPEX Real Estate LLC
                         81 Willoughby Street, 8th Floor
                         Brooklyn, NY 11201
          Attention:     Stephen Safina
          Telephone:     (718) 687-4201
          Email:         ssafina@cpexre.com

**1.1.8 Effective Date**: August        , 2019.

**1.1.9 Closing Date**: On the forty-fifth (45th) Calendar day after the issuance of an Order from the Bankruptcy Court approving the Contract and authorizing the sale under its terms as more fully described below, at 11:00am at the office of Seller's attorney, Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP.; 1 MetroTech Center, Suite 1701, Brooklyn, New York 11201, TIME OF THE ESSENCE, but in no event earlier than October 31, 2019 unless otherwise consented to by Seller in its sole discretion.

**1.2 Closing Costs.**

Closing costs shall be allocated and paid as follows:

| Cost | Responsible Party |
|------|-------------------|
| Title Commitment | Purchaser |
| Premium for Title Policy | Purchaser |
| Costs of Survey and/or any revisions, modifications or recertifications thereto | Purchaser |
| Costs for UCC Searches | Purchaser |
| Recording Fees | Purchaser |
| New York City and State Transfer Tax | Seller |
| Real Estate Sales Commission to Broker | Seller |

### 1.3 Notice Addresses:

| | | | |
|---|---|---|---|
| Purchaser: | 27 BED STUY LLC<br>C/O ELH MGMT LLC.<br>16 Court Street, Suite 800<br>Brooklyn, NY 11241<br>Attention: Larry Hirschfield<br>Telephone: (718) 885-5620<br>Email: larry@elhmgmt.com | Copy to: | Hirschen Singer & Epstein LLP<br>902 Broadway, 13th Floor<br>New York, New York 10010<br>Attention: Russell A. Kivler, Esq.<br>Telephone: 212-598-3216<br>Email: rkivler@hseny.com |
| Seller: | NORTHEAST BROOKLYN PARTNERSHIP<br>c/o NEBHDCo.<br>132 Ralph Avenue<br>Brooklyn, NY 11233<br>Attention: Jeffrey Dunston, CEO<br>Telephone: (718) 453-9490<br>Email: jdunston@nebhdco.org | Copy to: | Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP.<br>1 MetroTech Center<br>Suite 1701<br>Brooklyn, NY 11201<br>Attn: Stephen D. Chiaino, Esq.<br>Mark J. Caruso, Esq.<br>Telephone: (718) 215-5300<br>Email:<br>SChiaino@Abramslaw.com<br>MCaruso@Abramslaw.com |

## ARTICLE 2 - Property

### 2.1 Property Description.

Subject to the terms and conditions of this Agreement, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the following property (collectively, the "Property"):

**Real Property**. The land described in Exhibit A attached hereto (the "Land"), together with all of Seller's rights, title and interest in and to (i) all improvements located thereon ("Improvements"), (ii) all the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereon or in any way appertaining thereto, and (iii) without warranty, all right, title, and interest of Seller, if any, in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such Land and (iv) all right, title and interest of the Seller in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to said Property by reason of change of grade of any street ((i) – (iv) collectively, the "Real Property").

This sale also includes all air and development rights, if any. Seller makes no representation as to the existence of same except that Seller has not previously

transferred or encumbered any such rights.

      **2.1.1    Leases**. All of Seller's right, title and interest, without warranty, in all leases of the Real Property, including leases which may be made by Seller after the Effective Date and prior to Closing as permitted by this Agreement (the "<u>Leases</u>").

      **2.1.2    Tangible Personal Property**. All of Seller's right, title and interest, without warranty, in the equipment, machinery, furniture, furnishings, supplies and other tangible personal property, if any, owned by Seller and now or hereafter located in and used in connection with the operation, ownership or management of the Real Property including those tools and equipment used in connection with repair, maintenance and operation of the Improvements, but specifically excluding any items of personal property owned by tenants and/or manager, if any, at or on the Real Property and further excluding any items of personal property owned by third parties and/or leased to Seller (collectively, the "<u>Tangible Personal Property</u>").

      **2.1.3    Intangible Personal Property**. All of Seller's right, title and interest, if any, without warranty, in all intangible personal property related to the Real Property and the Improvements, including, without limitation: all trade names and trademarks associated with the Real Property and the Improvements, including Seller's rights and interests, if any, in the name of the Real Property; the plans and specifications and other architectural and engineering drawings for the Improvements, if any (to the extent assignable without cost to Seller); warranties (to the extent assignable without cost to Seller); contract rights related to the construction, operation, ownership or management of the Real Property, if any (but only to the extent assignable without cost to Seller and Seller's obligations thereunder are expressly assumed by Purchaser pursuant to this Agreement); governmental permits, approvals and licenses, if any (to the extent assignable without cost to Seller) (collectively the "<u>Intangible Personal Property</u>").

      **2.1.4    Licenses and Permits.** All right, title and interest of Seller, if any, in and to any licenses and permits owned or held by Seller (including any certificates of occupancy) to the extent such are assignable and related to or arising out of or used directly in connection with the ownership or operation of the Property (collectively, "<u>Licenses and Permits</u>").

      **2.1.5    Excluded Property**. Notwithstanding anything to the contrary herein, the Seller shall transfer to Purchaser, without any adjustment of the Purchase Price therefor, all reserve and escrow accounts (including the security deposit escrow accounts and rents paid more than thirty (30) days in advance of the due date, if any).

      **2.1.6**    Seller shall convey and Purchaser shall accept fee simple title to the Property in accordance with the terms of this Agreement, subject to Section 5.1.1.

## <u>ARTICLE 3 - Earnest Money</u>

### 3.1 Downpayment.

      3.1.1 (a) All sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment" or "Earnest Money") shall be paid by good check or checks drawn to the order of and delivered to Seller's attorney ("Escrow Agent"). The Escrow Agent shall hold the proceeds thereof in escrow in a special bank account at Northfield Bank located at 112 Court

Street, Brooklyn, NY 11201 (or as otherwise agreed in writing by Seller, Purchaser and Escrow Agent) until the Closing or sooner termination of this contract and shall pay over or apply such proceeds in accordance with the terms of this section. Escrow Agent shall hold such proceeds in its IOLA account, and neither party shall receive interest thereon. Escrow Agent shall not be responsible for any interest on the Downpayment to either party. At the Closing, the Downpayment, shall be paid by Escrow Agent to Seller and applied as a credit against the Purchase Price due from Purchaser. If for any reason the Closing does not occur and either party makes a written demand upon Escrow Agent for payment of such amount, Escrow Agent shall give written notice to the other party of such demand. If Escrow Agent does not receive a written objection from the other party to the proposed payment within ten (10) business days after the giving of such notice, Escrow Agent is hereby authorized to make such payment. If Escrow Agent does receive such written objection within such ten (10) business day period or if for any other reason Escrow Agent in good faith shall elect not to make such payment, Escrow Agent shall continue to hold such amount until otherwise directed by written instructions from the parties to this contract or a final and non appealable judgment of a court. However, Escrow Agent shall have the right at any time to deposit the escrowed proceeds with the clerk of the Supreme Court of the county in which the Premises is located. Escrow Agent shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)     The parties acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the duties of Escrow Agent hereunder are purely ministerial in nature and shall be expressly limited to the safekeeping and disposition of the Downpayment in accordance with the provisions of this contract, that Escrow Agent shall not be deemed to be the agent of either of the parties, and that Escrow Agent shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith, in willful disregard of this contract or involving gross negligence on the part of Escrow Agent.

All attorneys' fees and costs and Escrow Agent's costs and expenses incurred in connection with such interpleader shall be assessed against the party that is not awarded the Earnest Money, or if the Earnest Money is distributed in part to both parties, then in the inverse proportion of such distribution.

(c)     Escrow Agent has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this contract.

(d)     If Escrow Agent is Seller's attorney, Escrow Agent or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrow Agent is in possession of the Downpayment and continues to act as Escrow Agent.

**ARTICLE 4 - Due Diligence**

**4.1    Due Diligence.**

Purchaser acknowledges that this Agreement is not subject to a due diligence period and except as otherwise expressly provided for herein, the Property shall be purchased by Purchaser "AS-IS, WHERE IS, WITH ALL FAULTS as of the date hereof less reasonable wear and tear and casualty loss" as more particularly provided for in Section 11.2 of this Agreement.

**4.2    Service Contracts and Other Contracts**.

**4.2.1**    The schedule of service, maintenance, supply and management contracts ("Service Contracts") attached hereto as Exhibit B lists all such contracts affecting the Property, and the information set forth therein is accurate as of the date hereof, all of which are terminable in accordance with their respective terms, except for those indicated as non-terminable (the "Non-Terminable Contracts") on Exhibit B.

**4.2.2**    Seller shall deliver at Closing notices of termination of all Service Contracts that are not assumed in writing by Purchaser to the extent such Service Contracts have not otherwise expired. Effective as of the Closing, Purchaser hereby assumes the obligations arising from and after the Closing Date under the Non-Terminable Contracts and any other service contracts that Purchaser has agreed to assume in writing.

**4.3    Proprietary Information; Confidentiality.**

Purchaser acknowledges that all information and materials given by Seller to Purchaser in connection with the Property, including, without limitation, the materials described in Exhibit C attached hereto (collectively, the "Property Documents") are proprietary and confidential and were delivered to Purchaser solely to assist Purchaser in determining the feasibility of purchasing the Property. Purchaser shall not use the Property Documents for any purpose other than as set forth in the preceding sentence. Purchaser shall not use or disclose the contents of the Property Documents or this Agreement, and Purchaser shall not disclose the fact that negotiations have taken place between Purchaser and Seller in connection with the Property, in each case, to any person other than to those persons who were responsible for determining the feasibility of Purchaser's acquisition of the Property or third parties (including investors, applicable governmental agencies, lenders, and the Title Company) engaged by Purchaser (or its affiliates) to assist in Purchaser's acquisition of the

Property (collectively, "Permitted Outside Parties"). Purchaser shall not divulge or use the contents of the Property Documents and other information except in accordance with the express terms of Section 4.3 or as otherwise required by law. In permitting Purchaser to review the Property Documents or any other information, Seller has not waived any privilege or claim of confidentiality with respect thereto, and no third party benefits or relationships of any kind, either express or implied, have been offered, intended or created.

**4.4    No Representation or Warranty by Seller**.

Purchaser acknowledges that except as expressly set forth herein, Seller has not made nor makes any warranty or representation regarding the truth, accuracy or completeness of the Property Documents or the source(s) thereof. Purchaser further acknowledges that some if not all of the Property Documents were prepared by third parties other than Seller. Seller

expressly disclaims any and all liability for representations or warranties, express or implied, statements of fact and other matters contained in such information, or for omissions from the Property Documents, or in any  other written or oral communications transmitted or made available to Purchaser, whether on, prior to, or subsequent to the date hereof. Except as provided for herein, Purchaser shall rely solely upon its own investigation with respect to the Property, including, without limitation, the Property's physical, environmental or economic condition, compliance or lack of compliance with any ordinance, order, permit, law or regulation or any other attribute or matter relating thereto. Seller has not undertaken any independent investigation as to the truth, accuracy or completeness of the Property Documents furnished by any third party other than those prepared by or furnished by Seller and are providing any such Property Documents solely as an accommodation to Purchaser.

## <u>ARTICLE 5 - Title and Survey</u>

**5.1.1** Purchaser has obtained or shall obtain: (i) a current preliminary title report for the Real Property issued by the Title Company; (ii) copies of all underlying title documents described in the Title Commitment (collectively, "<u>Title Commitment</u>"); and (iii) if Purchaser so elects, a survey of the Real Property (the "<u>Survey</u>"). Purchaser shall accept title to the Property AS IS, and subject to any and all existing Violations provided however that Seller shall pay all monetary fines and penalties in connection with any violation, Orders, Notices and  Regulatory Agreements except that (a) on or prior to the Closing Date, Seller shall remove and clear all Voluntary Encumbrances (as defined below), (b) on the Closing Date, Seller shall, subject to the Pre-  Closing Lien Cap (as defined below), either pay in full amounts owed on all Pre-Closing Liens  (as defined below) or, at Seller's sole election, deduct such amounts in full from the Purchase  Price.

For the purposes of this Section 5.1.1, "Pre-Closing Liens" shall solely mean any Environmental Control Board ("ECB") violations or judgments, in each case, resulting in a monetary lien  or other monetary encumbrance against the Real Property as of the Closing in an aggregate  amount  not  to  exceed  One  Hundred  Thousand  Dollars  and  00/100 ($100,000.00) (the  "Pre-  Closing Lien Cap").

In the event that the aggregate amount of the Pre-Closing Liens, if any, exceeds the Pre-Closing Lien Cap, at Purchaser's sole election, either (a) at the Closing, Seller shall pay an amount equal to the Pre-Closing Lien Cap (which shall, at Seller's sole election, be deemed paid in full by Seller if Seller elects to deduct such amount from the Purchase Price at Closing) and Purchaser shall pay the amount in excess of the Pre-Closing Lien Cap or (b) in the event Seller fails to pay the amount in excess of the Pre Closing Lien Cap, Purchaser may  elect to terminate this Agreement and the sole liability of Seller shall be the release of the Earnest Money to Purchaser. Upon such release, this Agreement shall be null and void and the  parties hereto shall be relieved of all further obligations and liability with respect to the subject  matter of this Agreement.

The term "Voluntary Encumbrances" as used in this Agreement shall solely mean any mortgages (excluding the HPD/HDC Mortgages (as defined below)), use restrictions (excluding currently existing use restrictions related to the HPD/HDC Mortgages), and mechanic's liens encumbering the Property as of the Closing.

If Seller shall be unable to convey title to the Property at the Closing in accordance

with the provisions of this Section 5.1.1 or should the cost to clear title exceed $500,000.00 with respect to all title issues except for Voluntary Encumbrances and Pre-Closing Liens, if Purchaser shall have any other grounds under the express terms of this Agreement for refusing to consummate the purchase provided for herein, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey without any other credit or liability on the part of Seller, provided, however, that Purchaser shall be entitled to a credit not to exceed $500,000.00. If Purchaser shall not so elect, Purchaser may terminate this Agreement and the sole liability of Seller shall be the release of the Earnest Money to Purchaser. Upon such release, this Agreement shall be null and void and the parties hereto shall be relieved of all further obligations and liability with respect to the subject matter of this Agreement.

## ARTICLE 6 - Operations and Risk of Loss

**6.1 Ongoing Operations.**

From the Effective Date through Closing:

**6.1.1    Leases and Service Contracts.** Seller will continue to operate the Property in the ordinary course of business and make all repairs and improvements necessary to comply with all governmental rules and regulations, any mortgages or regulatory agreements.

**6.1.2    New Contracts.** Other than lease renewals required under the New York State Rent Stabilization Law and provided such renewals charge the maximum rent permitted thereunder, Seller will not, on or after the Effective Date, enter into any new contract without Purchaser's consent that will be an obligation affecting the Property subsequent to the Closing including, but not limited to, mortgages, restrictive covenants and/or contracts placing use restrictions on the Property, except that the restrictions in this Section 6.1.2 shall not include contracts entered into in the ordinary course of business that are terminable without cause and without the payment of any termination penalty on not more than thirty (30) days' prior notice.

**6.1.3    Maintenance of Improvements; Removal of Personal Property.** Subject to Sections 6.2 and 6.3, Seller shall maintain all Improvements substantially in their present condition (ordinary wear and tear and casualty excepted) and shall maintain its current insurance on the Property, all in a manner consistent with Seller's maintenance of, and insurance on, the Improvements during Seller's period of ownership and shall satisfy all accounts payable on or prior to the Closing Date. Seller will not remove any Tangible Personal Property except as in the ordinary course of business or as may be required for necessary repair or replacement, and replacement shall be of approximately equal quality and quantity as the removed item of Tangible Personal Property.

**6.1.4    Application of Security Deposits.** Seller shall not, between the date hereof and the Closing Date, apply any of such security deposits with respect to any tenant in occupancy of the Closing Date, unless Seller is entitled to do so under the terms of the lease and provides notice to Purchaser.

**6.1.5    Vacant Residential and Commercial Space.** Between the Effective Date

and the Closing Date, except as required by applicable laws and the regulatory agreement, Seller shall not re-let an apartment or commercial space which is currently or becomes vacant without notifying Purchaser of such vacancy and if Purchaser instructs Seller to keep the apartment vacant, the Seller shall receive a credit at Closing for lost rent resulting from such vacancy in an amount equal to, in the case of a residential space, the maximum amount of rent legally permissible for such unit as of the date of such vacancy and, in the case of a commercial space, the amount of rent that is commensurate with the market rate for such commercial space as of the date of such vacancy. Seller does not warrant that any particular Lease or tenancy will be in force or effect as of the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease prior to Closing by reason of the tenant's default thereunder shall not affect the obligations of Purchaser under this Agreement or entitle Purchaser to any credit or abatement against the Purchase Price or give rise to any other claim. True copies of all Leases, to the extent in Seller's possession or control, will be delivered or made available to Purchaser upon Purchaser's request and after execution of this Agreement. Seller will not be obligated to enter into and, other than lease renewals in accordance with Section 6.1.2, will not enter into any leases without first obtaining the Purchaser's prior written consent. In the event Purchaser does not consent to the entry by Seller into a residential or commercial lease which is on terms that are commensurate with the market, Purchaser shall, at the Closing, reimburse Seller for the amount of rent that Seller would have earned between the date of such rejection and the Closing Date, which, in the case of a residential space, shall be calculated based on the maximum amount of monthly rent legally permissible for such unit during such period and, in the case of a commercial space, shall be calculated based on the amount of monthly rent that is commensurate with the market rate for such commercial space as of the date of Seller's request for Purchaser's consent to enter into a commercial lease for such space.

**6.2 Damage.**

If prior to Closing the Property is damaged by fire or other casualty, Seller shall estimate the cost to repair and the time required to complete repairs and will provide Purchaser written notice of Seller's reasonable estimation of the cost to repair (the "Casualty Notice") as soon as reasonably possible after the occurrence of the casualty.

**6.2.1    Material.** In the event of any Material Damage (as defined below) to or destruction of the Property or any portion thereof prior to Closing, either Purchaser or Seller at their option, may terminate this Agreement by delivering written notice to the other on or before the expiration of thirty (30) calendar days after the date Seller delivers the Casualty Notice to Purchaser (and if necessary, the Closing Date shall be extended to give the parties the full thirty-day period to make such election and to obtain insurance settlement agreements with Seller's insurers). Upon any such termination, the Earnest Money shall be returned to Purchaser and the parties hereto shall have no further rights or obligations hereunder, other than those that by their terms survive the termination of this Agreement. Upon such release, this Agreement shall be null and void and the parties hereto shall be relieved of all further obligations and liability with respect to the subject matter of this Agreement. If neither party terminates this Agreement within said thirty (30) day period, then the parties shall proceed under this Agreement and close on schedule (subject to extension of Closing as provided above), and as of Closing Seller shall assign to Purchaser, without representation or warranty by or recourse against Seller, all of Seller's rights in and to any resulting insurance proceeds (including any rent loss insurance applicable to any period on and after the Closing Date) due Seller as a result of such damage or destruction and Purchaser shall assume full responsibility for all needed repairs,

and Seller shall receive a credit at Closing for any deductible amount under such insurance policies. For the purposes of this Agreement, "Material Damage" and "Materially Damaged" means damage which, in Seller's reasonable estimation, exceeds, in the aggregate, $3,000,000.00 to repair or which, in Seller's reasonable estimation, will take longer than one hundred and eighty (180) days to repair.

      **6.2.2    Not Material.** If the Property is not Materially Damaged, then neither Purchaser nor Seller shall have the right to terminate this Agreement, and Seller shall, at its sole option, either (i) repair the damage before the Closing in a manner reasonably satisfactory to Purchaser, or (ii) credit Purchaser at Closing for the reasonable cost to complete the repair (in which case Seller shall retain all insurance proceeds and Purchaser shall assume full responsibility for all needed repairs).

### 6.3 Condemnation.

      If proceedings in eminent domain are instituted with respect to the Property or any portion thereof, excluding temporary takings and takings that result in a decrease in the appraised value of less than 5% and do not interfere with the ability to use the remainder of the Property for its current use, either Purchaser or Seller may, at their option, by written notice to the other given within ten (10) days after notification of such proceedings (and if necessary the Closing Date shall be automatically extended to give the party the full ten-day period to make such election), either: (i) terminate this Agreement, in which case the Earnest Money shall be immediately returned to Purchaser and the parties hereto shall have no further rights or obligations, other than those that by their terms survive the termination of this Agreement, or (ii) proceed under this Agreement, in which event Seller shall, at the Closing, assign to Purchaser its entire right, title and interest in and to any condemnation award, and Purchaser shall have the sole right after the Closing to negotiate and otherwise deal with the condemning authority in respect of such matter. If the electing party does not give the other written notice of its election within the time required above, such party shall be deemed to have elected option (ii) above. It is a condition of closing that no condemnation proceedings shall be pending or threatened.

## <u>ARTICLE 7 - Closing</u>

### 7.1 Closing.

      The consummation of the transaction contemplated herein ("Closing") shall occur on the Closing Date at the offices of Seller's counsel  (or  such other location as may be mutually agreed upon by Seller and Purchaser).

### 7.2 Conditions to Parties' Obligation to Close.

      In addition to all other conditions set forth herein, the obligation of Seller, on the one hand, and Purchaser, on the other hand, to consummate the transactions contemplated hereunder are conditioned upon the following:

      **7.2.1    Representations and Warranties.** The other party's representations and warranties contained herein shall be true and correct in all material respects as of the date of this Agreement and the Closing Date except for changes resulting from passage of time (provided that either party may waive the requirement with respect to the other party); and

**7.2.2    Deliveries.** As of the Closing Date, the other party shall have tendered all deliveries described in Sections 7.3 and 7.4 to be made at Closing.

**7.2.3    Bankruptcy Court Approval of Contract and Sale.** The Seller's and Purchaser's respective obligations under this Contract of Sale are subject to approval and order of the United States Bankruptcy Court in the Seller's Chapter 11 case, In re Northeast Brooklyn Partnership, pending in the United States Bankruptcy Court for the Eastern District of New York under Chapter 11 Case No 19-40822 (CEC). In the event such approval is not obtained by June 30, 2020, for any reason, Purchaser may terminate this Agreement and the Earnest Money shall be immediately returned to Purchaser. In the event that the approval is denied by the Bankruptcy Court, this Contract shall automatically be deemed null and void and the Earnest Money shall be returned to Purchaser. Notwithstanding anything to the contrary, in the event the Order of the Bankruptcy Court is not obtained by June 30, 2020 or the Bankruptcy Court does not approve this Agreement or orders a sale to another purchaser, this Contract shall be automatically deemed null and void and the Contract Deposit shall be refunded to the Purchaser.

**7.3 Seller's Deliveries.** On the Closing Date, Seller shall deliver to Purchaser the following:

**7.3.1    Deed.** A bargain and sale deed in the form of Exhibit D attached hereto without covenants in a form acceptable for recordation, executed and acknowledged by Seller including Lien Law 13 provision, conveying to Purchaser Seller's interest in the Real Property (the "Deed");

**7.3.2    Assignment of Leases, Rents and Arrears.** An Assignment of Leases, Rents and Arrears in the form of Exhibit E attached hereto (the "Assignment"), executed and acknowledged by Seller, vesting in Purchaser, without warranty, Seller's right, title and interest in and to the property described therein free of any claims, if any, that are described as a Seller obligation to clear in Section 5.1.1; Purchaser shall assume all obligations of Seller as landlord under any lease or tenancy;

**7.3.3    Deed and Conveyancing or Transfer Tax Forms or Returns.** At the Closing, Seller shall execute, acknowledge, deliver and file all such returns (or, if required by ACRIS E-tax procedures, an electronic version thereof) as may be necessary to comply with Article 31 of the Tax Law of the State of New York and the regulations applicable thereto, and the New York City Real Property Transfer Tax Law (Admin. Code Article 21) and the regulations applicable thereto (collectively, as the same may be amended from time to time, the "Transfer Tax Laws"). The transfer taxes payable pursuant to the Transfer Tax Laws shall collectively be referred to as the "Transfer Taxes". Seller shall pay (or cause to be paid) to the appropriate governmental authority the Transfer Taxes payable in connection with the consummation of the transactions contemplated by this Agreement; provided however, Seller and/or Purchaser shall have the right to claim, and make use of, any exemption from payment of Transfer Taxes that may be available to Seller and/or Purchaser and/or its affiliates (including, without limitation, exemptions available pursuant to the United States Bankruptcy Code) and the parties agrees to cooperate with one another in such claim of exemption;

**7.3.4    FIRPTA.** A Foreign Investment in Real Property Tax Act affidavit executed by Seller;

**7.3.5    Notice to Tenants.** Seller and Purchaser shall deliver to each tenant immediately after the Closing a notice regarding the sale of the Property in substantially the form attached hereto as <u>Exhibit F</u> (the "Notice to Tenants"), or such other form as may be required by applicable state law;

**7.3.6    Possession.** Possession of the Real Property in the condition required by this Agreement, subject to the Leases, and keys therefore;

**7.3.7    Assignment.** A blanket assignment, without recourse or representation, of all Seller's right, title and interest, if any, to all contractors', suppliers', materialmen's and builders' guarantees and warranties of workmanship and/or materials in force and effect with respect to the Property on the Closing Date and a true and complete copy of each thereof;

**7.3.8    Additional Documents.** Any additional documents that the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement (provided, however, no such additional document shall expand any obligation, covenant, representation or warranty of Seller or result in any new or additional obligation, covenant, representation or warranty of Seller under this Agreement beyond those expressly set forth in this Agreement). In addition, the Seller shall deliver the following:

(i)    A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

(ii)    A schedule of all security deposits.

(iii)    To the extent in Seller's possession, a list setting forth the dates and extent of the last painting and decorating in each of the apartments painted by the Seller.

(iv)    The Section 8 contract to the extent in Seller's possession or control, but in any event the voucher showing the case number or voucher number for the Section 8 tenant.

(v)    An assignment of all rent arrears and landlord/tenant causes of action and an assignment of all of Seller's rights in and to the Lease containing, among other provisions, Seller's agreement indemnifying and agreeing to defend Purchaser from and against any claims made by tenants with respect to any failure to perform its obligations prior to the Closing.

**7.3.9    Estoppel Certificates and Subordination Agreements.** Seller shall request and use commercially reasonable efforts to obtain and deliver to Purchaser prior to Closing, written estoppel certificates, from each of the commercial tenants (a signed certificate is referred to herein as a "<u>Tenant Estoppel</u>"). The receipt of any Tenant Estoppels shall not be a condition precedent to Purchaser's obligation to proceed to Closing under this Agreement.

**7.4 Purchaser's Deliveries.** On the Closing Date, Purchaser shall deliver to Seller the following:

**7.4.1    Assignment of Leases, Rents and Arrears.** The Assignment executed

and acknowledged by Purchaser. Purchaser shall assume all obligations of Seller as landlord under any lease or tenancy;

      **7.4.2   Conveyancing or Transfer Tax Forms or Returns.** At the Closing, Purchaser shall execute, acknowledge and deliver to Seller all such returns (or, if required by ACRIS E-tax procedures, an electronic version thereof) as may be necessary to comply with the Transfer Tax Laws. The parties agree to cooperate in such claim of exemption from Transfer Taxes as described in Section 7.3.3;

      **7.4.3   Additional Documents.** Any additional documents that Seller or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement (provided, however, no such additional document shall expand any obligation, covenant, representation or warranty of Purchaser or result in any new or additional obligation, covenant, representation or warranty of Purchaser under this Agreement beyond those expressly set forth in this Agreement);

      **7.4.4   Purchase Price.** At or before 5:00 p.m. local time on the Closing Date, Purchaser shall deliver to Seller the Purchase Price, less the Earnest Money that is applied to the Purchase Price, plus or minus applicable prorations, if any, in immediately available U.S. federal funds wired for credit into Seller's account. Adjustments may be paid by attorney escrow checks; and

      **7.4.5   Notice to Tenants.** Following the transfer of title to Purchaser, Purchaser shall deliver to each Tenant the Notice to Tenants or such other form as may be required by applicable state law.

### 7.5 Closing Statements.

      Seller and Purchaser shall agree to adjustments and a form of closing statement at least two (2) business days prior to Closing. As of or prior to the Closing Date, Seller and Purchaser shall deliver to the other executed closing statements consistent with this Agreement.

### 7.6 Possession.

      Seller shall deliver possession of the Property to Purchaser at the Closing in the condition required pursuant to the express terms of this Agreement.

### 7.7 Delivery of Books and Records.

      On or before the Closing Date, Seller shall deliver to the offices of Purchaser's property manager to the extent in Seller's or its property manager's possession or control: lease files; maintenance records and warranties; plans and specifications; licenses, permits and certificates of occupancy; copies or originals of all books and records of account, contracts, and copies of correspondence with tenants and suppliers; receipts for deposits, unpaid bills and other papers or documents which pertain to the Property; all advertising materials; booklets, keys, and other items, if any, used in the operation of the Property. Seller shall make available to the Purchaser, prior to and/or after the Closing of title at any time upon reasonable notice, at the Seller's office, all records of the Seller, or the Seller's agents, in connection with the

management and operation of the Property, and to loan to the Purchaser all paid bills, vouchers, cancelled checks, and other documentation as may be reasonably requested by Purchaser. Purchaser shall reimburse Seller for all reasonable out of pocket costs incurred by Seller.

## **ARTICLE 8 - Prorations, Deposits, Commissions**

### **8.1 Prorations.**

**8.1.1**    As of the close of business on the day prior to the Closing, the following items shall be prorated with all items of income and expense for the Property being borne by Purchaser from and after (but including) the date of Closing: Rents and other income and rents that have been collected by Seller as of Closing; transferable licenses or permits, fees and assessments, prepaid expenses and obligations under and Non-Terminable Contracts and Service Contracts assumed in writing by Purchaser; real estate taxes ("Taxes"), if any; water and sewer and utility charges; and all other items customarily apportioned in connection with the sale of properties similarly located. With respect to any Rents that have not been collected, the parties agree that Purchaser shall purchase any of Seller's rent  arrears by paying to Seller an amount equal to the following amount of the arrears: 75% for arrears that are less than thirty (30) days past due; 50% for arrears that are more than thirty (30) days but less than sixty-one (61) days; 12.5% for arrears that are more than sixty (60) days but less than ninety (90) days; and 0% for arrears that are more than ninety (90) days.

**8.1.2    Taxes.** Seller shall pay any and all real property taxes owed related to commercial square footage portions of the Property from prior and as of the closing date. Any and all payments made pursuant to this Section shall be separate and apart from the Purchase Price.

**8.1.3    Utilities.** Purchaser shall take all steps necessary to effectuate the transfer of all utilities to its name as of the Closing Date, and where necessary, post deposits with the utility companies. Seller shall ensure that all utility meters are read as of the Closing Date, provided that if meter readings are not available, the adjustment will be estimated based on prior usage. Seller shall be entitled to recover any and all deposits held by any utility company as of the Closing Date.

### **8.2 Closing Costs.**

Closing costs shall be allocated between Seller and Purchaser in accordance with Section 1.2.

**8.3 Final Adjustment After Closing**.

If final bills are not available or cannot be issued prior to Closing for any item being prorated under <u>Section 8.1</u>, then Purchaser and Seller agree to allocate such items on a fair and equitable basis as soon as such bills are available, final adjustment to be made as soon as reasonably possible after the Closing. Payments in connection with the final adjustment shall be due within thirty (30) days of written notice. All such rights and obligations shall survive the Closing for a period of three (3) months.

**8.4 Tenant Deposits.**

All tenant security deposits, for residential tenants, and security received by the Seller and  not applied by Seller (and interest thereon if required by law or contract) shall be transferred to  Purchaser at Closing or credited against the Purchase Price, except for those security deposits  applied by Seller in accordance with the terms of the applicable lease. As of the Closing, Purchaser shall assume Seller's obligations related to tenant security deposits. Seller shall not  apply any security deposits unless the tenant has vacated the space.

**8.5 Commissions.**

Seller shall be responsible to Broker for a real estate sales commission at Closing in accordance with a separate agreement between Seller and Broker. Broker may share its commission with any other licensed broker involved in this transaction, but the payment of the

commission by Seller to Broker shall fully satisfy any obligations of Seller to pay a commission hereunder. Under  no circumstances shall Seller  owe  a commission or  other  compensation directly to any other broker, agent or person. Any cooperating broker shall not be an affiliate, subsidiary or related in any way to Purchaser. Neither party engaged with any other broker and if representation is not true, said party will indemnify the other party from any claims for commissions, fees or other compensation or reimbursement for expenses made by a broker engaged by or claiming to have dealt such party in connection with this Agreement.

## <u>ARTICLE 9 - Representations and Warranties</u>

**9.1 Seller's Representations and Warranties.**

To Seller's knowledge, Seller represents and warrants to Purchaser as follows, which shall be true, complete and accurate as of the date hereof and on the Closing Date, except for changes resulting from the passage of time:

**9.1.1   Organization and Authority.** Seller has been duly organized, is validly existing and in good standing in the state in which it was formed. Seller has the full right and authority and has obtained any and all consents required to  enter into this Agreement and to consummate or cause to be consummated the transactions  contemplated hereby. All of the documents to be  delivered by Seller at the Closing will be authorized and executed will constitute, as appropriate,  the valid and binding obligation of Seller, enforceable in accordance with their

terms.

**9.1.2   Conflicts and Pending Actions.** There is no agreement to which Seller is a party or, to Seller's knowledge, that is binding on Seller which is in conflict with this Agreement. Except as provided in Section 12.19, to Seller's knowledge, the execution and delivery by Seller of, and the performance and compliance by Seller with the terms and provisions of, this Agreement do not violate any of the terms, conditions or provisions of (i) its agreement of limited partnership, or (ii) its other limited partnership organizational documents. Subject to the terms of those certain Land Disposition Agreements, the Regulatory Agreements (the "Regulatory Agreements"), the execution and delivery of this Agreement and the performance of its obligations hereunder by Seller will not conflict with any provision of any law or regulation to which Seller is subject or any agreement or instrument to which Seller is a party or by which it is bound or any order or decree applicable to Seller or result in the creation or imposition of any lien on any of Seller's assets or property which would materially and adversely affect the ability of Seller to carry out the terms of this Agreement, provided that Seller has or will have obtained any consent, approval, authorization or order of the City of New York, any court or governmental agency or body, in each case, if and to the extent required for the execution, delivery or performance by Seller of this Agreement.

**9.1.3   Notices from Governmental Authorities.** To Seller's knowledge, Seller has not received from any governmental authority written notice of any material violation of any laws applicable (or alleged to be applicable) to the Property, or any part thereof, that has not been corrected, except (i) as may be reflected by the Property Documents and/or the Report of Title or otherwise disclosed in writing to Purchaser or (ii) violations that Purchaser has agreed to take subject to in accordance with Article 5.

**9.1.4   Litigation.** Seller has not received any notice of (nor to its knowledge are) any actions, suits, or legal proceedings pending or expressly threatened in writing against or affecting Seller (in respect of the Property) or the Property, at law or equity which might materially and adversely affect Seller's ability to transfer the Property in accordance with this Agreement.

**9.1.5   Work Order by Seller.** At the time of Closing, all work ordered by Seller with regard to the Premises shall have been paid for and no mechanic's lien(s) shall be filed either prior to Closing or in the future against the Premises as a result of work performed at the request of Seller or if filed shall be removed of record by bonding.

**9.1.6   Residential Rent Rolls.** To the best of Seller's knowledge, all residential tenancies under Leases at the Property as of the date set forth on Exhibit G ("Residential and Commercial Rent Roll"), the apartment leased, the security deposits held by Seller, expiration dates, rental concessions, the rental amounts, arrears in excess of thirty (30) days and the payment of rents more than thirty (30) days in advance of the date due, if any, are identified on Exhibit G. The information concerning written leases and any tenancies in the Property not arising out of the Leases (collectively, "Tenancies") is accurate as of the date set forth therein and there are no Leases or Tenancies of any space in the Property other than those set forth therein. Such Exhibit sets forth with respect to each Lease (i) the rent control/rent stabilization status of each of the apartment and whether any of the apartments are vacant or occupied by Tenants paying market rents and (ii) whether any apartment qualifies for a SCRIE or DRIE or is subject to a Section 8 tenancy. The rents set forth on the Rent Schedule are the current rents

being billed to the Tenants and are currently being collected by the Seller as landlord and there are no rentals more than thirty (30) days past due except as shown on the Rent Schedule. Except as shown on the Rent Schedule with respect to the preferential rents, no tenant has been given any concession or consideration for the rental of any space; no utilities are included in any rent; each tenant pays his, her or its own electric; gas for the apartments is master metered; and none of the apartments are rented furnished or for professional purposes.

**9.1.7** In addition Seller further warrants and represents that Seller has paid, or shall have paid at Closing, all costs required to be paid by the landlord in connection with the leasing and preparation of space and has paid all such obligations for brokerage commissions and finders' fees incurred in entering into the leases of the tenants listed on the Rent Schedule) and there is no agreement with any third party that will require any payment in connection with the renewal of any of the Leases. Except as otherwise set forth in the Rent Schedule or elsewhere in this Agreement:

(a)    all of the Leases are in full force and effect and none of them has been modified, amended or extended;

(b)    no renewal or extension option or options for additional space have been granted to tenants, other than as required by Law with respect of any renewals required of any tenant of a residential unit;

(c)    no tenant has an option to purchase the Property or a right of first refusal or first offer with respect to a sale of the Property;

(d)    there are no security deposits other than those set forth in the Rent Schedule and the security deposits are consistent with the amounts set forth in the Leases;

(e)    true and complete copies of the Leases have been delivered to Purchaser or its counsel and initialed by representatives of Purchaser and Seller and there are no Leases or Tenancies of any space in the Property other than those set forth therein and the Leases represent the entire agreement between Seller, as landlord, and the tenant thereunder for the apartment or space covered by the respective Lease;

(f)    [omitted];

(g)    Seller has not been notified that it is in default of its obligations under the Leases has been given or to the knowledge of Seller is pending;

(h)    Except as required by law and in accordance with Section 6.1.2, the Seller agrees not to execute a Lease without the express written consent of Purchaser. In the event Purchaser does not consent to the entry by Seller into a residential or commercial lease which is on terms that are commensurate with the market, Purchaser will reimburse Seller for the amount of rent that Seller would have earned between the date of such rejection and the Closing Date.

(i)    Except as ordered by the court or other governmental entity (and other than any NYC Disability Rent Increase Exemption ("DRIE") program and NYC Senior Citizen Rent Increase Exemption ("SCRIE") program benefits received by any tenant as set forth in the attached Exhibit "G"), no Tenant is entitled to rental concessions or abatements for any period subsequent to the Closing Date;

(j)    Seller has not made any material alterations or additions to the Property or the apartments without compliance with all applicable law;

(k)    Seller has received no notice that as to any tenant any action or proceeding, voluntary or involuntary, is pending against any tenant under any bankruptcy or insolvency act;

(l)    All requisite fees in connection with any HCR filings have been or will be paid therewith have been paid to the HCR, Seller has complied with all applicable HCR regulations and the rent restrictions set forth in the Regulatory Agreements and the New York State Rent Stabilization Law. The Seller will re-register the rents for the apartments at the Property with the HCR, if required, and will cause all other required registrations to be made between the date of this Agreement and the date of closing of title, and shall pay all requisite fees in connection therewith. Seller will deliver at closing of title all registration forms, proof of mailing or delivery to each tenant and proof of payment of all requisite fees described above for each year that filing was required by law to the extent in Seller's possession or under its control. Seller agrees to provide Purchaser or Purchaser's attorney with written authorization allowing the HCR to release rent registration records, including records related to the MBR's and MCR's to Buyer or its attorneys for examination prior to closing of title. To the best of Seller's knowledge, since the said registrations, there have been no diminutions of services and equipment and none will be suffered by the Seller through the Closing; to the best of Seller's knowledge no tenant has been given any concession or consideration for the rental of any space, no utilities are included in any rent and that none of the apartments are rented furnished or for professional purposes;

(m)    All rents being charged do not materially exceed the amount that is permitted by law, including the Regulatory Agreement;

(n)    Seller is not aware of any tenants are entitled to abatements as senior citizens except as may be set forth in the Rent Schedule;

(o)    Except as otherwise set forth in the Rent Schedule attached hereto, each apartment contains a range and a refrigerator, and all of the ranges and refrigerators and all of the items of personal property (or replacements thereof) are and on the Closing will be owned by Seller free of liens and encumbrances and shall be in working order;

(p)    In all cases where rents have been increased by reason of additional services, equipment, or renovations, same have actually been furnished and installed and fully paid for and none of the rentals reflect or include a sum allowed for increased occupancy or subleasing;

(q)    Seller has not been notified that any tenant in the Property is not an Eligible Tenant as required pursuant to the Regulatory Agreement nor has the City of New York notified Seller that the City of New York has elected to enforce any rights it might have under the Regulatory Agreement;

(r)    To Seller's actual knowledge, there are no pending harassment proceedings before any administrative agency or any court of competent jurisdiction, and there

have been no harassments filed against the Property or Seller during the two (2) years prior to the date of this Agreement;

(s)    There are no union contracts affecting any employees. Seller will not enter into any union contract or other union agreement that will be binding upon Purchaser at Closing. The non-union resident superintendent occupies an apartment in connection with his employment as a superintendent and is not entitled to occupancy as a rent regulated tenant.

(t)    For the past twelve (12) months there has been no organized rent strike or joint action by tenants' groups to withhold rent from any Seller;

(u)    Seller will timely file all necessary financial statements, including, without limitation, New York City Real Property Income and Expense Statement with the City of New York, if the same are due prior to Closing, and if Seller does not file by the Closing, it shall be responsible for any fines or penalties that are incurred as a result thereof.

**9.1.8**    If there is any litigation pending for the reduction of any of the rentals or a complaint alleging a reduction of services or if any are filed prior to the closing of title the Seller will notify Purchaser of same prior to Closing at the Seller's own cost and expense.

**9.1.9    Commercial Rent Rolls.** To the best of Seller's knowledge, all commercial tenancies under Leases at the Property as of the date set forth on Exhibit H, the unit leased, the security deposits held by Seller, expiration dates, rental concessions, the rental amounts, arrears in excess of thirty (30) days and the payment of rents more than thirty (30) days in advance of the date due, if any, are identified on Exhibit H. Seller further warrants and represents Seller has paid, or shall have paid at Closing, all costs required to be paid by the landlord in connection with the leasing and preparation of space and has paid all such obligations for brokerage commissions and finders' fees incurred in entering into the leases of the tenants listed on the Rent Schedule and there is no agreement with any third party that will require any payment in connection with the renewal of any of the Leases.

**9.1.10    No Assessments.** Except as set forth on tax bills for the Property, there are no special or other assessments for public improvements now affecting the Property, nor, to Seller's knowledge, are there any pending or threatened special assessments which would affect the Property.

**9.1.11    No Condemnation.** Seller has not received written notice of any pending or threatened condemnation or eminent domain proceedings relating to or affecting the Property.

**9.1.12    FIRPTA**. Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the **"**Code**"**).

**9.1.13    OFAC**. Seller is not, and will not become, a person or entity with whom United States persons or entities are restricted or prohibited from doing business under regulations of the Office of Foreign Asset Control (**"**OFAC**"**) of the Department of the Treasury (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or

transactions or be otherwise associated with such persons or entities.

**9.1.14  Existing Mortgage**.  Intentionally Omitted.

**9.1.15  Environmental Laws.** Other than with respect to environmental control board violations, Seller has not received any written notice from any governmental unit that it or the Property is not in compliance with any environmental law or that it has any liability with respect thereto, and there are no administrative, regulatory or judicial proceedings pending or to the best of Seller's knowledge threatened with respect to the Property alleging any violations of, or liability under any environmental law.

**9.2 Purchaser's Representations and Warranties.**

Purchaser represents and warrants to Seller that:

**9.2.1    Organization and Authority.** Purchaser has been duly organized and is validly existing as a limited liability company in good standing in the State of New York and is qualified to do business in the state of New York. Purchaser has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Purchaser at the Closing will be, authorized and properly executed and constitute, or will constitute, as appropriate, the valid and binding obligation of Purchaser, enforceable in accordance with their terms.

**9.2.2**    Purchaser is not now nor shall it be at any time prior to or at the Closing an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity (collectively, a "Person") with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "U.S. Person"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC "Specially Designated Nationals and Blocked Persons") or otherwise. Neither Purchaser nor any Person who owns an interest in Purchaser (other than the owner of publicly traded shares) (collectively, a "Purchaser Party") is now nor shall be at any time prior to or at the Closing a Person with whom a U.S. Person, including a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended ("Financial Institution"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

9.2.2.1.1    Neither Purchaser nor any Purchaser Party, nor any Person providing funds to Purchaser: (A) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined); (B) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (C) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. For purposes of this Subsection (f), the term "Anti-Money Laundering Laws" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

**9.2.3 Conflicts and Pending Action.** There is no agreement to which Purchaser is a party or to Purchaser's knowledge binding on Purchaser which is in conflict with  this Agreement. There is no action or proceeding pending or, to Purchaser's knowledge,  threatened against Purchaser which challenges or impairs Purchaser's ability  to execute or  perform its obligations under this Agreement.

**9.3 Survival of Representations and Warranties.**

The representations and warranties set forth in this Article 9 are made as of the date of this Agreement and are remade as of the Closing  Date and shall not be deemed to be merged into or waived by the instruments of Closing. Terms such as "to Seller's knowledge," "to the best of Seller's knowledge" or like phrases mean the  actual present and conscious awareness or knowledge of Seller ("Property Manager" or "Manager"), without any duty of inquiry or investigation; provided that so qualifying Seller's  knowledge shall in no event give rise to any personal liability on the part of Property Manager or  any other  officer or employee of Seller, on account of any breach of any representation or  warranty made by Seller herein. Said terms do not include constructive knowledge, imputed knowledge, or knowledge Seller or such persons do not have but could have obtained through  further investigation or inquiry. No broker, agent, or party other than Seller is authorized to  make any representation or warranty for or on behalf of Seller.

## **ARTICLE 10 - Default and Remedies**

**10.1    Seller's Remedies.**

If Purchaser fails to perform its obligations pursuant to this Agreement at or prior to Closing and fails to close for any reason except failure by Seller to perform hereunder, Seller

shall be entitled, as its sole remedy in any and all events (except as provided in <u>Section 4.6</u> hereof), to terminate this Agreement and retain the Earnest Money as liquidated damages. Seller shall be entitled to retain such Earnest Money as liquidated damages and not as penalty, in full satisfaction of claims against Purchaser hereunder. Seller and Purchaser agree that Seller's damages resulting from Purchaser's default are difficult, if not impossible, to determine and the Earnest Money is a fair estimate of those damages which has been agreed to in an effort to cause the amount of such damages to be certain.

**10.2    Purchaser's Remedies.**

If Seller fails to perform its obligations pursuant to this Agreement for any reason except failure by Purchaser to perform hereunder, Purchaser shall elect, as its sole remedy, either to (i) terminate this Agreement by giving Seller timely written notice of such election prior to or at Closing and Purchaser shall be entitled to a return of the Earnest Money or (ii) waive said failure or breach and proceed to Closing without reduction in the Purchase Price except as otherwise provided for herein or (iii) bring an action for specific performance. Purchaser's remedies shall be limited to those described in this <u>Section 10.2</u> hereof. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IN NO EVENT SHALL SELLER'S OR PURCHASER'S DIRECT OR INDIRECT PARTNERS, MEMBERS, SHAREHOLDERS, OWNERS OR AFFILIATES, ANY OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF SELLER OR THE FOREGOING, OR ANY AFFILIATE OR CONTROLLING PERSON THEREOF HAVE ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROPERTY, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE.

**10.3    Notice and Right to Cure.**

In the event that either Purchaser or Seller declares a default against the other, notice of default shall be given in accordance with the Notice provision of this Agreement and the recipient of the default notice shall have ten (10) days from the date the notice is given to cure the default.

<u>**ARTICLE 11 - Disclaimers, Release and Indemnity**</u>

**11.1    Disclaimers By Seller.**

Except as expressly set forth in this Agreement, it is understood and agreed that Seller has not at any time made and is not now making, and it specifically disclaims, any warranties or representations of any kind or character, express or implied, with respect to the Property, including, but not limited to, warranties or representations as to (i) matters of title, (ii) environmental matters relating to the Property or any portion thereof, including, without limitation, the presence of Hazardous Materials in, on, under or in the vicinity of the Property, (iii) geological conditions, including, without limitation, subsidence, subsurface conditions, water table, underground water reservoirs, limitations regarding the withdrawal of water, and geologic faults and the resulting damage of past and/or future faulting, (iv) whether, and to the extent to which the Property or any portion thereof is affected by any stream (surface or underground) body of water, wetlands, flood prone area, flood plain, floodway or special flood hazard, (v) drainage, (vi) soil conditions, including the existence of instability, past soil repairs, soil additions or conditions of soil fill, or susceptibility to landslides, or the sufficiency of any

undershoring, (vii) the presence of endangered species or any environmentally sensitive or protected areas, (viii) zoning or building entitlements to which the Property or any portion thereof may be subject, (x) usages of adjoining property, (xi) access to the Property or any portion thereof, (xii) the value, compliance with the plans and specifications, size, location, age, use, design, quality, description, suitability, structural integrity, operation, title to, or physical or financial condition of the Property or any portion thereof, or any income, expenses, charges, liens, encumbrances, rights or claims on or affecting or pertaining to the Property or any part thereof, (xiii) the condition or use of the Property or compliance of the Property with any or all past, present or future federal, state or local ordinances, rules, regulations or laws, building, fire or zoning ordinances, codes or other similar laws, (xiv) the existence or non-existence of underground storage tanks, surface impoundments, or landfills, (xv) the merchantability of the Property or fitness of the Property for any particular purpose, (xvi) the truth, accuracy or completeness of the Property Documents, (xvii) tax consequences, or (xviii) any other matter or thing with respect to the Property.

**11.2    Sale "As Is, Where Is."**

Purchaser acknowledges and agrees that upon Closing, Seller shall sell and convey to Purchaser and Purchaser shall accept title and the Property "AS IS, WHERE IS, WITH ALL FAULTS as of the date hereof less reasonable wear and tear and casualty loss" subject to all restrictions and regulations. Purchaser has not relied and will not rely on, and Seller has not made and is not liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Property or relating thereto (including specifically, without limitation, Property information packages distributed with respect to the Property) made or furnished, whether on, prior to or subsequent to the Effective Date, by Seller, or any real estate broker, agent or third party representing or purporting to represent Seller, to whomever made or given, directly or indirectly, orally or in writing. Purchaser represents that it is a knowledgeable, experienced and sophisticated purchaser of real estate and that, except as expressly set forth in this Agreement, it is relying solely on its own expertise and that of Purchaser's consultants in purchasing the Property and shall make an independent verification of the accuracy of the Property Documents provided by Seller. Purchaser will conduct such inspections and investigations of the Property as Purchaser deems necessary, including, but not limited to, the physical and environmental conditions thereof, and shall rely upon same; provided, however, that in no event shall Purchaser's right to conduct inspections or investigations have any effect on the limitations provided in Section 4.1. Purchaser acknowledges that Seller has afforded Purchaser a full opportunity to conduct such investigations of the Property as Purchaser deemed necessary to satisfy itself as to the condition of the Property and the existence or non-existence or curative action to be taken with respect to any Hazardous Materials (as defined below) on or discharged from the Property, and will rely solely upon same and not upon any information provided by or on behalf of Seller or its agents or employees with respect thereto, other than such representations, warranties and covenants of Seller as are expressly set forth in this Agreement. As of the Effective Date, Purchaser hereby assumes the risk that adverse matters, including, but not limited to, adverse physical or construction defects or adverse environmental, health or safety conditions, may not have been revealed by Purchaser's inspections and investigations or the title report prepared by the Title Company described in Section 1.1.5.

### 11.3    Seller Released from Liability.

Purchaser acknowledges that it had the opportunity to inspect the Property prior to the date of this Agreement, and during such period, observe its physical characteristics and existing conditions and the opportunity to conduct such investigation and study on and of the Property and adjacent areas as Purchaser deems necessary, and Purchaser hereby FOREVER RELEASES AND DISCHARGES Seller from all responsibility and liability, including without limitation, liabilities under the Comprehensive Environmental Response, Compensation and Liability Act Of 1980 (42 U.S.C. Sections 9601 et seq.), as amended ("CERCLA"), the New York State Environmental Quality Review Act (N.Y. Environmental Conservation Law § 8 (McKinney 2011), et seq.), as amended ("SEQR") and the New York City Environmental Quality Review (2 RCNY § 1-04 et seq .), as amended ("CEQR") regarding the condition (including, without limitation, the presence in the soil, air, structures and surface and subsurface waters, of Hazardous Materials or other materials or substances that have been or may in the future be determined to be toxic, hazardous, undesirable or subject to regulation and that may need to be specially treated, handled and/or removed from the Property under current or future federal, state and local laws, regulations or guidelines), valuation, salability or utility of the Property, or its suitability for any purpose whatsoever. Purchaser further hereby WAIVES any and all objections to or complaints regarding (including, but not limited to, federal, state and common law based actions), or any private right of action under, state and federal law to which the Property is or may be subject, including, without limitation, structural and geologic conditions, subsurface soil and water conditions and solid and hazardous waste and Hazardous Materials on, under, adjacent to or otherwise affecting the Property. Purchaser further hereby assumes the risk of changes in applicable laws and regulations relating to past, present and future environmental conditions on the Property and the risk that adverse physical characteristics and conditions, including, without limitation, the presence of Hazardous Materials or other contaminants, may not have been revealed by its investigation.

### 11.4    "Hazardous Materials" Defined.

For purposes hereof, "Hazardous Materials" means "Hazardous Material," "Hazardous Substance," "Pollutant or Contaminant," and "Petroleum" and "Natural Gas Liquids," as those terms are defined or used in Section 101 of CERCLA, SEQR or CEQR and any other substances regulated under federal, state or local law because of their effect or potential effect on public health and the environment, including, without limitation, PCBs, lead paint, mold, fungi, asbestos, urea formaldehyde, radioactive materials, putrescible, and infectious materials.

### 11.5    Survival.

The terms and conditions of this Article 11 shall expressly survive the Closing, not merge with the provisions of any closing documents and effective as of the Closing shall hereby be automatically deemed incorporated into the Deed without further action needed.

Purchaser acknowledges and agrees that the disclaimers and other agreements set forth herein are an integral part of this Agreement and that Seller would not have agreed to sell

the Property to Purchaser for the Purchase Price without the disclaimers and other agreements set forth above.

## ARTICLE 12 - Miscellaneous

**12.1    Parties Bound; Assignment.**

This Agreement, and the terms, covenants, and conditions herein contained, shall inure to the benefit of and be binding upon the heirs, personal representatives, successors, and permitted assigns of each of the parties hereto. Notwithstanding anything to the contrary, Purchaser may not assign this Agreement, or any of its rights hereunder, in whole or in part, or any direct or indirect ownership interests in Purchaser without written consent of Seller, which consent may be granted or denied by Seller in its sole discretion; provided that no consent shall be required for any assignment to (i) an entity in which Larry Hirschfeld has a controlling interest(ii) an entity in which Larry Hirschfeld is the managing member or (iii) an Article XI Housing Development Fund Company which Purchaser controls.

**12.2    Headings.**

The article, section, subsection, paragraph and/or other headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

**12.3    Invalidity and Waiver.**

If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and, to the greatest extent legally possible, effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

**12.4    Governing Law.**

This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the State of New York.

**12.5    Survival.**

Only obligations which are expressly stated in this Agreement to survive Closing shall survive delivery of the deed to Purchaser.

**12.6    Entirety and Amendments.**

This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property.  This Agreement

may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

**12.7    Reserved.**

**12.8    Confidentiality.**

Neither party shall make any public announcement or disclosure of any information related to this Agreement to outside brokers or third parties, before or after the Closing, without the prior written specific consent of the other party; provided, however, that Purchaser may, subject to the provisions of <u>Section 4.8</u>, make disclosure of this Agreement to its Permitted Outside Parties as necessary to perform its obligations hereunder and as may be required under laws or regulations applicable to Purchaser and/or investors interested in this transaction.

**12.9    Notices.**

All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in <u>Section 1.3</u>. Any such notices shall, unless otherwise provided herein, be given or served (i) by depositing the same in the United States mail, postage paid, certified and addressed to the party to be notified, with return receipt requested, (ii) by overnight delivery using a nationally recognized overnight courier or (iii) by personal delivery**.** Notice deposited in the mail in the manner hereinabove described shall be effective on the third (3rd) business day after such deposit. Notice given in any other manner shall be effective only if and when received by the party to be notified between the hours of 8:00 a.m. and 5:00 p.m. of any business day with delivery made after such hours to be deemed received the following business day. A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice. Notices given and received by counsel to the Purchaser shall be deemed given or received by Purchaser and notices given or received by counsel to the Seller shall be deemed given or received by Seller.

**12.10    Construction.**

The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and agree that the normal rule of construction – to the effect that any ambiguities are to be resolved against the drafting party – shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

**12.11    Calculation of Time Periods.**

Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday for national banks in New York, in which event the period

shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday.  The last day of any period of time described herein shall be deemed to end at 5:00 p.m.

### 12.12   Execution in Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. To facilitate execution of this Agreement, the parties may execute and exchange by e-mail PDF counterparts of the signature pages, provided that executed originals thereof are forwarded to the other party on the same day by any of the delivery methods set forth in <u>Section 12.9</u> other than facsimile.

### 12.13   No Recordation.

Without the prior written consent of Seller, there shall be no recordation of either this Agreement or any memorandum hereof, or any affidavit pertaining hereto, and any such recordation of this Agreement or memorandum or affidavit by Purchaser without the prior written consent of Seller shall constitute a default hereunder by Purchaser, whereupon Seller shall have the remedies set forth in <u>Section 10.1</u> hereof, provided, however, that Purchaser may file a memorandum of contract at any time after an uncured default by Seller hereunder.

### 12.14   Further Assurances.

In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by either party at Closing, each party agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Property to Purchaser.

### 12.15   Discharge of Obligations.

The acceptance of the Deed by Purchaser shall be deemed to be a full performance and discharge of every representation and warranty made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except those which are herein specifically stated to survive Closing.

### 12.16   No Third Party Beneficiary.

The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing, except that a tenant of the Property may enforce Purchaser's indemnity obligation.

12.17       To the extent that the Seller has copies of original renovation plans for any of the Premises, Seller shall provide the same to the Purchaser at or prior to Closing.

SIGNATURE PAGE TO AGREEMENT
OF PURCHASE AND SALE
BY AND BETWEEN

Northeast Brooklyn Partnership,

AND

27 BED STUY LLC

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year written below.

**SELLER:**

NORTHEAST BROOKLYN PARTNERSHIP
By: Cheryl's Villa Housing Corporation, as General Partner

By: Jeffrey Dunston, President

**PURCHASER:**

27 BED STUY LLC

By: _____
Name:  Larry Hirschfield
Title:   President


## JOINDER BY ESCROW AGENT

Escrow Agent has executed this Agreement in order to confirm that Escrow Agent has received and shall hold the Earnest Money required to be deposited under this Agreement and the interest earned thereto, in escrow, and shall disburse the Earnest Money, and the interest earned thereon, pursuant to the provisions of this Agreement.


ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP


By_____
   Mark J. Caruso, Esq.
   Partner

## <u>LIST OF EXHIBITS</u>

A.  Property Description

B.  List of Service Contracts

C.  Property Documents

D.  Bargain and Sale Deed

E.  Assignment of Leases, Rents and Arrears

F.  Notice to Tenants

G.  Residential and Commercial Rent Roll

## EXHIBIT A – Property Description (the "Land")

| Limited Partnership (Seller) | Address | Block | Lot | County | Subject to Tax Lot Reapportionment |
|---|---|---|---|---|---|
| Northeast Brooklyn/Cheryl's Villa | 399 Kosciuszko Street | 1601 | 55 | Kings | |
| Northeast Brooklyn/Cheryl's Villa | 399 Kosciuszko Street | 1601 | 55 | Kings | |
| Northeast Brooklyn/Cheryl's Villa | 403 Kosciuszko Street | 1601 | 53 | Kings | |
| Northeast Brooklyn/Cheryl's Villa | 409 Kosciuszko Street | 1601 | 50 | Kings | |
| Northeast Brooklyn/Cheryl's Villa | 675 Halsey Street | 1663 | 86 | Kings | |
| Northeast Brooklyn/Cheryl's Villa | 671 Halsey Street | 1663 | 88 | Kings | |

## **EXHIBIT B – Service Contracts**

None.

## **EXHIBIT C – Property Documents**

Part of CPEX Bid Package

1.  Combined Portfolio Income and Expenses
2.  Overview, Income and Expenses per entity (Northeast Brooklyn Partnership aka Cheryl's Villa,
3.  NEBHDCo. Property Roll-Up (includes a list of all properties, residential units, commercial units, total building sq.ft., total lot sq.ft. and air rights, if any)
4.  Combined Portfolio Residential Unit Count
5.  Combined Portfolio Bedroom Count
6.  Retail Rental Summary
7.  Historical Residential Turnover Analysis
8.  Low Income Housing Tax Credit (LIHTC) Rent and Income Limits (2016)
9.  Superintendents Apartment Summary

Provided Separately to Purchaser

1.  Retail Leases
2.  Retail Lease Abstracts
3.  Current DHCR's
4.  Regulatory Agreements (Northeast Brooklyn Partnership aka Cheryl's Villa,
5.  Certificate of Occupancy's (Northeast Brooklyn Partnership aka Cheryl's Villa,
6.  Property violations summary
7.  Current Profit and Loss Statements
8.  Current Unaudited Financials
9.  Curent Audited Financials
10. NEBHDCo. Year 15 Underwriting
11. Capital Improvement Documentation (Northeast Brooklyn Partnership aka Cheryl's Villa,
12. J51 Abatement Documentation (Northeast Brooklyn Partnership aka Cheryl's Villa)

### EXHIBIT D – Bargain and Sale Deed

### DEED

**This Indenture**, made [                    ], 2019, between NORTHEAST BROOKLYN PARTNERSHIP, A New York State limited partnership, c/o NEBHDCo. 132 Ralph Avenue, Brooklyn, NY 11233, Attention: Jeffrey Dunston, CEO, party of the first part, and 2 7 B E D S T U Y  L L C ,  c / o  ELH Mgmt. LLC, a New York State limited liability company with offices at 16 Court Street, Suite 800, Brooklyn, NY 11241,

**Witnesseth**, that the party of the first part, in consideration of One Dollar ($1.00) and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County, City and State of New York and as more particularly described in Schedule A annexed hereto and hereby made a part hereof;

Said Premises also being commonly known as and by street addresses: As set forth on annexed schedules.

Said Premises being the Premises conveyed to the Grantor herein by deed, dated [June 27, 1991, recorded August 13, 1991, in the Office of the City Register of the City of New York, County of Kings, in Reel 2729 Page 1063]

**Together** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; **Together** with the

_____

appurtenances and all the estate and rights of the party of the first part in and to said premises; **To Have And To Hold** the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

And the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

And this conveyance has been made with the affirmative consent of the holders of all of the outstanding shares of the  general partners  of  the  party  of  the  first part and  the  applicable regulatory bodies.

*[Remainder of page intentionally left blank]*

**In Witness Whereof**,  this deed has been duly executed the day and year first above written.

> Northeast Brooklyn Partnership
> By its General Partner, Cheryl's Villa Housing Corporation
> Jeffrey Dunston, President]
>
> _____
> [

STATE OF NEW YORK        )
                                           ) SS:
COUNTY OF_____)

On the        day of_____, 2019, before me, the undersigned, personally appeared Jeffrey Dunston, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

**SCHEDULE A**

**LEGAL DESCRIPTION**

[To be inserted]

**DEED**

_____

[

**NORTHEAST BROOKLYN PARTNERSHIP**
**TO**


**27 BED STUY LLC,**

_____



**PREMISES:**

| <u>**ADDRESS**</u> | <u>**BLOCK**</u> | <u>**LOT**</u> |
|---|---|---|
| [To be inserted] | | |

| | |
|---|---|
| **City of:** | **New York** |
| **State of:** | **New York** |
| **County of:** | **Kings** |
| **Borough of:** | **Brooklyn** |



**RECORD AND RETURN TO:**

Hirschen Singer  & Epstein LLP
902 Broadway, 13th Floor
New York, NY  10010
Attn:  Russell A. Kivler, Esq.

D - 5

### <u>EXHIBIT E – Assignment of Leases, Rents and Arrears</u>

### <u>ASSIGNMENT OF LEASES, RENTS AND ARREARS</u>

This **ASSIGNMENT** (the "**Assignment**"), is made as of the [    ] day of [          ], 2019, by [Northeast Brooklyn Partnership, a New York State limited partnership with offices at c/o NEBHDCo., 132 Ralph Avenue, Brooklyn, NY 11233 (the "**Seller**") and, 27 BED STUY LLC, a New York State limited liability company with offices at c/o ELH MGMT. LLC, 16 Court Street, Suite 800, Brooklyn, NY 11241, , (the "**Purchaser**").

### RECITALS

**WHEREAS**, the Seller is the owner of the premises set forth in Schedule A (the "Property") and the landlord under all leases relating to the Property;

**WHEREAS**, the Seller and the Purchaser have entered into that certain Agreement of Purchase and Sale, dated as of the date hereof, (the "**Purchase Agreement**") whereby the Seller has agreed to sell and the Purchaser has agreed to purchase the Property upon the terms and conditions set forth in the Purchase Agreement and in consideration of the sum of   Dollars (the "**Purchase Price**") paid by  Purchaser to  Seller; and

**WHEREAS,** the Purchase Agreement provides that Purchaser shall purchase any of Seller's rent arrears by paying to Seller an amount equal to the following amount of the arrears: 75% for arrears that are less than thirty (30) days past due; 50% for arrears that are more than thirty (30) days but less than sixty-one (61) days; 12.5% for arrears that are more than sixty (60) days but less than ninety (90) days; and 0% for arrears that are more than ninety (90) days (the "**Arrears Acquisition Price**"); and

**WHEREAS**, as part of the consideration for paying the Purchase Price and the Arrears Acquisition Price, the Seller has agreed, in addition to executing the Purchase Agreement and the other purchase documents evidencing the mutual obligations between Purchaser and Seller (all such documents hereinafter referred to as the "**Purchase Documents**"), also to execute and deliver this Assignment as additional consideration for the payment of the Purchase Price.

**NOW, THEREFORE**, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Seller hereby assigns to the Purchaser all of the rents, issues and profits due and to become due from the Property, together with all leases, agreements, service contracts and insurance policies affecting the Property, upon the terms and conditions set forth below.

1.    **Collection of Rents and Arrears**

From this date forward, the Purchaser shall have the power and authority to enter upon and take possession of the Property and to demand, collect and receive from the tenants, lessees or other occupants now or at any time hereafter in possession of the Property or from any part thereof, rents and/or rental arrears now due or to become due, to endorse the name of the Seller or any subsequent owner of the Property on any checks, notes, or other instruments for the payment of money, to deposit the same in bank accounts, to give any and all acquittances or any other instruments in relation thereto in the name of the Seller or in the name of the Purchaser and, either in its own name or in the name of the Seller, to institute, prosecute, settle or compromise any summary or legal proceedings for the recovery of such rents or profits or to recover the whole or any part of the Property, and to institute, prosecute, settle or compromise any other proceedings for the protection of the Property, for the recovery of any damages done to the Property, or for the abatement of any nuisance thereon. The Purchaser shall also have the power to defend any legal proceedings brought against the Seller, Purchaser or against any subsequent owner arising out of the operation of the Property.

2.    **Authority to Lease**

From this date forward, the Purchaser shall have the power to lease or rent the Property or any part thereof, to employ an agent to rent and manage the Property, to make any changes or improvements deemed by it, in its sole discretion, to be necessary or expedient for the leasing or renting of the Property, to keep and maintain the Property in tenantable and rentable condition, as well as in a good state of repair, to purchase all equipment or supplies necessary or desirable in the operation and maintenance of the Property, to pay for all gas, electricity, power, painting, repairs, wages of employees and other items for maintenance of the Property, to pay taxes, assessments, water rates and meter charges and sewer rents now due and unpaid or which may hereafter become due and a charge or lien against the Property, to pay the principal and/or interest required to be paid under the Loan Documents now due or hereafter to become due, to pay the premiums on all policies of insurance now in effect or hereafter effected by the Seller, to comply with orders of any governmental departments having jurisdiction against the Property, to remove any mechanic's liens, security interests or other liens against the Property and, in general, to pay all charges and expenses incurred in the operation of the Property.

3.    **Payment of Expenses**

The Purchaser shall have the authority to pay the cost of all of the matters herein mentioned out of the rents and other revenues received from the Property. The cost of any such expenditures and of any payments which may be made by the Purchaser under the provisions of this Assignment, including expenses and charges for reasonable counsel fees, shall be charged to the Purchaser and for all purposes shall be deemed to be secured hereby and such costs may be retained by the Purchaser out of the rents and other revenues received from the Property.

4.    **Liability**

Except for its acts or failure to act due to its gross negligence or willful malfeasance, the Purchaser shall in no way be liable for any act done or anything omitted by it in connection with this Assignment but shall be liable only to account for all moneys that it may receive hereunder. Except for its acts or failure to act due to its gross negligence or willful malfeasance, the Seller shall in no way be liable for any act done or anything omitted by it in connection with this Assignment and nothing herein contained shall be construed so as to prejudice any right which the Seller may have by reason of any default, present or future, under the terms of the Purchase Documents.

5.    **Transfer of Leases**

(a)    Effective immediately, the Seller assigns, transfers and sets over to the Purchaser all leases or subleases made to the various tenants in the buildings at the Property and all of its right, title and interest therein and the Seller authorizes and empowers the Purchaser to continue present leases or to demise any one or more apartments or spaces therein upon such terms and conditions as the Purchaser may, in its sole discretion, deem just and proper and, if necessary, to execute, acknowledge and deliver any and all instruments in writing necessary to effectuate this Assignment. The Purchaser shall have full power and authority to do and perform all acts or things necessary and requisite to be done in and about the Property as fully, and to all intents and purposes, as the Seller might or could do if present, with full power of substitution and revocation. The Seller ratifies and confirms all that the Purchaser shall lawfully do or cause to be done by virtue hereof.

(b)    Purchaser shall assume all obligations of Seller as landlord, under all leases and shall be responsible for any obligations owed to tenants and shall bear any cure costs that may be due.

6.    **Modification of Leases**

The Purchaser may, without the prior written consent of the Seller: (i) cancel, modify or surrender any lease now existing with respect to any portion of the Property; (ii) reduce any rents or change, modify or waive any provision of any existing lease; and (iii) enter into any lease on any portion of the Property.

7.    **Failure to Account**

Except for its acts or failure to act due to its gross negligence or willful malfeasance, the Seller shall in no way be responsible or liable from this date forward for any prior failure to account for any rents collected by any agent or collector of the Property whom it may have designated or appointed to collect or manage the Property, nor shall the Lender be in any way liable for the failure or refusal on its part to have made repairs to the Property. The Seller shall in no way be personally responsible for any debt by Purchaser incurred on the date hereof and moving forward with respect to the Property.

8.      **Events of Default**

Anything in this Assignment to the contrary notwithstanding, the amount due to the Seller under the Purchase Documents shall, at the option of the Seller, become immediately due and payable if a default occurs and is continuing beyond the applicable notice and/or grace period, if any, under the Purchase Documents.

9.      **Further Assignment**

The Purchaser is given the privilege of assigning all of its right, title and interest in and to this Assignment to any person, firm or corporation to whom the Purchase Documents are assigned and in such manner so that the holder of the Purchase Documents shall have all of the rights and privileges given herein to the Purchaser as if such Purchaser were originally named herein as the Purchaser.

10.     **Authorization**

If the Seller is a corporation, the Seller certifies and represents that this Assignment was authorized by the board of directors of the Seller and there is no requirement under its certificate of incorporation or its by-laws for consent of shareholders to this transaction. If the Seller is a partnership, the execution and delivery of this Assignment has been duly authorized by the partners of the Seller pursuant to its partnership agreement. If the Seller is a limited liability company, the execution and delivery of this Assignment has been duly authorized pursuant to its operating agreement.

12.     **Description**

The Property is more particularly described on Schedule A annexed hereto.

13.     **Conflict**

Whenever the terms, provisions, covenants and conditions of this Assignment conflict in any way with the terms, provisions, covenants or conditions of Purchase Documents, the terms, provisions, covenants and conditions of the Purchase Documents shall control and prevail. All terms not expressly defined herein shall have the meaning ascribed thereto in the Purchase Documents.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment as of the date first above written.

<div style="margin-left: 40%;">

Northeast Brooklyn Partnership
By: Cheryl's Villa Housing Corporation, as General
Partner

_____

By: Jeffrey Dunston, President]

</div>

STATE OF NEW YORK          )
                                    )ss.:
COUNTY OF NEW YORK    )


On the [__] day of [_  ], 2019, before me, the undersigned, personally appeared Jeffrey Dunston, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.


<div style="margin-left: 50%;">

_____

Notary Public

</div>

SCHEDULE A

[Legal description to be inserted]

## NORTHEAST BROOKLYN PARTNERSHIP

- to -

## 27 BED STUY LLC,

## ASSIGNMENT OF LEASES, RENTS AND ARREARS

**Premises:**      The property affected by this instrument lies within the:
Borough:      Brooklyn
County:       Kings

Address:                                   Block:                      Lot:

[To be inserted]

**EXECUTION VERSION**

**EXHIBIT F – Notice To Tenants**

_____, 2019

Dear Tenant:

You are hereby notified that [Name of LP], a New York limited partnership ("Seller"), the current owner of _____, Brooklyn, New York (the "Property") and the current owner of the landlord's interest in your lease in the Property, has sold the Property to ELH Mgmt. LLC 27 BED STUY LLC ("New Owner"), as of the above date. In connection with such sale, Seller has assigned and transferred its interest in your lease and any and all security deposits in the sum of $_____thereunder or relating thereto to New Owner, and New Owner has assumed and agreed to perform all of the landlord's obligations under your lease (including any obligations set forth in your lease to repay or account for any security deposits thereunder) from and after such date.

Accordingly, (a) all your obligations under the lease from and after the date hereof, including your obligation to pay rent, shall be performable to and for the benefit of New Owner, its successors and assigns, and (b) all the obligations of the landlord under the lease, including any obligations to repay or account for any security deposits hereunder, shall be the binding obligation of New Owner and its successors and assigns. Unless and until you are otherwise notified in writing by New Owner, the address of New Owner for all purposes under your lease is:

_____

_____

_____

Very truly yours,

**SELLER:**                                    **NEW OWNER**:

[Name of LP]                                   ELH Mgmt. LLC
                                               27 BED STUY
                                               LLC

By: [Name of GP]

By: _____           By: _____
Name:                           Name:
Title:                          Title:

EXECUTION VERSION

F - 1

**EXECUTION VERSION**

## **EXHIBIT G – Residential and Commercial Rent Roll**

See separate attachment.