UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                                    Chapter 11

PARK MONROE HOUSING DEVELOPMENT            Case No. 1-19-40820 (CEC)
    FUND CORPORATION, *et al.,*                (Jointly Administered)

        Debtors.

------------------------------------------------------------x


**AMENDED DISCLOSURE STATEMENT
IN SUPPORT OF CHAPTER 11 PLAN OF
<u>NORTHEAST BROOKLYN PARTNERSHIP</u>**


Dated:  October 28, 2019


ARCHER & GREINER, P.C.
630 Third Avenue
New York, New York 10017
Tel: (212) 682-4940
Allen G. Kadish
Harrison H.D. Breakstone
Email: akadish@archerlaw.com
hbreakstone@archerlaw.com

*Counsel for Northeast Brooklyn Partnership,
Debtor and Debtor-in-Possession*

# I.

## INTRODUCTION[1]

Northeast Brooklyn Partnership, a New York limited partnership, debtor and debtor-in-possession, commenced this chapter 11 Case on February 11, 2019, by filing a voluntary chapter 11 petition under the Bankruptcy Code in the Bankruptcy Court.  Chapter 11 of the Bankruptcy Code allows the debtor, and under some circumstances, creditors and other parties in interest, to propose a chapter 11 plan. The Plan provides for the Debtor to sell its key assets, the Property, and pay creditors from the proceeds of sale, the "Implementation Funds."  The Sale is contemplated to achieve proceeds sufficient to pay all Allowed Administrative, Priority and Secured Claims in full, and otherwise provide a return to Unsecured Claims subject to certain limitations described herein.  The Debtor is the party proposing the Plan.  The Plan is attached hereto.

In the Debtor's view, the treatment of Claims under the Plan provides a greater and more certain recovery for Creditors than that which is likely to be achieved under other reorganization or liquidation alternatives.

The document you are reading is the *Amended Disclosure Statement in Support of Chapter 11 Plan of Northeast Brooklyn Partnership* (this "Disclosure Statement").  Unless otherwise defined in this Disclosure Statement, capitalized terms used herein will have the meanings ascribed to them in the Plan.

1.1     **Purpose of this Document.**  This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether to confirm the Plan.

> READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:
>
> (1)   WHO CAN VOTE OR OBJECT;
>
> (2)   THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what you will receive on account of your Claim if the Plan is confirmed);
>
> (3)   THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;
>
> (4)   WHAT THE BANKRUPTCY COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN;

---

[1] This Disclosure Statement was amended to provide for solicitation of and voting on the Plan.  The original Plan assumed payment in full of all Classes.  The Debtor projects less than full payment to Creditors in Class 4.

(5)    THE FEASIBILITY OF THE PLAN; and

(6)    THE EFFECT OF CONFIRMATION.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan may affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Section 1125 of the Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The term "adequate information" is defined in section 1125(a) as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the Plan.

This Disclosure Statement is provided to each Creditor holding a Claim that has been scheduled by the Debtor as an undisputed, non-contingent or liquidated Claim, or who has filed a proof of claim against the Debtor.

1.2    **Confirmation Procedures.**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS IN THIS CASE.

(a)    Voting.

The Plan pro vides for payment of all Allowed Administrative, Priority and Secured Claims in full.  Therefore, Creditors holding Allowed Administrative, Priority and Secured Claims are not entitled to vote on the Plan.  Creditors holding Allowed Unsecured Claims will receive only partial payment on their Claims and therefore are entitled to vote on the Plan.

(b)    Who May Vote to Accept/Reject the Plan.

In general, a creditor has a right to vote for or against a plan if that creditor has a claim that is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

(c)    What is an Allowed Claim.

As noted above, an impaired creditor must first have an allowed claim to have the

right to vote. Generally, any proof of claim or interest is deemed allowed, unless a party in interest files an objection to the claim. When an objection to a claim is filed, the creditor holding the claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes.

A creditor may have an allowed claim even if a proof of claim is not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.

THE GENERAL BAR DATE (THE COURT ORDERED DEADLINE) FOR FILING A PROOF OF CLAIM IN THIS CASE WAS JULY 1, 2019.

        (d)        What is an Impaired Claim.

As noted above, an allowed claim only has the right to vote if it is in a class that is impaired under the plan (unless otherwise provided). A class is impaired if the plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class is impaired if the plan fails to pay the members of that class 100% of its claim plus interest.

In this case, the Debtor believes that only the class of Unsecured Claims is Impaired. Parties who dispute the Debtor's characterization of their Claim as being Unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the Class.

        (e)        Who is Not Eligible to Vote.

The following four types of claims are not entitled to vote: (1) claims that have been disallowed or have been objected to prior to voting on the plan (unless otherwise allowed by the Bankruptcy Court for voting purposes); (2) claims in an unimpaired class; (3) claims entitled to priority pursuant to sections 507(a)(1), (a)(2), and (a)(8) of the Bankruptcy Code; and (4) claims in classes that do not receive or retain any value under the plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the plan. Claims entitled to priority pursuant to sections 507(a)(1), (a)(2), and (a)(8) of the Bankruptcy Code are not entitled to vote because such claims are not placed in classes and are required to receive certain treatment specified by the Bankruptcy Code. Claims in classes that do not receive or retain any value under the plan do not vote because such classes are deemed to have rejected the plan and are entitled to certain consideration by the Bankruptcy Court. *The Plan proposes that all Creditors besides those with Unsecured Claims, with certain limitations described herein, are to be paid in full and therefore hold Unimpaired Claims.* Therefore, only Creditors holding Unsecured Claims are entitled to vote on the Plan. Voting procedures for those Creditors holding Unsecured Claims will be established by motion and order of the Bankruptcy Court.

EVEN IF YOUR CLAIM IS NOT ENTITLED TO VOTE ON THE PLAN, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

      (f)      Time and Place of the Confirmation Hearing.

The hearing at which the Bankruptcy Court will determine whether to confirm the Plan will take place before the Honorable Carla E. Craig, United States Bankruptcy Judge, on Wednesday, November 13, 2019 at 2:30 p.m., in Courtroom 3529, at the Conrad B. Duberstein U.S. Courthouse, 271-C Cadman Plaza East, Brooklyn, New York 11201-1800.

      (g)      Who May Object to Confirmation of the Plan.

Any Creditor or other party in interest may object to the Confirmation of the Plan.

      (h)      Deadline for Objecting to the Confirmation of the Plan.

Objections to the Confirmation of the Plan must be filed with the Bankruptcy Court on or before Wednesday, November 6, 2019, and served upon Debtor's counsel at the following address:

ARCHER & GREINER, P.C.
*Counsel for Northeast Brooklyn Partnership*
Attn:  Allen G. Kadish
Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017

Any interested party desiring further information about the Plan should contact Debtor's counsel.

1.3    **Disclaimer.**  The financial data relied upon in formulating the Plan is based on the Debtor's books and records and certain evaluations and projections prepared therefrom.  The Debtor's managers provided the information contained in this Disclosure Statement. The Debtor represents that everything stated in the Disclosure Statement is true to the Debtor's best information, knowledge and belief.  While every effort has been made to ensure the accuracy of all information, the information presented herein is unaudited and has not been examined, reviewed or compiled by independent public accountants.  Neither the Debtor, nor the Debtor's Professionals, make any representation or warranty regarding the financial or historical information contained herein.

THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF THE PLAN.

## II.

## <u>BACKGROUND</u>

2.1      **Description and History of the Debtor's Business.**

The Debtor is a for-profit limited liability partnership organized under the laws of New York on or about August 29, 1991.  NBP owns and operates five residential buildings and an additional lot, totaling 40 units that are over 90% leased:

| Address | Units | Neighborhood |
|---------|-------|--------------|
| 409 Kosciuszko Street<br>Brooklyn, New York 11221 | 3 | Bedford-Stuyvesant |
| 403 Kosciuszko Street<br>Brooklyn, New York 11221 | 13 | Bedford-Stuyvesant |
| 399 Kosciuszko Street<br>Brooklyn, New York 11221 | 12 | Bedford-Stuyvesant |
| 397 Kosciuszko Street<br>Brooklyn, New York 11221 | Lot | Bedford-Stuyvesant |
| 675 Halsey Street<br>Brooklyn, New York 11233 | 6 | Stuyvesant Heights |
| 671 Halsey Street<br>Brooklyn, New York 11233 | 6 | Stuyvesant Heights |

The Debtor's stated purpose upon its organization was, and remains, to acquire the land and improvements and rehabilitate or construct the Property, to finance such acquisition and rehabilitation or construction through loans, and to operate, manage, lease, and otherwise deal with the Property as a real estate development consisting of, or including in significant part, low-income rental housing.  The purposes of the partnership also include provision of decent, safe, and sanitary housing affordable to low-income households and qualifying for low-income housing tax benefits.

The Debtor is a domestic limited partnership with one general partner and one limited partner.  Cheryl's Villa Housing Corporation ("Cheryl's Villa") is the general partner of the Debtor.  Cheryl's Villa is a for-profit, New York corporation incorporated on February 15, 1991 with a corporate purpose, among others, of serving as the general partner of a limited partnership engaged in the development and operation of low-income housing accommodations under the federal low-income housing tax credit program.  North Hill 1 LLC ("North Hill") is the limited partner of the Debtor.  North Hill is a for-profit, New York limited liability corporation incorporated on March 7, 2017.  NEB is the sole shareholder of Cheryl's Villa and North Hill.  NEB was incorporated in January 1985 as a section 501(c)(3) not-for-profit organization with a mission to provide affordable rental housing to low-income residents of Central Brooklyn, with an initial focus on advocacy through block associations and merchant and tenant organizing.

Given that NEB is the sole member of Cheryl's Villa and North Hill, the corporate purpose of the Debtor, and its corporate structure, including the operations of the Debtor, are executed principally by NEB. NEB executes administrative, financial and operational support for the Debtor.

The Debtor's Property is owned subject to certain deed restrictions and an *Amended and Restated Regulatory Agreement*, dated July 31, 2012, such that the use and disposition of the Property is restricted in the interest of the preservation of affordable housing.

The Debtor has operated as a debtor-in-possession since the Petition Date. The Debtor's operations have included the collection of rent from its tenants and pursuing collections from delinquent tenants.

Prior to, and throughout the Debtor's Case, the Debtor has maintained a Property Management Agreement and a Janitorial Agreement with NEB, under which NEB operates the Debtor's buildings and provides maintenance services. Under these agreements NEB has consistently attended to all repairs in the Debtor's buildings. These repairs include, but are not limited to, violations pursuant to the City's Alternative Enforcement Program.

2.2    **The Debtor's Secured Creditors.**

(a)    **City Secured Claim.** The City is the Debtor's largest secured creditor. The City holds the City Mortgages encumbering the Property in the principal amount of $2,848,843.00.

(b)    **Remaining Secured Claims (besides City Secured Claim)**.    The following Creditors have Secured Claims as approximated and set forth below and remain subject to final liquidation:

       i.      New York City Department of Finance – Holds a pre-petition Secured Claim in the amount of $93,596.97 (as of February 11, 2019).

      ii.     New York City Water Board – Holds a pre-petition and post-petition Secured Claim for unpaid water charges in the amount of $88,819.14 (as of February 11, 2019).

    iii.     New York City Commissioner of Finance – Holds a pre-petition Secured Claim in the amount of $485.41 (as of February 11, 2019).

    iv.     New York City Office of Administrative Trials and Hearings – Holds a pre-petition Secured Claim in the amount of $400.00 (as of February 11, 2019).

     v.     Internal Revenue Service – Holds a pre-petition Secured Claim

in the amount of $4,680.00 (as of February 11, 2019).

2.3        **Events Leading to Chapter 11.**

At some point the Debtor failed to make monthly debt service after attempts to sell the Property failed due to lack of cooperation by the City.  On October 31, 2017, the City commenced the Foreclosure Action in the Supreme Court of the State of New York, County of Kings, against the Debtor and several other parties titled *City of New York v. Northeast Brooklyn Partnership, New York State Department of Taxation and Finance, New York City Environmental Control Board; City of New York Department of Finance; Betty J. Cox d/b/a JS Secretarial Services; and "John Does" #'s 1-100* (No. 521090/2017).  The City commenced the commercial foreclosure action alleging that the Debtor failed to comply with the terms and provisions of the mortgages by failing to pay the monthly debt service due and owing on July 1, 2017, and thereafter.

On December 13, 2018, the State Court entered an Order of Receivership [NYSCEF Doc. No. 95].  Prior to the qualification of the receiver, the Debtor filed for relief under Chapter 11 to restructure the Debtor's outstanding debt obligations such that repayment would be possible to all creditors rather than a receiver take control for the sole benefit of the City and to the detriment of all the Debtor's other creditors and its corporate purpose.  The events and circumstances precipitating the Debtor's filing are set forth more fully in the *Declaration of Jeffrey E. Dunston Pursuant to Local Bankruptcy Rule 1007-4* filed February 15, 2019 [Docket No. 8].

2.4        **Confirmation of the Plan.**

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing as set forth above.  The Bankruptcy Court has set deadlines for objections, if any, to Confirmation of the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied, and, if it the Bankruptcy Court determines that they have been, the Bankruptcy Court will enter an order confirming the Plan. The Debtor intends to seek Confirmation of the Plan at the Confirmation Hearing.  The Confirmation Order and the occurrence of the Effective Date would make the Plan binding upon the Debtor, all Creditors and other parties regardless of whether they accept the Plan.

## ARTICLE III

## THE PLAN

3.1    **Classification and Treatment of Claims.**

(a)    The table below provides a summary of the classification and proposed treatment of Claims under the Plan and a listing of unclassified Claims.  The figures set forth in the table below as to Claims are based on the Schedules, filed Claims, or other estimates made by the Debtor.  Estimates are as of the projected Effective Date, November 15, 2019.

| CLASS AND ESTIMATED AMOUNT OF CLAIMS | TYPE OF CLAIM | SUMMARY OF TREATMENT |
|---|---|---|
| Unclassified<br><br>(Estimate: $0) | Administrative Claims (excluding Claims for Professional Fees, including statutory United States Trustee fees). | **Non-voting.**  Except to the extent any entity entitled to payment has received payment on account of such Claim prior to the Effective Date or agrees to less favorable treatment, each Holder of an Allowed Administrative Claim will receive Cash from the Debtor in an amount equal to such Allowed Claim by the later of either (i) the Effective Date or as soon thereafter as is reasonably practicable, (ii) the date that is 14 days after the Administrative Claim is Allowed; or (iii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such Allowed Administrative Claim; provided, however, that any Allowed Administrative Claim incurred by the Debtor in the ordinary course of its business will be paid in full or performed by the Debtor in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto.  Since by law holders of Allowed Administrative Claims must be paid in full, these Claims are not classified and holders of Allowed Administrative Claims do not vote. |
| Unclassified<br><br>(Estimate: $454,000) | Administrative Claims for Professional Fees and Reimbursement of Expenses | **Non-voting.** All Professionals seeking payment of Professional Fees incurred through and including the Effective Date will file their respective final applications on or before the date that is 30 days after the Effective Date.  Any such application timely filed will be deemed to be an Allowed Administrative Expense Claim, subject to the entry |

| | | |
|---|---|---|
| | | of a Final Order by the Bankruptcy Court approving such application. Since by law, holders of Administrative Claims for Professional Compensation and Reimbursement of Expenses must be paid in full by the Debtor to the extent Allowed, these Claims are not classified and holders of Administrative Claims do not vote. |
| Unclassified<br><br>(Estimate: $0) | Administrative Tax Claims | **Non-voting.**  All Administrative Tax Claims held by Governmental Units will be paid by the Debtor, in Cash, in full either (i) on or prior to the Effective Date, or (ii) upon such other terms as may be agreed to, in writing, between the Debtor and such Governmental Unit as of the Effective Date.  These Claims are not classified and holders of Administrative Tax Claims do not vote. |
| Unclassified<br><br>(Estimate: $0) | Priority Tax Claims | **Non-voting.**  In full satisfaction and release of Priority Tax Claims, and except as may be otherwise mutually agreed in writing between the Debtor and such Governmental Units, each Priority Tax Claim will be paid by the Debtor, in Cash, in full as of the Effective Date.  These Claims are not classified and holders of Priority Tax Claims do not vote. |
| Class 1<br><br>(Estimate: $0) | Priority Claims (other than Priority Tax Claims and Administrative Claims) | **Unimpaired; Non-Voting.**  All Priority Claims will be paid by the Debtor, in Cash, in full on the Effective Date, or as soon as practicable after such claims become Allowed Claims.  These Claims are Unimpaired and do not vote. |
| Class 2<br><br>(Estimate: $3,400,000) | City Secured Claim | **Unimpaired; Non-Voting.**  The City Secured Claim will be either (i) paid by the Debtor, in Cash, in full on the Effective Date, or as soon as practicable after such claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such City Secured Claim.  Such Claim is Unimpaired and does not vote. |
| Class 3<br><br>(Estimate: $200,000) | Remaining Secured Claims besides City Secured Claim | **Unimpaired;  Non-Voting.**  The Remaining Secured Claims will be Allowed Claims to the extent it is not disputed and either (i) paid by the Debtor, in Cash, in full on the Effective Date, or as soon as practicable after each claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holders of each Remaining Secured Claim. Such Claim is Unimpaired and does not vote. |
| Class 4 | General  Unsecured | **Impaired;  Voting.**  The General Unsecured |

| | Claims | Claims will be paid by the Debtor, in Cash, on a pro-rata basis, either (i) on the Effective Date; or as soon as practicable after such claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holders of such General Unsecured Claims. Such Claims are Impaired and are entitled to vote. Exhibit "5.1(c)" shows, based on certain assumptions, an estimated distribution of approximately 6 cents on the dollar on General Unsecured Claims, which include certain Claims of affiliates of the Debtor. |
|---|---|---|
| (Estimate: $250,000) | | |

(b)      **Objection Deadline**.  Unless otherwise ordered by the Bankruptcy Court, the Debtor shall file and serve any objection to any Unsecured Claim at any time, but in no event after the later of (i) 90 days after the Effective Date, or (ii) 90 days after the date proof of such Claim or a request for payment of such Claim is filed.  This deadline may be extended by Bankruptcy Court order(s).

(c)      **Disputed Claims Reserve.**  As soon as practicable following the Effective Date, the Disputed Claims Reserve shall be established by the Debtor from the Implementation Funds in an amount equal to the Disputed Claims; provided, however, that the Debtor shall have no obligation to fund the Disputed Claims Reserve unless and until a distribution occurs to holders of Allowed Claims.  The Disputed Claims Reserve shall be held separately from other assets held by the Debtor, subject to an allocable share of all expenses and obligations of the Estate, on account of Disputed Claims. The Debtor shall remove funds from the Disputed Claims Reserve as Disputed Claims are resolved, which funds shall be distributed as provided in the Plan.

3.2      **Certain Other Provisions Related to Unclassified Claims.**

(a)      **Administrative Bar Date.**  Except as otherwise provided in the Plan, requests for payment of Allowed Administrative Claims must be filed no later than the Administrative Claim Bar Date as set forth in the Confirmation Order.  Holders of Allowed Administrative Claims that do not file requests for the payment on or before the Administrative Claim Bar Date, will be forever barred from asserting such Allowed Administrative Expense Claims against the Debtor or its property.

(b)      **Claims for Professional Fees and Reimbursement.**  All Professionals seeking payment of Professional Fees incurred through and including the Effective Date will file their respective final applications on or before the date that is 30 days after the Confirmation Date.  Any such application timely filed will be deemed to be an Allowed Administrative Expense Claim, subject to the entry of a Final Order by the Bankruptcy Court approving such application.

Objections to any Professional's application for compensation or reimbursement must

be timely filed and served upon such Professional, and upon the Debtor, in accordance with the Bankruptcy Rules or any order entered by the Bankruptcy Court.  Upon entry of a Final Order approving an application, the fees will be paid within seven days thereafter or otherwise in accordance with the Plan or as agreed to by the Professional and the Debtor.

Funds will be reserved on the Effective Date for anticipated Professional Fees that may come due and payable pursuant to orders entered after the Effective Date.

As of the date of this Disclosure Statement, the estimated amounts of Professional Fees are as follows, as of October 31, 2019:

Archer & Greiner, P.C. - Counsel for the Debtor
$288,000.00 (estimate)

Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP
– Special Real Estate Counsel for the Debtor
$10,000.00 (estimate)

Sperber Denenberg & Kahan, PC
– Special Landlord-Tenant Counsel for the Debtor
$7,500.00 (estimate)

The funds to pay the approved amounts of such fees will be provided from the Implementation Funds.

(c)    **Statutory Fees.**  On the Effective Date, the Debtors will make all payments required to be paid to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6).  All fees payable pursuant to 28 U.S.C. § 1930(a)(6) after the Effective Date will be paid by the Reorganized Debtor on a quarterly basis until the Case is closed, converted, or dismissed.

3.3    **Executory Contracts and Unexpired Leases.**

(a)    **Generally.**  To the extent not (i) assumed in the Case prior to the Confirmation Date, (ii) rejected in the Case prior to the Confirmation Date, or (iii) specifically rejected pursuant to the Plan, the Confirmation Order will constitute an Order authorizing the assumption and assignment of all Executory Contracts and Unexpired Leases.

i.    The provisions (if any) of each Executory Contract or Unexpired Lease to be assumed and assigned under the Plan which is or may be in default will be satisfied in the matter set forth herein.  In the event of a dispute regarding (i) the nature or the amount of any Cure, (ii) the ability of the Purchaser to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption and assignment, the Cure will occur as soon as practicable following agreement of the parties or the entry of a Final Order resolving the dispute and approving the assumption of the Executory Contract or Unexpired Lease.

ii.     Notwithstanding anything otherwise to the contrary, (i) nothing contained herein will constitute or be deemed to constitute a waiver or relinquishment of any right of the Debtor to object to any cure payments asserted and it will retain, reserve and be entitled to assert any objection or legal or equitable defense to any cure, and (ii) if a dispute relating to a cure remains unresolved or is resolved in a manner that the Debtor determines, in its sole discretion, does not protect its interests, the Debtor will be entitled to reject the Executory Contract or Unexpired Lease to which such cure dispute relates.

iii.     Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract or Unexpired Lease to be assumed and assigned, pursuant to the Plan, the Debtor will, consistent with the requirements of section 365 of the Bankruptcy Code, before the Confirmation Hearing, file and serve on parties to executory contracts or unexpired leases to be assumed and assigned, and other parties in interest (the "Cure Notice") listing the proposed cure (including amounts of compensation for actual pecuniary loss) to be paid in connection with the assumption of all Executory Contracts or Unexpired Leases to be assumed and assigned. The parties to such Executory Contracts or Unexpired Leases to be assumed and assigned will have such time as may be set by the Bankruptcy Court to object in writing to the Cure amount proposed by the Debtor, and to propose an alternative cure amount. In the event that no objection is timely filed, the applicable party will be deemed to have consented to the Cure proposed (including amounts of compensation for actual pecuniary loss) by the Debtor and will be forever enjoined and barred from seeking any additional amount on account of the Debtor's cure obligations under section 365 of the Bankruptcy Code from the Debtor, its Estate, or any assignee of the contract or lease. If an objection is timely filed with respect to an Executory Contract or Unexpired Lease, the Bankruptcy Court will hold a hearing to determine the amount of any disputed Cure amount not settled by the parties.

(a)     **Rejection Claims.**  Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtor will be treated as General Unsecured Claims.

(b)     **Bar to Rejection Claims.**  A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease will not be timely unless it is filed with the Bankruptcy Court and served so that it is received by the Debtor within such time as may be set by the Bankruptcy Court. Any such Claim not timely filed and served will be forever barred from assertion and may not be enforced against the Debtor, its successors or properties.

(c)     **Tenant Leases**.

(i)     The existing claims of the tenants under the Unexpired Leases with the Debtor will be addressed and paid through the cure process, including any judicial determinations thereof, associated with the Debtor's assumption of the tenants' Unexpired Leases with the Debtor and assignment to the Purchaser. The tenants under the Unexpired Leases will not have any continuing obligations to the Debtor following the assumption and assignment of their leases to the Purchaser. Any Claims of the tenants against the Debtor which

are not addressed through the Cure process will be treated in accordance with the terms of the Plan.  Nothing in the Plan or the Cure process will prejudice the tenants' rights against the Purchaser in respect of (a) any unremedied conditions or repair issues in their apartments as of the closing of the Sale (excluding any Claims for damages in respect thereof arising prior to the closing of the Sale, which claims would be dealt with through the Cure process), and (b) any Claims arising after the closing of the sale for rent overcharges and any related statutory claims. The Purchaser will assume all obligations of the Debtor as landlord, under all assigned leases and will be responsible for any obligations owed to tenants and shall bear any Cure costs that may be due.

(ii)    Each of the Represented Tenants who filed a proof of claim against the Debtor will have an allowed Claim estimated solely for voting purposes in the amount of $15,000 per Claim; provided that all rights of the Debtor and its Estate to object to such claims for allowance, distribution, Cure or any other purposes will be fully preserved and nothing contained herein will be deemed to constitute an admission by the Debtor or the Represented Tenants as to the Allowed amount of any Represented Tenant's Claim for allowance, distribution, Cure or any other purposes.

## ARTICLE IV

## SIGNIFICANT EVENTS IN THE CASE

4.1    **Professional Retentions.**

On April 15, 2019, the Court entered an order approving the retention of Archer & Greiner, P.C. as counsel to represent the Debtor in this Case pursuant to section 327(a) of the Bankruptcy Code effective as of February 11, 2019 [Docket No. 32].

On July 26, 2019, the Debtor filed an application for the retention of CPEX Real Estate as real estate broker [Docket No. 107].

On August 19, 2019, the Court entered an order approving the retention of Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP, as special real estate transactional counsel to represent the Debtor in this Case pursuant to section 327(e) of the Bankruptcy Code effective as of April 30, 2019 [Docket No. 131].

On October 9, 2019, the Court entered an order approving the retention of Sperber, Denenberg & Kahan, P.C., as special landlord-tenant counsel to represent the Debtor in this Case pursuant to section 327(e) of the Bankruptcy Code effective as of February 11, 2019 [Docket No. 156].

4.2    **Motions.**

On March 12, 2019, the Debtor filed a motion for an order to authorize the use of cash collateral. [Docket No. 22].  The Debtor has used cash collateral on consent of the City.

On March 12, 2019, the Debtor filed a motion for an order granting authority to continue utility services and to provide an adequate assurance payment to the Debtor's utility providers [Docket No. 23]. The Court entered an order granting the motion on June 10, 2019 [Docket No 63].

On March 12, 2019, the Debtor filed a motion for an order granting authority to maintain and enter into an insurance premium financing agreement [Docket No. 23]. The Court entered an order granting the motion on June 10, 2019 [Docket No 64].

On May 24, 2019, the Debtor filed a motion for an order extending its period to file a Chapter 11 plan and solicit acceptances thereto [Docket No. 57]. The Court entered an order granting the motion on July 11, 2019 [Docket No. 89].

On June 11, 2019, certain represented tenants filed the *Tenants' Motion for Relief from Automatic Stay* [Docket No. 68]. The Debtor entered into a stipulation with these certain represented tenants for a stay of their respective non-payment proceedings [Docket No. 81]. The Court entered an order granting certain represented tenants relief from the automatic stay on September 3, 2019 [Docket No. 143].

On June 25, 2019, the City filed its *Motion of the City of the New York for (I) Stay Relief to Permit Foreclosure of Debtor's Real Property or, in the Alternative, (II) Dismissal of the Case, or (III) Appointment of a Chapter 11 Trustee* [Docket No. 83]. On July 23, 2019, certain represented tenants filed their *Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 101]. On October 23, 2019, the Debtor, the City and the Represented Tenants entered into the *Stipulation and Order Settling (1) Motion of the City of New York for (I) Stay Relief to Permit Foreclosure of Debtor's Real Property or, in the Alternative, (II) Dismissal of the Case or (III) Appointment of a Chapter 11 Trustee and (2) Tenants' Motion for the Entry of an Order Directing the Appointment of a Trustee* [Docket No. 172] which provides for the settlement of the City's and the Tenant's motions.

## 4.3    **Monthly Operating Reports.**

Monthly operating reports have been filed on a monthly basis and are publicly available.

## 4.4    **Office of the United States Trustee Fees.**

Statutory fees have been paid on a quarterly basis to the office of the United States Trustee.

## 4.5    **Claims Bar Date.**

On May 2, 2019, the Bankruptcy Court entered an order setting a General Bar Date of July 1, 2019 at 5:00 p.m., for persons and entities, and August 12, 2019 at 5:00 p.m., for Governmental Units, thereby setting the deadlines by which the Debtor's Creditors must file proofs of claim for alleged liabilities not paid and/or damages incurred arising from or related

to periods prior to the Petition Date [Docket No. 51].

## ARTICLE V

## IMPLEMENTATION OF THE PLAN

5.1      **Means of Implementation**.

(a)      **Sale Proceeds.**  The Debtor and the Purchaser will close on the Sale of the Property on the terms set forth and according to the Sale Contract.  A copy of the Sale Contract is attached as Exhibit "A" to the Plan.   The Purchase Price is $4,300,000.00 plus the assumption and assignment, and cure, of all tenant leases as set forth in the Sale Contract.  **The Sale Proceeds are the source of the Implementation Funds and therefore, all distributions depend upon the closing and funding of the Sale**.  **The Sale is not subject to higher and better offers and the Property will not be marketed any further.**  The Property was marketed over an extended period of time pre-petition and no further marketing is expected. The Debtor believes that the extended pre-petition marketing process has brought the highest and best price for the Property, and believes that if the Property were further marketed at this time, no higher or better result could be achieved given the attendant accruals, costs and delays.

The Purchaser was located with the assistance of CPEX Real Estate as real estate broker for the Debtor.  CPEX Real Estate is entitled to a broker fee of 2% for its services.  The proposed Purchaser is 27 BED STUY LLC, a special purpose entity organized by ELH Mgmt. LLC.  Diligence materials as provided by the Purchaser  are attached hereto as Exhibit "5.1(a)."  The principal of ELH Mgmt. LLC asserts that it is a sophisticated real estate investor that directly or indirectly owns multiple properties throughout New York City and elsewhere.  The principal further asserts that the Purchaser will have the financial resources to consummate the transaction once the necessary Court approvals are obtained.  An earnest-money deposit in the amount of $300,000.00 has been provided as liquidated damages for failure of the Purchaser to close, as set forth at paragraph 10.1 in the Sale Contract.

In summary, the terms of the private Sale are as follows.  The Sale Contract provides for the Sale of the Property on an "as is" "where is" basis.  The Sale Contract is for all of Debtor's right, title and interest in and to the Property, together with all related fixtures, improvements and development rights, and subject to all deed restrictions, zoning and other potential restrictions including, but not limited to, the current regulatory agreement with the City.  The Purchaser will become responsible for violations and repairs on the Effective Date. The Sale Contract also includes the Debtor's assumption and assignment to the Purchaser of all residential leases.  The Sale Contract does not include the Debtor's other property including books and records (except building and tenant records), cash, deposits with third parties, intellectual property, goodwill, tax attributes, claims and causes of action.  Except as provided herein, and in the Sale Contract, the Sale shall be free and clear of all liens, claims, interests, taxes and non-permitted encumbrances pursuant to sections 363(b) and (f), 1123(a)(5)(D) and 1129 of the Bankruptcy Code.

The Debtor and Purchaser will bear their respective closing costs and

expenses consistent with customary practices. The Debtor will pay all brokerage fees from the Sale proceeds upon Court approval as appropriate.  The Purchaser has represented that the sole broker who introduced the Purchaser to the property and worked with the Purchaser on this Sale was CPEX Real Estate and no other broker.  To the extent any closing costs or obligations are not capable of being paid at closing, such costs will be escrowed or retained upon the agreement of the parties or otherwise as the Court may direct, to be paid promptly as allowed or fixed.

       (b)     **Rent Proceeds and Cash on Hand.**  Rent proceeds and Cash on hand are property of the Debtor and may also be used as Implementation Funds to fund and implement the Plan as available.

       (c)     **Sources and Uses.**  An estimate of the sources and uses of the Implementation Funds is attached hereto as Exhibit "5.1(c)."  Exhibit "5.1(c)" shows, based on certain assumptions, an estimated distribution of approximately 6 cents on the dollar on General Unsecured Claims, which include certain Claims of affiliates of the Debtor.

5.2     **Preservation of Rights of Action**. Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into in connection with the Plan, the Debtor will retain, and in accordance with its determination of the best interest of the Estate, may enforce any claims, rights and causes of action (i) arising under sections 510 and 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtor or the Estate as of the Petition Date, and arising under any provision of state or federal law, or any theory of statutory or common law or equity, including, but not limited to, any cause of action asserted, or which may hereafter be asserted.  Any recovery received by the Debtor through the prosecution, settlement or collection of any such claim, right or cause of action, will be retained by the Debtor following the satisfaction of all other Allowed Claims under the terms of the Plan.  A *non-exclusive* schedule of specific rights of action preserved is attached hereto as Exhibit "5.2."

5.3     **Stamp Tax.**  Under the Plan, pursuant to the fullest application of section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, will not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment including without limitation New York City Real Property Transfer Tax and New York State Documentary Tax.

5.4    **Modification and Revocation of the Plan**.  The Plan may be altered, amended or modified by the Debtor at any time before the substantial consummation of the Plan, as provided in sections 1101(a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. Section 1127 of the Bankruptcy Code authorizes the proponent of a chapter 11 plan to modify such plan at any time prior to confirmation of the plan so long as the plan, as modified, continues to meet certain technical requirements of sections 1122 and 1123 of the Bankruptcy Code with respect to the classification of claims and the contents of a plan.  Prior to confirmation, if a debtor files modifications to a plan, pursuant to section 1127(a) of the Bankruptcy Code "the plan as modified becomes the plan."  No order of the court is required to modify the plan under the terms of section 1127(a) of the Bankruptcy Code; however, the proponent of a modification to a plan must comply with section 1125 of the Bankruptcy Code with respect to the plan as modified.  In other words, if a modification materially alters the treatment of any Creditor who has accepted the plan, the debtor will be required to make additional disclosures to those Creditors whose treatment has been materially and adversely altered and give such creditors an opportunity to change their votes.

The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order.  If the Debtor revokes or withdraws the Plan, or if no Confirmation Order is entered, the Plan will be null and void, and nothing contained in the Plan will constitute a waiver or release of any Claims by or against, or any interest in, the Debtor; or prejudice in any manner the rights of the Debtor.

5.5    **Retention of Jurisdiction.**

The Plan contains detailed provisions providing for the retention of broad jurisdiction by the Bankruptcy Court over the Plan and this Case for the purposes of, *inter alia*, determining all disputes relating to Claims, resolving all matters presented by or arising under the interpretation, implementation or enforcement of the Plan and to determine all other matters pending on the Effective Date.

**ARTICLE VI**

**ACCEPTANCE AND CONFIRMATION**

6.1    **Requirements for Confirmation.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court is expected to enter an order confirming the Plan.  These requirements include determinations by the Bankruptcy Court that: (i) the Plan has classified Claims in a permissible manner, (ii) the contents of the Plan comply with various technical requirements of the Bankruptcy Code, (iii) the Debtor has proposed the Plan in good faith, (iv) the Debtor has made disclosures concerning the Plan that are adequate and include information concerning all payments made or promised in connection with the Plan and the Case, (v) the Plan is in the "best interest" of all Creditors, (vi) the Plan is feasible and (vii) the Plan has been accepted by the requisite number and amount of Creditors in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances. The Debtor believes that all of these

conditions have been or will be met prior to the Confirmation Hearing.

**Best Interest Test.**  The so-called "best interest" test requires that each impaired Creditor either (a) accepts the Plan, or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such Entity would receive or if the Debtor's property were to be liquidated under chapter 7 of the Bankruptcy Code.

Under the Plan, all Unsecured Creditors will receive Cash in an amount pro rata equal to their Allowed Claims. A meaningful return to Creditors on account of their Allowed Claims would not be assured in a liquidation such as the foreclosure described in section 2.3 above.

To determine what the holders in each Impaired Class of Claims would receive if the Debtor were liquidated (under chapter 7 or otherwise), the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets in a chapter 7 liquidation case.  The amount that would be available for satisfaction of Allowed Claims against the Debtor would consist of the proceeds resulting from the disposition of the Debtor's assets, augmented by the Cash held by the Debtor at the commencement of the chapter 7 case.  Such amount would be reduced by the amount of any Claims secured by the Debtor's assets, the costs and expenses of the liquidation, and such additional Administrative Claims and Priority Claims that may result from the chapter 7 case.

The costs of liquidation under chapter 7 or otherwise would become Administrative Claims with the highest priority against the proceeds of liquidation after payment of Allowed Secured Claims.  Such costs would include the fees payable to a chapter 7 trustee or other liquidation agent, as well as those which might be payable to attorneys, financial advisors, appraisers, accountants and other Professionals that such trustee may engage to assist in the liquidation.  In addition, liquidation costs would include any liabilities incurred or assumed pursuant to the transactions necessary to effectuate the liquidation. Moreover, claims entitled to administrative priority may arise by reason of any breach or rejection of any executory contracts entered into by the Debtor during the pendency of the Case in chapter 11.  After satisfying Administrative Claims arising in the course of the liquidation, the proceeds of the liquidation would then be payable to satisfy any unpaid expenses incurred during the time this Case was pending under chapter 11, including compensation for attorneys, financial advisors, appraisers, accountants and other professionals retained by the Debtor.  Given the foregoing a chapter 7 trustee might consider abandoning the assets to the secured creditor resulting in a foreclosure scenario and no return on Unsecured Claims.

After consideration of the effects that a liquidation would have on the proceeds available for distribution including (i) the increased costs and expenses of a liquidation arising from fees payable to the trustee (or liquidating agent), (ii) the erosion in value of the Debtor's assets in the context of the expeditious liquidation and the "forced sale" atmosphere that would prevail, and (iii) the potential increases in Claims which would be satisfied on a priority basis or on a parity with the Claims of General Unsecured Creditors, the Debtor firmly believes that if its property were to be liquidated under chapter 7 there would be no assurance of recovery or the timing thereof to holders of Unsecured Claims because any recovery would be dependent upon the uncertain outcome of a forced sale of the Property.  Any such sale would likely return

value only on the City Secured Claim while prejudicing all other Secured Claims and Unsecured Claims.

(a)      **Liquidation Analysis.**

As discussed in the foregoing section under the "Best Interest Test," the Plan provides for the payment in full of all Allowed Secured, Administrative, and Priority Claims, as well as a meaningful pro rata return on all Unsecured Claims, but there can be no such assurance if the Property were to be liquidated in a liquidation proceeding.  In addition, all claims of Tenants will be addressed through the Cure process.

(b)      **Feasibility.**

For the Plan to be confirmed, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor other than as contemplated by the Plan.  The Debtor believes that the Plan is feasible and not reasonably likely to be followed by resort to further reorganization or liquidation under the supervision of the Bankruptcy Court.  As discussed above, the Debtor has, with the real estate advisory services of CPEX Real Estate, located the Purchaser.  The Debtor and the Purchaser have agreed upon a Purchase Price that will provide the necessary Implementation Funds.  The Purchase Price is set forth in the Sale Contract, and is an amount expected to be sufficient to support the Plan.  The contemplated transaction is for an "as is" "where is" sale, subject to all current deed restrictions and regulatory agreements with the City, but otherwise free and clear of all liens, claims and encumbrances, with no financing or any other contingencies available to the Purchaser.

Upon the signing of the Sale Contract by both parties, the earnest money deposit, was deposited by the Purchaser into the Debtor's special real estate counsel's escrow account.  The earnest money deposit is to stand as liquidated damages in the event of a failure to close.

Upon the Sale and satisfaction of the City Secured Claim, the City will dismiss the Foreclosure Action with prejudice, upon appropriate notice to the Debtor.

(c)      **Confirmation with the Acceptance of Each Impaired Class.**

A plan may be confirmed if each impaired class of claims accepts the plan.  Classes of claims which are not impaired are deemed to have accepted the plan.  A class is impaired if the legal, equitable or contractual rights attaching to the claims of that class are modified other than by curing defaults and reinstating maturities or by payment in full in cash.

Holders of claims impaired by a plan are entitled to vote by submitting ballots accepting or rejecting the plan.  Holders of claims not impaired by a plan are deemed to accept the plan, and may not vote to accept or reject the plan.  Holders of claims that would

neither receive nor retain any property under a plan would be deemed to reject the plan.

The Bankruptcy Code defines acceptance of a plan by a Class of Claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of Claims of that class. Only those Claims, the holders of which actually vote to accept or reject the plan, are counted for the purpose of determining whether the requisite number and amount of acceptances have been received.

## ARTICLE VII

## EFFECT OF CONFIRMATION

7.1      **Post-Effective Date Reorganized Debtor.**

The Reorganized Debtor is empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan, (ii) make all Distributions contemplated hereby, (iii) employ and compensate professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Reorganized Debtor by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Reorganized Debtor to be necessary and proper to implement the provisions thereof. After the Effective Date, and even upon closing of the Case, the Reorganized Debtor shall remain as a reorganized entity free of the constraints of the Bankruptcy Code and operating under applicable state law. The pre-Effective Date authorized representatives, Jeffrey Dunston and Nathaniel Montgomery, will remain as post-Effective Date authorized representatives of the Debtor. NEB will continue to administer daily operations of the Debtor post-Effective Date.

7.2      **Closing of Case.**

After the Effective Date and upon all distributions having been made including payment of Professional Fees, and the Case having been fully administered, the Case will be closed.

7.3      **Injunction**.

(a)      Except (i) as otherwise provided in the Plan, (ii) as otherwise provided under Final Order entered by the Bankruptcy Court or (iii) with respect to the Debtor's obligations under the Plan, the occurrence of the Effective Date will forever stay, restrain and permanently enjoin on and after the Effective Date (1) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Property or the Debtor's other assets, to prevent or stay any person from carrying out the transactions set forth in this Plan or to interfere with any such transactions, (2) the creation, perfection or enforcement of any lien or encumbrance against the Property or the Debtor's other assets or (3) any Claim released under the Confirmation Order, this Plan or pursuant to section 1141(d)(1) of the Bankruptcy Code as against the Property or the Debtor's  other assets.

(b)         Except as otherwise provided in the Plan, the Confirmation Order, and the *Order Granting Tenants Relief From Automatic Stay* dated September 3, 2019 [Docket No. 144], the entry of the Confirmation Order will constitute an injunction against the commencement or continuation of any action, the employment of process, or any act, to collect, recover or offset from the Property or the Debtor's other assets.

(c)         Nothing contained in the Plan or the Confirmation Order will enjoin, limit or restrict in any manner the Reorganized Debtor, from administering, enforcing, collecting or taking any other action after the Effective Date.

(d)         Any violation of the foregoing provisions by any party will subject the offending party to appropriate sanctions for violation of the within injunction, including, without limitation, damages, attorneys' fees, costs and disbursements.

(e)         The Bankruptcy Court will retain exclusive jurisdiction, and the Order confirming this Plan shall provide that jurisdiction of the Bankruptcy Court will survive the confirmation of this Plan for the purpose of enforcing all of the Plan provisions, including, without limitation, disputes relating to the interpretation and enforcement of Plan provisions.

7.4    **Limitation of Liability**.  Pursuant to section 1125(e) of the Bankruptcy Code, neither the Debtor, nor any of its respective members, officers, managers, directors, agents or employees (acting in such capacity) nor any attorney or other Professional employed by any of them, will have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, prosecution, dissemination, confirmation, consummation or administration of the Plan, this Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or the distribution of property under the Plan, except as may be expressly provided for in such agreements or documents, and except for willful misconduct or gross negligence.  Furthermore, nothing in the Plan shall limit the liability of Professionals of the Debtor to their respective clients for malpractice pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

7.5    **Plan and Confirmation Order as Release.**  From and after the Effective Date, a copy of the Confirmation Order and this Plan will constitute and may be submitted as a complete defense to any claim or liability released.

7.6    **Injunction.**

Except as otherwise provided in the Plan, all parties will be precluded and enjoined from asserting against the Debtor, and its respective successors, assets or properties, or against any property that is distributed, or is to be distributed under the Plan (including but not limited to the Property) any other or further Claim based upon any acts or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

Except as otherwise provided under the Plan, or a Final Order of the Bankruptcy Court, any judgment at any time obtained, to the extent that such judgment is a determination of the liability of the Debtor with respect to any debt treated pursuant to the Plan, will be null

and void and of no force and effect, regardless of whether a Proof of Claim therefor was filed or deemed filed and, except as otherwise provided in the Plan, all Creditors holding Claims against the Debtor, will be precluded from asserting against the Debtor, and any of its assets including the Property, or any property distributed under the Plan, any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, and, upon the Effective Date, the Confirmation Order will permanently enjoin all Creditors and their successors and assigns, from enforcing or seeking to enforce any such Claims against the Debtor.

7.7      **Releases**

Section 1125(e) of the Bankruptcy Code protects persons acting in good faith, from civil claims arising in connection with solicitations of acceptances of plans of reorganization or participating in the offer, issuance, sale or purchase of a security under the Plan.  Pursuant to section 1125(e), neither the Debtor, nor any of their respective members, officers, managers, directors, agents or employees (acting in such capacity) nor any attorney or Professionals employed by any of them, will have or incur any liability to any person or entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, prosecution, dissemination, Confirmation, consummation or administration of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or the distribution of property under the Plan, or any other action taken or omitted to be taken in connection with the Case or the Plan, except as may be expressly provided for in such agreements or documents, and except for willful misconduct or gross negligence.  From and after the Effective Date, a copy of the Confirmation Order and the Plan will constitute and may be submitted as a complete defense to any claim or liability released pursuant to the Plan.

(a)      **Debtor Release.**  The Plan provides that on the Effective Date, each Creditor, except the Represented Tenants (the treatment of the Claims of which are set forth in the Plan), will be deemed to have irrevocably waived and released the Debtor from and against any and all claims, liabilities, suits, actions, threatened actions, whether in law or in equity, that may have existed from the beginning of time to the Effective Date including all claims or liabilities arising in connection with the formulation and efforts to confirm the Plan; provided, however, that the foregoing release will not constitute a release of the Debtor from any of its obligations under the Plan.  The Plan also provides that on the Effective Date, the tenants under the Unexpired Leases (except the Represented Tenants), will be deemed to have irrevocably waived and released any of the Debtor's respective officers, managers, directors, employees, members, partners, representatives, attorneys, Professionals, predecessors, successors and assigns (together with the Debtor, the "Debtor Released Parties") from and against any and all claims, liabilities, suits, actions, threatened actions, whether in law or in equity, that may have existed from the beginning of time to the Effective Date, to the extent they are obligations of the Debtor, including all claims or liabilities arising in connection with the formulation and efforts to confirm the Plan.  Additionally, the Plan provides that on the Effective Date, each Creditor, except the tenants under the Unexpired Leases, will be deemed to have irrevocably waived and released any of the Debtor Released Parties from and against any and all claims, liabilities, suits, actions, threatened actions, whether in law or in equity, that may have existed

from the beginning of time to the Effective Date, to the extent they are related to the Debtor, including all claims or liabilities arising in connection with the formulation and efforts to confirm the Plan.

(b)      **Exculpation.**  Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting of the Debtor Release (as described above), and except as otherwise specifically provided in the Plan, the Debtor Released Parties are exculpated by and with respect to all parties (including the Debtor and the Creditors), from claims, liabilities, suits, actions and threatened actions, whether in law or in equity, that may have existed prepetition or action taken postpetition or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, implementing, or consummating the Plan or the Case.

## ARTICLE VIII

## ALTERNATIVES TO THE PLAN AND RISK FACTORS

Holders of Claims in Class 4 Claims should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein),  before deciding whether to vote to accept or to reject the Plan.  No other Classes described in the Plan are being solicited for acceptances and rejections of the Plan.

8.1.    **Risks Related to the Chapter 11 Case.**

(a)      *The Plan may fail to be confirmed, which may result in the Debtor being liquidated inside or outside of bankruptcy.*

If the Plan is not confirmed by the Bankruptcy Court the alternatives may include (a) liquidation of the Debtor under chapter 7 of the Bankruptcy Code or otherwise, (b) the dismissal of this Case or relief from the stay in favor of the City and the resulting continuation of the Foreclosure Action, or (c) the promulgation and confirmation of an alternative plan of reorganization.  As discussed under the section entitled "Best Interest Test," under alternatives (a) and (b) above, there would be no assurance of recovery or the timing thereof to Creditors holding Unsecured Claims because any recovery would be dependent upon the uncertain outcome of a straight foreclosure or forced sale of the Property.  The Plan provides the greatest likelihood for a substantial recovery by the Creditors.

(b)      *The Sale is not subject to higher and better offers, and the Property will not be marketed any further.*

The Implementation Funds are insufficient to provide a 100% return to all Classes of Creditors.  The Property was marketed over an extended period of time pre-petition and no further marketing is expected.  The Debtor is confident that the extended pre-petition marketing process has brought the highest and best price for the Property, and believes that if the Property were

further marketed at this time, no higher or better price could be achieved given the attendant accruals, costs and delays.

(c)    *The Disclosure Statement and Plan are based upon estimates and projections, which are inherently uncertain.*

The Disclosure Statement and Plan rely upon estimates and projections, which are inherently uncertain.  Any failure to close as set forth in the Disclosure Statement and Plan will result in the accrual of additional debt and therefore, prior estimates and projections will no longer be applicable.

## ARTICLE IX

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to each holder of an Allowed Unsecured Claim. This summary does not cover all potential U.S. federal income tax consequences that could possibly arise under the Plan and does not address the Plan's U.S. federal income tax consequences for any holder of an Unsecured Claim that is a partnership (or other pass-through entity) or otherwise subject to special tax rules.

This summary is based upon the laws in effect on the date of this Disclosure Statement and existing judicial and administrative interpretations thereof, all of which are subject to change, possibly with retroactive effect.  *Holders of Allowed Claims should consult their own tax advisor as to the Plan's specific federal, state, local and foreign income and other tax consequences.*

In accordance with the Plan, each Creditor with an Allowed Claim will be entitled to payment on its Allowed Claim subject to certain limitations. Each such Creditor will recognize gain or loss upon the receipt of payment equal to the difference, if any, between the "amount realized" by such Creditor and the Creditor's adjusted basis in his, her or its Allowed Claim. The "amount realized" is equal to the value of such Creditor's payments.  Any gain or loss realized by such a Creditor should constitute ordinary income or loss to him, her or it unless the Allowed Claim is a capital asset.  If an Allowed Claim is a capital asset, and it has been held for more than one year, such Creditor will likely realize long term capital gain or loss.

The tax consequences to holders of claims will differ and will depend on factors specific to each Creditor, including but not limited to: (i) whether the Creditor's Allowed Claim (or portion thereof) constitutes a claim for principal or interest; (ii) the origin of the Creditor's Claim; (iii) the type of consideration received by the Creditor in exchange for the Allowed Claim; (iv) whether the Creditor is a United States person or foreign person for tax purposes; whether the Creditor reports income on the accrual or cash basis method; and (v) whether the Creditor has taken a bad debt deduction or otherwise recognized loss with respect to an Allowed Claim.

THERE ARE MANY FACTORS WHICH WILL DETERMINE THE TAX CONSEQUENCES TO EACH HOLDER. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE IT IS IMPORTANT THAT, NOTWITHSTANDING THE DESCRIPTION ABOVE, EACH CREDITOR CONSIDER, AND OBTAIN HIS, HER OR ITS OWN TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE PLAN.

THE DISCUSSION HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY CREDITOR FOR THE PURPOSE OF AVOIDING TAX CONSEQUENCES OR PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER. THE DISCUSSION HEREIN WAS WRITTEN TO SUPPORT THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH HOLDER SHOULD SEEK ADVICE BASED UPON THE CREDITOR'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

10.1    **Orders in Aid of Consummation**. Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of Confirmation directing the implementation of matters or actions required by the Plan.

10.2    **Compliance with Tax Requirements**. In connection with the Plan, the Debtor and the Reorganized Debtor, will comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Plan will be subject to such withholding and reporting requirements; provided, however, that the transfer of any Cash, property or other interest hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code.

10.3    **Due Authorization by Creditors.**    Each and every Creditor who accepts a distribution provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there are no outstanding Liens, encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, conveyed or modified by the Plan, or obligations undertaken by such Creditor under the Plan.

10.4    **Amendments.**    The Plan may be altered, amended or modified by the Debtor, in writing and signed by the Debtor, at any time before the substantial consummation of the Plan, as provided in sections 1101(a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

10.5    **Revocation.**    The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order.  If the Plan is revoked or withdrawn or if no Confirmation Order is entered, the Plan will be null and void, and nothing contained in the Plan shall (i) constitute a

waiver or release of any Claims by or against, the Debtor; or (ii) prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor or its Estate.

10.6    **Filing of Additional Documents.**    Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

10.7    **Computation of Time.**    In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

10.8    **Successors and Assigns.**    The rights, benefits and obligations of any Entity named or referred to in this Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or permitted assign of such Entity.

10.9    **Notices.**    All notices and other communications to be given or made hereunder must be in writing and will be deemed to have been given or made when mailed or as otherwise set forth herein:

**If to the Debtor, at:**

Northeast Brooklyn Partnership
Attn:  Authorized Representative
132 Ralph Avenue
Brooklyn, New York 11233

-and-

Archer & Greiner, P.C.
*Counsel for Northeast Brooklyn Partnership*
Attn: Allen G. Kadish
      Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017

**If to the Purchaser, at:**
Hirschen Singer & Epstein LLP
*Counsel for 27 BED STUY LLC*
Attn: Russel A. Kivler
902 Broadway, 13th Floor
New York, New York 10010

Notices to any Creditor will be at (i) the addresses set forth on the respective Proofs of Claim filed by such holder; (ii) the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor after the date of any related Proof of Claim; (iii) the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Reorganized

Debtor has not received a written notice of a change of address; or (iv) the address reflected in the Schedules if no Proof of Claim is filed and the Reorganized Debtor has not received a written notice of a change of address.

10.10     **Governing Law**.  Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other Federal law are applicable, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

10.11     **Other Actions**.  On the Effective Date, and without limitation by any other provision of the Plan, the amendment of the Debtor's bylaws as may be appropriate, the bylaws of Reorganized Debtor, and all other actions and documents contemplated to be taken or executed on the Effective Date, will be authorized and approved in all respects pursuant to this Plan.  In order to effectuate the transactions set forth in the Plan the Reorganized Debtor may reincorporate or a new entity may be formed, consistent with the Plan, to serve as the Reorganized Debtor.  All matters provided for in this Plan involving the corporate structure of the Debtor or Reorganized Debtor, and any corporate action required by the Debtor or Reorganized Debtor in connection with this Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by officers, directors and employees of the Debtor or Reorganized Debtor. On the Effective Date, the appropriate officers and directors of the Reorganized Debtor are authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by this Plan in the name of and on behalf of Reorganized Debtor without the need for any required approvals, authorizations, or consents, except and solely to the extent provided for in this Plan. Nothing contained herein shall prevent the Debtor from taking such actions as may be reasonably necessary to consummate this Plan, although such actions may not specifically be provided for within this Plan.

10.12     **Severability**.   In the event any provision of this Plan is determined to be unenforceable such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of this Plan.

10.13     **Business Day**.  In the event that this Plan requires an act to be performed on a day that is not a Business Day, such act will be performed on the first Business Day thereafter.

10.14     **Amendment of Bylaws.**  Pursuant to section 1123(a)(5)(I) of the Bankruptcy Code, the Debtor's bylaws and operating budget cash requirements will be deemed amended as of the Effective Date, to the extent necessary, to implement the terms of this Plan.

10.15     **Reorganized Debtor.**  The Debtor, on and after the Effective Date will be referred to as the Reorganized Debtor.

# ARTICLE XI

## ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, the Plan and the other materials delivered together herewith and all deliveries, correspondence and questions, as the case may be, relating to the Plan should be directed to Debtor's counsel:

ARCHER & GREINER, P.C.
*Counsel for Northeast Brooklyn Partnership*
Attn: Allen G. Kadish
Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017

Copies of all pleadings, orders, lists, schedules, proofs of claims or other documents in this Case are on file in the Office of the Clerk of the United States Bankruptcy Court at the United States Bankruptcy Court, 271-C Cadman Plaza East, Brooklyn, New York 11201, and are available for public inspection Monday through Friday, between the hours of 9:00 a.m. and 5:00 p.m. Additionally, copies of all pleadings, orders, lists, schedules, proofs of claim or other documents in this case may be viewed and printed over the internet from the Bankruptcy Court's Electronic Case Filing system at http://www.nyeb.uscourts.gov.

# ARTICLE XII

## CONCLUSION

The Debtor believes the Plan is in the best interests of all Creditors and strongly encourages all holders of Claims against the Debtor to support confirmation thereof.

Dated:  New York, New York                NORTHEAST BROOKLYN PARTNERSHIP
      October 28, 2019                Debtor and Debtor-in-Possession

By:    _____
      Jeffrey E. Dunston
      *Authorized Representative*

ARCHER & GREINER, P.C.

By:   s/ Allen G. Kadish
     Allen G. Kadish
     Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017
Tel:  (212) 682-4940
Email:    akadish@archerlaw.com
       hbreakstone@archerlaw.com

*Counsel for Northeast Brooklyn Partnership,*
*Debtor and Debtor-in-Possession*

### Index to Exhibits

**Exhibit 5.1(a):**     **Purchaser Diligence**

**Exhibit 5.1(c):**     **Projected Sources and Uses**

**Exhibit 5.2:**        **Causes of Action**

**Exhibit 5.1(a)**

**Purchaser Diligence**

# LARRY HIRSCHFIELD - BIOGRAPHY AND PROJECT EXPERIENCE

Larry Hirschfield has been a developer of residential real estate in New York City since 1992. He is the sole owner of ELH Mgmt. LLC. Through ELH Mgmt., Hirschfield has been responsible for the renovation, rehabilitation, design and new construction of more than 1,015 units of affordable housing. A leading developer of affordable housing in the City of New York, active in Brooklyn and Manhattan, Larry Hirschfield is on the Board of Directors of New York State Association for Affordable Housing (NYSAFAH) and the Citizens Housing and Planning Council.

Hirschfield has owned, managed, and developed residential and mixed use real estate in Manhattan, on the Upper East Side, Washington Heights, Harlem and most of the developing neighborhoods in Brooklyn, New York, since 1992 and also owns medical, office, and retail property in Pennsylvania, North Carolina, Georgia, New Mexico, California, Arizona, Oklahoma, Illinois, Virginia, Florida, Minnesota, Ohio, and Colorado.

A graduate of Columbia University, Hirschfield entered the real estate industry in 1992.  His earliest projects were the renovation and restoration of two brownstones, one in Fort Greene and the other one in Prospect Heights, converting them from rooming houses to Class A dwellings.  Several of the units were occupied at the time Hirschfield took title, with a number of those tenants being able to reoccupy their units once the renovations were complete. One of the brownstones was also a NYC landmarked property. The interior and exterior historic details were carefully restored.

Hirschfield then moved onto larger projects, acquiring several apartment buildings in Washington Heights and Crown Heights.  The Washington Heights properties had been foreclosed on and in distressed condition. The Crown Heights buildings, of similar vintage and disrepair, required the replacement of all major systems. Hirschfield turned these properties around through HPD's Article 8A Loan Program.

To accommodate his rapidly growing business, Hirschfield formed ELH Mgmt. LLC in 1995. The establishment of the corporation consolidated the increasing number of projects into a single well-run and increasingly well-known entity.

ELH Mgmt. LLC then expanded from the renovation and rehabilitation of small and medium-sized apartment buildings into the management of affordable housing in 1995.  At that time, Hirschfield participated in the first of a variety of HPD programs when his company was designated as a developer in Round I of the Neighborhood Entrepreneurs Program.  Through NEP, Hirschfield took possession of formerly city-owned property and made use of the Low-Income Housing Tax Credit. In addition, Hirschfield worked with a local non-for-profit to provide social services to the tenants.

ELH Mgmt. LLC was appointed 7A Administrator of 18 buildings beginning at the end of 1997 and continuing to this day in cases brought by HPD. Hirschfield and his staff worked to renovate and stabilize the buildings and to provide essential services to tenants.

Hirschfield's business continued to expand in 1998 when ELH Mgmt. was designated in Round IV of the Neighborhood Entrepreneurs Program. The NEP program involves both the syndication of Low Income Housing Tax Credits and the use of Federal HOME Funds. In accordance with LIHTC and HOME guidelines, a certain percentage of the units are rented at 60% of AMI and a certain percentage at 50% of AMI; the remainder of the units are rented at market rate. More recently, ELH has been designated as a developer for two clusters in the 203K NEP.  Hirschfield's flagship property in the NEP program is the Imperial, a 35-unit mixed-income rental in Crown Heights. The Imperial was meticulously restored by Hirschfield to a degree commensurate with its status as an individually designated New York City landmark.

The next HPD program in which ELH Mgmt. participated was the Third Party Transfer Program. ELH Mgmt. was awarded 19 buildings in Rounds III, IV and V-B of the program. These buildings are located in Crown Heights, Prospect Heights, East Flatbush and Clinton Hill. With the acquisition of these properties, Hirschfield created ELH Construction Company, LLC to do the rehabilitation for his own, and other developer's, properties.  ELH Mgmt. also manages affordable rental properties in the Third Party Transfer Program for the non-profit Brooklyn Neighborhood Improvement Association.

ELH Mgmt. has taken on additional new construction projects through HPD's Cornerstone Round III: they were awarded a site on St Nicholas Avenue in Harlem where they built and sold out an 11-story condominium project. .  In Crown Heights, ELH built a 38-unit mixed-income apartment building utilizing NY State tax credits (SLIHC).  This project is distinguished by the transferring of adjacent air rights, connecting to an earlier ELH building in NEP, arranging a lot merger, and finally re-ULURPing the land to see the project to completion.

ELH has also bought and renovated a number of other properties, including three in Manhattan, through HPD's Asset Sales Program as well as through the private market.

Other recent acquisitions include project based Section 8 buildings Crown Heights and Prospect Heights providing for further diversification in management.

Hirschfield has well-established relationships with primary bankers and lenders in the field of affordable housing. Financial Institutions with whom Hirschfield has worked include Local Initiatives Support Corporation (LISC), Richman Housing Resources, RBC Capital Markets, Santander Bank, Dime, Low Income Investment Fund (LIIF), BPD Bank, Astoria Federal Savings and The Community Preservation Corporation (CPC) and numerous lenders around the country.  He was featured in CPC's Summer 2006 Newsletter. Non-profits with whom Hirschfield has worked successfully are Urban Homesteading Assistance Board, Brooklyn Neighborhood Improvement Association, Habitat for Humanity, and Urban Homesteading Assistance Board (UHAB).

Hirschfield has an excellent track record in the rehabilitation and construction of affordable housing. The total development costs of project he has completed or are underway exceed $200 million. Hirschfield's emphasis on architectural detail, community context, efficient use of space and maximum tenant satisfaction has contributed to his achievements in renovation, rehabilitation and new construction.

## ST. MARKS GARDENS – 517-521 ST. MARKS AVENUE, BROOKLYN, NY.

The St. Marks Gardens building contains 38 newly constructed rental apartments, 31 of which are reserved for households earning up to 90% of AMI, in compliance with the New York State Low Income Housing Credit ("SLIHC") requirements. ELH originally obtained the site as accessory space next to a building it renovated in Round 1 of NEP.  To develop the site, ELH obtained permission from HPD and ushered the project through ULURP.  The project initiated a review of other HPD conveyances of accessory space, leading to development of other affordable housing projects.



## <u>THE IMPERIAL</u> – 1198 PACIFIC STREET, BROOKLYN, NY.

In 2006, Pacific Village LP embarked on a massive restoration of the Imperial's exterior and a gut rehabilitation and reconfiguration of the interior into affordable housing units.  The restoration of the façade, planned by Hebert Warman, required painstaking repair of masonry work and replication of detailed copper work that was costly.  The interior, designed by GM Architects, completely reconfigured the building into 35 attractive and modern units. The ambitious and meticulously executed project earned the developer two 2007 Brooklyn Chamber of Commerce Brooklyn Building Awards and a feature article by the New York Times.



## PARKSIDE FLATS: 362 ST. NICHOLAS AVENUE

The building boasts 22 homes that are intelligently designed, and are characterized by clean lines, innovative use of contemporary amenities.



# ELH & KRETCHMER JOINT VENTURES

## CONEY ISLAND COMMONS

Hirschfield and Kretchmer were first introduced in 2006, when The Kretchmer Companies sought partners to respond to the HPD RFP for a site on Surfside Avenue within the Coney Island Urban Renewal Area. Hirschfield's participation in numerous HPD programs, which also include the Cornerstone, New Foundations and Asset Sales Programs, and his extensive experience partnering with non-profits and using Low- Income Housing Tax Credits and Federal HOME Funds, complemented Kretchmer's expertise and enthusiasm, creating a formidable team with deep experience and strong skills. Kretchmer and Hirschfield, along with partner Steven Zervoudis of Galaxy General Contractors, won the highly competitive RFP in 2006, and began pre-development work for the proposed mixed-income, home-ownership project.

As the project advanced through the pre-construction phase, including ULURP, the Great Recession of 2008 took firm hold. It became apparent to both the development team and HPD that the project as envisioned – mixed-income homeownership – was no longer viable. Nonetheless, the partnership stuck with the project, and with HPD's support, the project was re-envisioned as a 100% affordable rental development. In October 2012, fate would intervene yet again to disrupt the project in the form of Superstorm Sandy. By then the project was in mid-construction, in a section of Brooklyn that was deeply impacted by the storm. The partners moved quickly to restore damage to the site, file insurance claims, and restart construction a short 12 weeks after the storm hit. It was a stellar performance by a capable, resilient and dedicated development team.

In addition to withstanding the larger forces of a severe economic downturn and Mother Nature, the developers completed a highly complex financing (using HPD's LAMP program, New York City RESO-A funds and private contributions), managed a complicated transaction and build-out for the YMCA (there was intense community interest in the YMCA, and the developers and the Y worked very hard together to design and develop the exact facility the community wanted and needed), and navigated a tricky and volatile political environment in order to complete the project. Finished in 2013, the $84 million Coney Island Commons is a sustainably designed complex of two buildings comprising 195 apartments, a 42,500 square foot YMCA, and enclosed parking structure with a rooftop recreation area. The residential buildings, seven and eleven stories, contain a mix of studios, one and two bedroom units for rent to households earning up to 60% AMI. The YMCA includes an aquatic center, a full court gymnasium, and fitness and multi-purpose rooms. The project is participating in the NYSERDA Multifamily Performance Program and incorporates strategies to conserve energy and promote healthy living, including green roofs planted with natural grasses and native wildflowers. In 2014, Coney Island Commons won the prestigious Build Brooklyn Award for Community Development from the Brooklyn Chamber of Commerce, awarded to projects that enrich Brooklyn's neighborhoods and economy.



# STANLEY COMMONS

In 2008, in response to a joint RFP by NYCHA and HPD, Stanley Commons, LLC was awarded development rights to a development site on environmentally remediated land in Brooklyn's East New York neighborhood. Their winning plan, called Stanley Commons, originally proposed a homeownership development featuring 53 townhouse structures with 144 apartments. As with Coney Island, the depressed real estate market forced changes, and the project was re-envisioned as a six-building development housing 240 rental apartments.

The re-imagined project also includes the addition of a 19,000 square foot community facility providing social services, to be operated jointly by Good Shepherd, a

NYC social services provider and MAN-UP, a Brooklyn-based service organization. The project will provide rental apartments for households earning 60% of AMI and is slated for completion in December 2016. It is presently in construction. The 6 buildings representing the residential component have been topped off. Rental and occupancy will start early 2017.





Stanley Commons Progress as of 10-5-16

## Bronxchester



Kretchmer and Hirschfield were also part of a larger development team including Hudson, BRP and Related that was recently awarded development rights to the Bronxchester site in the Melrose/Hub section of the Bronx. The team's winning proposal for these large, highly sought-after sites will create a nearly 1 million square foot mixed-use development, including 985 affordable housing units, over 45,000 square feet of ground-level retail, 30,000 square feet of community space and a 48,000 square foot YMCA. The project is expected to break ground early in 2016. Kretchmer and Hirschfield will share responsibility for developing the affordable housing, as well managing other aspects of the project during and after construction, including direct responsibility for completion of the first mixed-use building, which will house 211 units and the YMCA.



## NATIONAL REAL ESTATE

# Investor®

June 2007

**35 Financial Market Jitters**
Widening spreads on CMBS deals tied to subprime lending

**45 Miami's Perfect Storm**
How the condo bust has spurred a wave of office building

### THE ART OF
# AFFORDABLE HOUSING

While battling a shortage, developers like Larry Hirschfield offset rising costs with creative partnerships and financial incentives. p. 26

A PENTON MEDIA PUBLICATION

---

# CONTENTS



35

73

**CRISIS LEVELS:** Developers are finding it harder to build reasonably priced housing due to rising construction, energy and land costs coupled with government regulations. However, savvy developers like Larry Hirschfield of ELH Management are finding creative ways to fight back.

26

### DEVELOPMENTS

**10** Lower Manhattan real estate is rising up from the ashes.

**11** Q&A with Christina Noelle, developer, MCZ Development Corp.

**12** Miami's Little Havana attracts developers of workforce housing.

**14** Atlanta's condo market teeters on the brink of total saturation.

**16** U.S. pension funds diversify portfolios via global investment.

**18** The Port of Savannah welcomes spec space to burgeoning market.

### FEATURES

**35** SHIFTING WINDS
Will analysts' earnings dampen CMBS issuance?

**45** MIAMI AREA REVIEW
How the condo boom and bust helps commercial real estate.

**53** STUDENT HOUSING
Developers learn what it takes to make the grade on product.

**59** SALE-LEASEBACKS
Investors pursue portfolios to place capital efficiently.

**67** GOING ONCE, TWICE ...
Sellers tap into auctions to fetch higher asset prices.

**73** MIXED-USE FORMULA
How partnerships soften the blow of competition.

### COLUMNS

**6** FIRST WORD
What does 'sustainability' mean and why do we care?

**8** LANDMARKS & LEADERS
From lumberer to developer, Forest City's roots run deep.

**20** WORLD BEAT
New French president rides the coattails of office boom.

**22** FINANCING TODAY
Investors choose to play risk curve with mezzanine loans.

**78** MEXICO'S COASTLINE
Developers buying beachfront must navigate complex laws.

**80** MONEY & REAL ESTATE
Worst-case scenario: U.S. trade deficits cause global recession.

**82** TAX NOTES
How to reduce tax assessments on aging manufacturing plants.

**88** LAST WORD
Are there sharp teeth behind the highly touted green labels?



# THE ART OF
## AFFORDABLE HOUSING

While battling a shortage, developers like Larry Hirschfield offset
rising costs with creative partnerships and financial incentives.

By Denise Kalette

**COVER STORY**

A s millions of Americans struggle with the cost of housing, developers who build affordable apartments and condos are confronting such severe financial challenges that at least one major firm has stopped building subsidized projects.

To get low-cost projects built today, developers must search for ways to partner with government agencies or nonprofits to snare low-cost land, and to gain financial incentives.

The need is clear: Some 17 million American households spend at least 50% of their income on housing, and many families skimp on food and healthcare because of the cost of shelter, according to a report issued in June by Harvard University's Joint Center for Housing Studies.

From 2001 to 2005, the number of

**ELEGANT AFFORDABILITY:** Developer Larry Hirschfield guided the renovation of the 34-unit Brooklyn grande dame, the Imperial, built in the 1890s. Rent for a one-bedroom starts at $430. Tax credits provided an incentive for the project.

Photography by Dirk Eusterbrock

## COVER STORY

households spending more than half their income for housing jumped by nearly 3.2 million. Meanwhile, the nation's inventory of affordable units dropped by 1.2 million in the decade ending in 2003.

"One-third of all households are spending more than 30% of their income on housing. It's gotten so high, people no longer find it shocking," says Rachel Drew, Harvard research analyst and project manager for the new report. As for the millions spending at least 50%, "We call that a severe housing cost burden."

From Washington to San Francisco, workers, the elderly and others clamor for affordable apartments and place their names on long waiting lists for housing aid. Meanwhile, developers are fighting rising construction, energy, and land costs, as well as governmental regulations.

In Boston, more than 15,500 applicants languish on one nonprofit's housing list. So many vie for low-rent units in New York City that officials use lotteries to pick tenants. Many firemen, nurses and teachers search in vain for reasonably priced lodging in the Big Apple, where a one bedroom can fetch $6,200 on the chic Upper West Side, or $2,800 in artsy SoHo.

### Responding to the problem

"Everybody knows there's a crisis," says developer Larry Hirschfield, president of ELH Management LLC, a Brooklyn-based property development firm that has renovated scores of buildings. "In Manhattan, in a doorman building, you can start at $4,000, $5,000 or $6,000 a month and up — that's a rental price."

Across the country, an army of developers and investors like Hirschfield have stepped in to produce low-cost housing, and found creative ways to navigate the governmental and financial obstacles.

Some of Hirschfield's rehabs were funded through New York Mayor Michael Bloomberg's 10-year, $7.5 billion program to create 165,000 affordable units throughout the city. Since 2003, about 55,000 units have been created.

Hirschfield's labors gave new life to the turreted Brooklyn gem the Imperial, which had fallen into disrepair. Built in the 1890s with 25 palatial apartments, it now offers 34 units for rent starting at



LIFE ABOVE THE HUBBUB: In Wheaton, Md., Bozzuto Development Co. partnered with the nonprofit Housing Opportunities Commission of Montgomery County to build the $50 million mixed-use MetroPointe project at a subway stop. Of its 173 residential units, 30% are affordable.

$430 per month. As part of a Coney Island effort, Hirschfield is partnering with two other firms to build 152 co-ops that could cost as little as $117,000 for a two-bedroom, based on the buyer's income.

### $1 Coney Island land deal

Hirschfield works with New York's Housing Development Corp., a leading issuer of bonds for multifamily affordable housing. Under the agreement with HDC to build co-ops and a community center through Coney Island Commons LLC, with partners KB Cos. and Galaxy General Contracting, the city will convey the property for $1 and contribute $5 million toward the community center.

The New York State Affordable Housing Corp. will provide a subsidy ranging from $25,000 to $40,000 per apartment. The units will be sold via lottery, with at least half the co-ops reserved for Coney Island residents.

The $56 million project, located about a mile from the historic amusement park, includes a 40,000 sq. ft. community center. "They have people banging at their door" at the sales firm, the builder says.

But spiraling costs and federal rules barring thousands of owners from raising rents to offset higher operating costs, hamper many developers. Some no longer participate in government programs.

"We're not building any more subsidized housing, which I'm sorry about," says Ron Terwilliger, chairman and CEO of Atlanta-based Trammell Crow Residential. One of the nation's largest

multifamily housing developers, the company formerly built about 1,500 affordable units a year for people earning 60% or less of an area's median income, and received federal tax credits in return. But development costs rose by 50% in the last three years. "With the increase in land costs and construction costs and the lack of rent increases, it doesn't work for us anymore," says Terwilliger.

The company's last initiated low-income project, a $48 million rental development across from the Georgia State Capitol, is being built in cooperation with the Atlanta Housing Authority. Tenants have begun moving in after completion of the initial 269 units, and another 421 units are under construction.

Terwilliger, who donated $12 million to nonprofits for affordable housing construction, believes too much of the burden for creating the housing has fallen on developers. "The governments aren't doing enough to subsidize the housing," he says. "This is a society-wide problem."

Developers say solutions to creating economical housing lie in partnerships with community agencies, and persuading local and federal government to offer additional subsidy programs, particularly those that allow realistic adjustment for increased operating expenses.

They also urge local governments to rezone land to permit higher-density housing near workers' jobs. Some investors ask cities to donate land for projects so the savings can be passed on to tenants or buyers.

---

### Frozen rents shock industry

The U.S. Department of Housing and Urban Development recently published new income limits that freeze rents in roughly 2,000 of the nation's 3,100 counties for property owners receiving tax credits through Section 42 of the IRS tax code. HUD's income limits are used to set maximum rents owners can charge.

Low income housing tax credits are the government's main incentive for creating affordable housing, spurring construction of more than 1.8 million units in the last two decades. The government offers about $5 billion in tax credits annually through state and local agencies to construct or rehabilitate rental housing.

The rent freeze is the biggest shock to hit the tax credit industry in years, says Paul Emrath, an economist at the National Association of Home Builders in Washington, D.C. "That's unlike anything we've seen before. That came as a surprise to everyone." HUD based its current income limits on calculations from the American Community Survey conducted in 2005 by the U.S. Census Bureau.

The newer survey showed median family income figures that were substantially lower than those indicated by the 2000 Census, even adjusted for inflation, Emrath says. To resolve industry frustration, the home builders propose decoupling rents from HUD income limits and tying them to the consumer price index or another inflation measure.

Rent freezes have long posed a problem for property owners participating in other federal programs, including HUD's Section 8 program, which offers housing assistance and vouchers to tenants whose incomes fall within HUD guidelines.

"The debt-service coverage has been deteriorating for Section 8-assisted properties because the rents are frozen," while owner costs are rising, says Wendy Dolber, managing director of Standard & Poor's public finance housing group. "Some of the owners have been taking money out of their own pockets to put back into the property. It's questionable how long they can do that."

The contracts of about one million housing units financed 20 or 30 years ago with government assistance and subject

to federal rules now are expiring. As the loans are paid off and contracts with investors expire, the units will vanish from the Section 8 portfolio, freeing private owners to raise rents. Only about two million "deeply affordable" apartments will remain, Dolber says, mainly federally subsidized or owned units.

### Public, private solutions

Many developers believe the future of affordable housing lies in a new generation of structures created through partnerships with public agencies, and in creating infill projects. Some developers receive incentives for building multifamily housing in which a percentage is set aside for people whose incomes are lower than the area median income.

Here's how government and private industry are dealing with housing issues.

▶ **HUD blocks Brooklyn deal:** HUD Secretary Alphonso Jackson recently scuttled the proposed $1.3 billion sale of Brooklyn's Starrett City rental complex, saying the sale would have displaced the 14,000 residents of the nation's largest federally subsidized rental complex. Developer David Bistricer, a partner in Clipper Equity LLC, twice tried to buy the 6,000-unit complex from Starrett City Associates. The deal requires approval by

the federal government and New York State, which holds Starrett's $234 million mortgage. The state blocked Bistricer's second purchase attempt in April, saying it would be too costly to increase government subsidies to keep rents affordable.

▶ **Struggle in Beantown:** In Boston, a rising number of city dwellers cannot afford market rental rates. About 45% of those receiving Section 8 vouchers for housing aid are workers, says Amy West, a spokeswoman for the nonprofit Metropolitan Boston Housing Partnership.

According to the National Low Income Housing Council, the Boston area median household income in 2006 was $84,100. A family earning 30% of that, or $25,230, would be required to pay no more than $631 a month for housing. Meanwhile, the Fair Market Rent for a two-bedroom apartment in Boston is $1,366 per month. West says, and a family would have to earn $54,640 to afford it.

▶ **Buyers snap up Miami lofts:** In Miami, where the recent condo boom sent rental and purchase prices rocketing before the market fizzled, many workers have been priced out of the market.

"A person who made $50,000 a couple years ago could not afford to live downtown, and now a person who makes

### New rules stir investor anxiety

**M**ultifamily housing investors are bracing for new federal rules expected to be issued in late June that some fear could compound their difficulties:

• Thousands of 15-year federal contracts to offer affordable housing in exchange for tax credits are expiring, and many of the properties are expected to be sold. Owners are waiting for the IRS to reveal new guidelines for the sales. The IRS has required that units be offered first to buyers who will keep them affordable, but many sellers want to earn market rates, and are eager to learn what constraints are placed on the sales.

• On June 30, current IRS guidelines for utility allowances expire, and the IRS is updating rules that now limit landlords' ability to recoup utility costs for tax credit properties. Some owners have been forced to dip into operating reserves to meet expenses, and industry groups hope the new IRS proposals will permit allowances based on accurate utility costs. The proposals will be subject to public comment before they become final.

• Another source of investor anxiety is a proposed fee increase for loan guarantees from the Federal Housing Administration. A similar plan was withdrawn months ago after stinging rebukes by the Mortgage Bankers Association and bipartisan Congressional opponents. Real estate groups claim the fee increase is a disguised tax on rental housing, and that it will lead to higher rents.

— Denise Kalette

Issue 6.4 • Summer 2006

# CPC Update

## Profiling CPC Developer Larry Hirschfield



Larry Hirschfield's life has taken many twists and turns: he's been a professional musician and now he's a Brooklyn and Manhattan real estate developer. Hirschfield's road from playing for some of America's most famous orchestras to building multifamily housing is an interesting tale of a necessity for more space creating an entirely new career.

Hirschfield started his working life as a classical percussionist who played timpani, xylophone, drums, cymbals, triangles, vibraphone, and chimes to name a few. Hirschfield received his undergraduate training at Columbia University and continued on to the Mannes College of music. After graduating he pursued a career as a freelance musician recording in studios, touring with the NYC opera, and with Broadway shows as well as backing up many famous pop artists.

*(continued on page 4)*

### Developer Larry Hirschfield

*(continued from page 1)*

By the time the 1980s rolled around, his large collection of instruments forced him to look for more space. After listening to a financial expert on a radio talk show who recommended investment in real estate, he set out to buy a brownstone, eventually narrowing his search to Ft. Greene, Brooklyn. He purchased a 3-family home in 1985 at a time when Ft. Greene was considered the new housing frontier. However, the building was large, very inexpensive and it was filled with historic detailing.

After purchasing the building he had a life altering, whole mini Real Estate Experience. Hirschfield contributed his own labor to the work and did such a good job that he became the contractor's assistant. The renovation included restoring the historic details, and creating a duplex apartment for himself and his instruments, along with two rental units.

In 1991-1992, a combination of budget cuts in the National Endowment for the Arts and the advent of music looping technology and "sampling" took a big bite out of live music performance. Especially hard hit were the percussion parts that were his specialty. On the other hand, Hirschfield had fallen in love with what he did with the one building and so he bought two more brownstones!



*1151-1155 Dean Street*

Beginning in 1995, he began working with the New York City Department of Housing Preservation and Development (HPD) through their Neighborhood Entrepreneurs Program and in 1997 did his first 8A project with the City with CPC as the lender. This first project was 1151-1155 Dean Street, which he had purchased in 1993. Not a single system had been replaced in the building since 1905, but it was structurally sound. He refinanced the property and began renovations with CPC starting in 1997. Together, he and CPC mortgage officer Anita Pins put together a plan that included refinancing from CPC, an 8A loan, and a weatherization grant to replace the windows and boiler. After that experience, Hirschfield decided to continue working with CPC.

"Anita is great, she really knows her stuff. She helped me put together a brilliant plan for Dean Street. CPC is flexible and accommodating and I learned a lot. I learned that working with weatherization and tying it to a construction loan had its pitfalls," said Hirschfield. "Anita even worked with me when the job was held up because of weatherization funding issues."

He is currently in round 5B of HPD's Third Party Transfer program, which means he will have nine more buildings he intends to finance with CPC. Mr. Hirschfield is also working on a City Cornerstone project with Bruce Dale, CPC's regional director for Manhattan and the Bronx, in Harlem on St. Nicholas Avenue and 128th Street and has closed four deals in Brooklyn for a total of 11 buildings. He also just financed another new project on Rutland Road for an additional three buildings and was just awarded two clusters in HPD's New Foundation Program, which he will also undertake with CPC and Anita Pins.

"CPC, along with HPD, helped me become a real estate entrepreneur," said Hirschfield. "If we hit a bump, I know that Anita and CPC have what it takes to fix it. CPC really cares."

While Mr. Hirschfield is no longer a full time or part time musician, he still finds the time to teach his children the piano and hopes that they will continue to create a family music legacy.

# Hispanics propel U.S. apartment market

While Congress grapples with proposals for a sweeping overhaul of U.S. immigration policy, the apartment industry is advising firms to prepare to accommodate thousands of new arrivals, primarily Hispanics. Foreign-born and minority households are the fastest-growing segments of the housing market, according to a report by the Joint Center for Housing Studies of Harvard University.

The minority share of U.S. households is expected to expand from 28% in 2005 to more than 32% in 2015 and have a major impact on multifamily housing. Over the next eight years, the number of rental households is projected to increase by at least 1.8 million. "Minorities will be responsible for the entire gain and will eventually account for the majority of renter households," the National Multi Housing Council (NMHC) writes in a lengthy report on preparing for a rental housing boom.

"When it comes to housing demand, the immigration story is essentially a Hispanic story," reports NMHC. Half the immigrants entering the U.S. are Hispanic, and Hispanic households rose by 58% in the 1990s. Hispanics make up 54% of immigrant renters, the report states, and the number is growing annually.

The implication for apartment firms, whether in cities or suburbs, according to NMHC's 2006 annual report, is that "to a large degree, the future of rental housing is focused on Hispanics."

While the immigrants' impact on the rental market in coming years is expected to be substantial, the industry is monitoring the proposed legislation to reform U.S. policy, which could affect the market. One plan gathering bipartisan support in Washington would offer millions of illegal immigrants now in the U.S. a chance for legal status, but would prevent future arrivals from staying.

As the country grows more ethnically diverse, apartment firms will need to adapt to the renters, say authors of



**MARKET SIZZLES AS HISPANICS ARRIVE**
The burgeoning Hispanic population is spurring the rental market. The number of Hispanic renters is expected to rise to 9.1 million by 2020, a Harvard study shows.

*projected

Source: Harvard University, NMHC

the NMHC study. At many properties, Spanish-speaking staff and bilingual leases will become the norm.

Savvy apartment owners already have taken the immigrant market into account. "I think it's critical throughout our mid-Atlantic states and particularly in the Washington, D.C. area," to adjust to the newcomers, says Tom Bozzuto, chairman and CEO of the Maryland-based Bozzuto Group, which has built and acquired more than 28,000 apartments and for-sale homes with a combined value of nearly $3 billion.

"There is a tremendously large immigrant population in Montgomery County," Bozzuto says. Though the county has the image of a wealthy Washington, D.C. suburb, it also has a large share of people who need affordable housing. The company built a mixed-use, mixed-income project that includes 173 apartment units at a subway stop in Wheaton, Md., setting aside 30% of the units for affordable housing. The group also built 122 condos priced from the low $200,000s, a rarity in the pricey capital area.

## Bridging the language barrier

"One of the things we have at all our [rental] properties is an interpreter system," Bozzuto says. It amounts to a telephone system with two handsets. At one property, a Cantonese-speaking pro-

spective tenant approached the English-speaking manager. The manager picked up one phone, and the Cantonese-speaking woman picked up the other, and her words were simultaneously interpreted for the manager.

The firm surveyed its own employees and discovered they had come from 52 countries, from El Salvador to Australia, Germany and the Netherlands. All work in the region between Northern Virginia and Pennsylvania. A number of the company's managers are bilingual.

## Heavy housing burden

Across ethnic lines, the need for affordable housing is clear, says Bozzuto, a member of the Harvard Joint Center advisory board. One of every three U.S. households spends more than 30% of its income on housing, and one in every seven households spends more than 50% on housing.

Bozzuto is not certain what percentage of his tenants are immigrants, since the company does not seek that information, but he says the majority are Americans.

"It takes a great deal of ambition and guts to leave a place where all your family is and where you grew up, and come to a place where you know no one," Bozzuto says. "I have great respect for the immigrant population."
— **Denise Kalette**

$80,000 cannot afford to live downtown," says Oscar A. Rodriguez, senior vice president of development at The Related Group, which targets workers earning between $40,000 and $80,000 a year, and obtains government subsidies.

When Related built the 23-story, $50 million Loft Downtown project, offering 196 units priced from $99,000, the tower sold out in three weeks, and residents began occupying the condos in 2005. The project was five times less profitable per unit than the luxury Icon Brickell, a $500 million, 50-story tower with 1,000 units opening in 2009, Rodriguez says.

▶ **Block Grant helps Maryland project:** In Maryland, the Bozzuto Group worked with a local housing authority and a nonprofit to develop The Addison at St. Paul, offering condos from the low $200,000s, says chairman and CEO Tom Bozzuto. The nonprofit bought an apartment project near a subway station inexpensively, and secured a $500,000 grant commitment from Prince George's County under the Community Development Block Grant Program. Ninety of the workforce units have been sold.

With government funding in short supply, the number of affordable units shrinking, and remedial efforts piecemeal, prospects for a turnaround are bleak, the Harvard authors conclude. Despite this, many developers have found success.

Even with government assistance, Hirschfeld says it's too early to tell what sort of return his Coney Island investment in New York will generate. After years of rehabbing units, Coney Island Commons is his first project built from scratch, and he, too, cites the daunting construction and energy costs.

"I don't know what our next move is going to be. I think we'll continue to look at affordable housing, but where the land is going to come from, how it's going to be financed, how it's going to work — that's anybody's guess."
*Denise Kalette is Senior Associate Editor.*

*We welcome your response. Please tell us about your experience with affordable housing, with specific examples and suggestions for developers and government participants. Email comments to denise.kalette@penton.com.*

**The New York Times**

REAL ESTATE  |  STREETSCAPES | LOUIS SEITZ

# Three Singular Brooklyn Buildings, Each With a Second Chance

By CHRISTOPHER GRAY    JAN. 28, 2007

IN the 1890s, Louis Seitz built three singular apartment houses in Brooklyn: the Imperial, at Pacific Street and Bedford Avenue; the Alhambra, at Nostrand Avenue and Macon Street; and the Renaissance, at Nostrand and Hancock Street.

As decades passed, each building went to a different owner. But all followed the downward path that overtook much of Brooklyn; a century later, they were disintegrating.

Under the supervision of the city's Department of Housing Preservation and Development, they have now been rebuilt by developers who have remained faithful to the originals, at least on the exterior. The buildings in their infancy catered to a wealthy clientele, but today most of the apartments are for moderate- or low-income tenants.

Born in 1860, Mr. Seitz left school at 16 and worked in a wholesale business of some sort before going into real estate in 1884.

The masterpiece of his trio, built in 1889, was the wild and woolly Alhambra. The blocklong building was set back 15 feet from Nostrand Avenue, with six towers, arcaded balconies, a garden and a croquet lawn. It mixed several styles, and in 1890, The Brooklyn Daily Eagle said it "might best be described as Morrisian," an allusion to the pyrotechnics of Mr. Seitz's architect, Montrose Morris. The five-story building,

which cost $200,000, had a resident engineer and 32 apartments of 8 to 10 rooms. It was instantly one of Brooklyn's best apartment houses.

Two years later, Mr. Seitz and Mr. Morris completed two near twins: the Imperial, several blocks south in Crown Heights, and the Renaissance, a block north of the Alhambra.

According to an 1892 issue of The Eagle, Mr. Seitz told Mr. Morris to prepare plans for the Imperial regardless of cost, in order to make "a monument handsome beyond compare." And that monument, at Pacific and Bedford, is wonderfully rambunctious, its triple outsize turrets and pointed roofs like the three musketeers backed into a corner, swords flailing.

Although the exterior walls meet at right angles, the plot is slightly acute — perhaps only 80 degrees instead of the usual 90 — which animates the facade in a way seen in few other buildings. The whole is dominated by triple-height arches, topped by an irregular attic story, its slate roofs crowded together as if jockeying for position.

The Alhambra is in a moody palette of orange and brown and red, while the Imperial turned the corner of the new Renaissance style, airy and light in soft yellow and buff brick and terra cotta. Two-story-high fluted columns give the later building a Roman pomp. In 1892, The Eagle called it "an architectural dream in cream and white," generally patterned after McKim, Mead & White's Hotel Imperial, which once stood at 32nd Street and Broadway in Manhattan.

The 1892 Renaissance, at Nostrand Avenue and Hancock Street, is essentially the same as the Imperial, although less operatic.

An 1893 book, "The Eagle and Brooklyn," singled out Mr. Seitz's efforts, noting his "discriminating artistic sense" and saying he had revolutionized the Brooklyn apartment market. Andrew Scott Dolkart, who has studied the career of Montrose Morris extensively, calls him one of Brooklyn's great 19th-century architects.

In an 1899 account, The Eagle called the Imperial "one of the finest apartments in Brooklyn"; in 1901, it reported that the 25 seven-room apartments each rented for

$60 a month. According to the 1905 New York State census, tenants had occupations like lawyer, exporter, engineer and stockbroker.

By the 1970s, all three buildings were on the skids. The city took possession of the Imperial in 1979, because its taxes had not been paid. An article in The New York Times in 1983 estimated the building's expenses at $67,000 a year, while reporting that the rent roll could not have exceeded $57,000.

The buildings were designated landmarks in 1986, but within a decade the Renaissance was vacant, the Alhambra had only stores as occupants (much of its roof had collapsed from a fire), and the Imperial had only a few tenants.

Rebuilding work on the Alhambra and the Renaissance took place in the 1990s, but the Imperial did not reopen until last October, after a $6.3 million gut renovation similar to the those at the Alhambra and the Imperial.

There is no longer anything historic about any of the interiors, which are plain white and could be in a postwar building on Third Avenue in Manhattan. But in the Imperial some of the two- and three-bedroom apartments retain some original character because they occupy the turrets. A fifth-floor apartment at the northwest corner, with distant views of the Manhattan skyline, is now available at $1,800 a month at market rate, or as low as $700 for prospective tenants who meet certain income guidelines.

Outside, the building's developer, Larry Hirschfield, the president of ELH Management, has delivered interesting results. The masonry has been cleaned, but not too harshly, preserving the dings and nicks of time that give a building character. The slate roofs were kept intact, not rebuilt in modern materials, which would have removed more of the building's patina.

Mr. Hirschfield also had to reproduce much of the copper work in the triple-height window bays. But instead of either cleaning the old copper to look new, or patinating the replacement copper to look old, he left old and new together, so some parts are aged green and others are shiny brown — a bit odd, but that's how old buildings often look in real life.

So the Department of Housing Preservation and Development has saved the shells of Mr. Seitz's three signature buildings from disaster and now can make some claim on the same kind of revolution he created in the 1890s.

E-mail: streetscapes@nytimes.com
A version of this article appears in print on , on Page RE7 of the New York edition with the headline: Three Singular Brooklyn Buildings, Each With a Second Chance.



This is how the Imperial appeared about 1900 and how it looks today.

Ruby Washington/The
New York Times (top); MetroHistory.com



7/20/15 9:22am

## Affordable Housing Should Always Look This Good: Crown Heights Jewel Nearly Restored



One of Crown Heights' most important houses is about to begin its new life as affordable housing.

The John and Elizabeth Truslow House at 96 Brooklyn Avenue was originally built for a brilliantly wealthy family who made a fortune in stove manufacturing. But after moldering in obscurity, affordable housing developers NIA JV and ELH Management swooped in to brighten its future.

Restoration on the home — which began in 2013 — is visibly nearing completion. When Brownstoner visited on Sunday, the exterior was notably spruced up and, we presume, all the holes and leaks fixed. Soon, its seven new apartments will be occupied by families making $36,680 to $120,240 a year.





The unique square oriels — once peeling and leaking — have been repaired and received a fresh coat of paint. New, Landmarks-approved windows have gone in on the top floors.

NIA JV LLC and partner ELH Management LLC are no strangers to historic restoration and conversion for affordable housing. ELH Management's president is Larry Hirschfield, known for rehabilitating landmarked properties into affordable units. In 2007, Hirschfield notably converted The Imperial — a grand building at Pacific and Bedford — into 34 units with rents then staring at $430 a month.

ELH Management is also building the 100 percent affordable (and architecturally sensitive) apartments at 816 Washington Avenue in Prospect Heights, as we noted last week.



The peeling and damaged oriels in 2013. Photo by Suzanne Spellen

Demo of 96 Brooklyn Avenue's interior started in 2013. A tipster at the time told us he'd seen "wheelbarrows of debris being carted out" of the house. The site was also cleared of a tiny jungle of overgrown trees and shrubs. Even though the interior has reportedly been gutted, the footprint of the seven apartments has changed only slightly, according to the alteration permit.

The Queen Anne style home was built for John and Elizabeth Truslow in the 1880s, back when Crown Heights was suburbia. The home was designed by one of Brooklyn's leading 19th century firms, the Parfitt Brothers. Interestingly, architectural historians believe that the house's shape may have been based on a building (since demolished) that the Parfitts designed for the Brooklyn Association for Improving the Condition of the Poor, where Truslow was a board member.

In 2013, our columnist Montrose Morris wrote "Crown Heights North community is looking forward for this house to stop traffic on this corner. Like the Imperial, it is one of our architectural jewels."

96 Brooklyn Avenue Coverage [Brownstoner] GMAP













Above, the house in 2013, before restoration. Photo by Suzanne Spellen

## Brownstoner

# Crown Heights Gem Shines Again: The 19th Century Truslow House



Architecture | Crown Heights | by Susan De Vries  💬 3                    Nov 29, 2016 • 11:27am

Crown Heights is filled with architectural delights, but a particularly significant house sits on the corner of Brooklyn Avenue and Dean Street, designed by the prolific Parfitt Brothers, a prominent Brooklyn architectural firm known especially for its original work in the Queen Anne style.

A walk past the John and Elizabeth Truslow House at 96 Brooklyn Avenue shows that the once-neglected structure is glittering once again after an exterior restoration.



Grandly sited on the corner of Dean Street and Brooklyn Avenue, the rich red brick, brownstone trim, contrasting green painted details, and unusual square oriels all add to the picturesque drama of the house.



After years of delays and uncertainty, restoration was begun in 2013 and was completed in September, when the building received its final certificate of occupancy.



Affordable housing developers NIA JV LLC and ELH MGMT LLC undertook the restoration of the exterior and the conversion to eight affordable rentals.



The restoration appears to have included the small garage, constructed in the 1950s — the same time the rear extension was added to the house.



[Photos by Susan De Vries]

**Related Stories**

· Affordable Housing Should Always Look This Good: Crown Heights Jewel Nearly Restored
· Building of the Day: 96 Brooklyn Avenue
· Parfitt Brothers in Brooklyn

*Email tips@brownstoner.com with further comments, questions or tips. Follow Brownstoner on Twitter and Instagram, and like us on Facebook.*

# LARRY HIRSCHFIELD - BIOGRAPHY AND PROJECT EXPERIENCE

Larry Hirschfield has been a developer of residential real estate in New York City since 1992. He is the sole owner of ELH Mgmt. LLC. Through ELH Mgmt., Hirschfield has been responsible for the renovation, rehabilitation, design and new construction of more than 1,015 units of affordable housing. A leading developer of affordable housing in the City of New York, active in Brooklyn and Manhattan, Larry Hirschfield is on the Board of Directors of New York State Association for Affordable Housing (NYSAFAH) and the Citizens Housing and Planning Council.

Hirschfield has owned, managed, and developed residential and mixed use real estate in Manhattan, on the Upper East Side, Washington Heights, Harlem and most of the developing neighborhoods in Brooklyn, New York, since 1992 and also owns medical, office, and retail property in Pennsylvania, North Carolina, Georgia, New Mexico, California, Arizona, Oklahoma, Illinois, Virginia, Florida, Minnesota, Ohio, and Colorado.

A graduate of Columbia University, Hirschfield entered the real estate industry in 1992.  His earliest projects were the renovation and restoration of two brownstones, one in Fort Greene and the other one in Prospect Heights, converting them from rooming houses to Class A dwellings.  Several of the units were occupied at the time Hirschfield took title, with a number of those tenants being able to reoccupy their units once the renovations were complete. One of the brownstones was also a NYC landmarked property. The interior and exterior historic details were carefully restored.

Hirschfield then moved onto larger projects, acquiring several apartment buildings in Washington Heights and Crown Heights.  The Washington Heights properties had been foreclosed on and in distressed condition. The Crown Heights buildings, of similar vintage and disrepair, required the replacement of all major systems. Hirschfield turned these properties around through HPD's Article 8A Loan Program.

To accommodate his rapidly growing business, Hirschfield formed ELH Mgmt. LLC in 1995. The establishment of the corporation consolidated the increasing number of projects into a single well-run and increasingly well-known entity.

ELH Mgmt. LLC then expanded from the renovation and rehabilitation of small and medium-sized apartment buildings into the management of affordable housing in 1995.  At that time, Hirschfield participated in the first of a variety of HPD programs when his company was designated as a developer in Round I of the Neighborhood Entrepreneurs Program.  Through NEP, Hirschfield took possession of formerly city-owned property and made use of the Low-Income Housing Tax Credit. In addition, Hirschfield worked with a local non-for-profit to provide social services to the tenants.

ELH Mgmt. LLC was appointed 7A Administrator of 18 buildings beginning at the end of 1997 and continuing to this day in cases brought by HPD. Hirschfield and his staff worked to renovate and stabilize the buildings and to provide essential services to tenants.

Hirschfield's business continued to expand in 1998 when ELH Mgmt. was designated in Round IV of the Neighborhood Entrepreneurs Program. The NEP program involves both the syndication of Low Income Housing Tax Credits and the use of Federal HOME Funds. In accordance with LIHTC and HOME guidelines, a certain percentage of the units are rented at 60% of AMI and a certain percentage at 50% of AMI; the remainder of the units are rented at market rate. More recently, ELH has been designated as a developer for two clusters in the 203K NEP.  Hirschfield's flagship property in the NEP program is the Imperial, a 35-unit mixed-income rental in Crown Heights. The Imperial was meticulously restored by Hirschfield to a degree commensurate with its status as an individually designated New York City landmark.

The next HPD program in which ELH Mgmt. participated was the Third Party Transfer Program. ELH Mgmt. was awarded 19 buildings in Rounds III, IV and V-B of the program. These buildings are located in Crown Heights, Prospect Heights, East Flatbush and Clinton Hill. With the acquisition of these properties, Hirschfield created ELH Construction Company, LLC to do the rehabilitation for his own, and other developer's, properties.  ELH Mgmt. also manages affordable rental properties in the Third Party Transfer Program for the non-profit Brooklyn Neighborhood Improvement Association.

ELH Mgmt. has taken on additional new construction projects through HPD's Cornerstone Round III: they were awarded a site on St Nicholas Avenue in Harlem where they built and sold out an 11-story condominium project. .  In Crown Heights, ELH built a 38-unit mixed-income apartment building utilizing NY State tax credits (SLIHC).  This project is distinguished by the transferring of adjacent air rights, connecting to an earlier ELH building in NEP, arranging a lot merger, and finally re-ULURPing the land to see the project to completion.

ELH has also bought and renovated a number of other properties, including three in Manhattan, through HPD's Asset Sales Program as well as through the private market.

Other recent acquisitions include project based Section 8 buildings Crown Heights and Prospect Heights providing for further diversification in management.

Hirschfield has well-established relationships with primary bankers and lenders in the field of affordable housing. Financial Institutions with whom Hirschfield has worked include Local Initiatives Support Corporation (LISC), Richman Housing Resources, RBC Capital Markets, Santander Bank, Dime, Low Income Investment Fund (LIIF), BPD Bank, Astoria Federal Savings and The Community Preservation Corporation (CPC) and numerous lenders around the country.  He was featured in CPC's Summer 2006 Newsletter. Non-profits with whom Hirschfield has worked successfully are Urban Homesteading Assistance Board, Brooklyn Neighborhood Improvement Association, Habitat for Humanity, and Urban Homesteading Assistance Board (UHAB).

Hirschfield has an excellent track record in the rehabilitation and construction of affordable housing. The total development costs of project he has completed or are underway exceed $200 million. Hirschfield's emphasis on architectural detail, community context, efficient use of space and maximum tenant satisfaction has contributed to his achievements in renovation, rehabilitation and new construction.

**Exhibit 5.1(c)**

**Projected Sources and Uses**

# In re Northeast Brooklyn Partnership, Chapter 11 Case No. 19-40822
## Schedule of Claims/Proposed Uses (Estimates/Assumptions)  DRAFT

| SOURCES | | | AMOUNT |
|---|---|---|---|
| Sale | | | **$4,300,000.00** |
| | | | |
| | | | |
| **USES** | **As of February 11, 2019** | **Interest Rate** | **As of November 15, 2019** |
| NYC Department of Housing Preservation & Development* | $2,701,622.14 | 16.00% | $3,029,454.81 |
| NYC Department of Housing Preservation & Development* | $486,621.33 | 16.00% | $615,281.27 |
| NYC Department of Finance | $93,596.97 | 18.25% | $106,551.54 |
| NYC Office of Administrative Trials and Hearings | $400.00 | 9.00% | $427.30 |
| NYC Water Board | $88,819.14 | 7.00% | $93,534.37 |
| NYC Commissioner of Finance | $485.41 | 2.35% | $494.06 |
| IRS | $4,680.00 | 2.35% | $4,763.41 |
| | | SUBTOTAL= $3,850,506.77 | |
| Archer & Greiner, P.C.  (Counsel) | $0.00 | | $288,000.00 |
| Sperber, Denenberg & Kahan LLP (Landlord-Tenant Counsel) | $0.00 | | $7,500.00 |
| Abrams Fensterman (Real Estate Transactional Counsel) | $0.00 | | $10,000.00 |
| Office of the U.S. Trustee Fee | $0.00 | | $43,000.00 |
| CPEX Real Estate Broker Fee | $0.00 | | $86,000.00 |
| | | SUBTOTAL= $434,500.00 | |
| Advantage Wholesale Supply | $7,645.20 | | $458.71 |
| All County Sewer & Drain, Inc. | $530.76 | | $31.85 |
| Anthony Installation Inc. | $1,130.40 | | $67.82 |
| B & M Utica Ave. Locksmith Inc. | $272.19 | | $16.33 |
| Borinquen Exterminatinc Company Inc. | $600.00 | | $36.00 |
| BXTERMINATOR | $1,435.16 | | $86.11 |
| CohnReznick LLP | $10,425.00 | | $625.50 |
| Con Ed | $2,042.29 | | $122.54 |
| E & S Maintenance | $6,009.80 | | $360.59 |
| Eldon V Lessie | $2,759.00 | | $165.54 |
| Ever-Ready Fire Sprinkler, Inc | $900.00 | | $54.00 |
| Falcon Power Installers | $1,350.95 | | $81.06 |
| Frank Kennedy, R.A. | $500.00 | | $30.00 |
| Hartford Steam Boiler | $140.00 | | $8.40 |
| Ivan Armstrong | $12,646.00 | | $758.76 |
| J.Alam Home Improvement, Inc. | $6,200.00 | | $372.00 |
| Leema Plumbing & Heating | $240.00 | | $14.40 |
| MDG Design & Construction LLC | $42,399.74 | | $2,543.98 |
| Mobilink Wireless | $182.28 | | $10.94 |
| National Grid | $13,012.91 | | $780.77 |
| NEBHDCo (+) | $79,793.75 | | $4,787.63 |
| New York Water Management | $4,002.05 | | $240.12 |
| Raymond Ballard Apartments HDFC (+) | $10,000.00 | | $600.00 |
| Rosenblum and Bianco | $17,174.53 | | $1,030.47 |
| S.D.L. Appliance Repair Service | $5,128.03 | | $307.68 |
| SiteCompli, LLC | $3,363.50 | | $201.81 |
| Sperber Denenberg & Kahan, P.C. [Pre-Petiton] | $13,855.75 | | $831.35 |
| Superior Maintenance Supply | $4,526.02 | | $271.56 |
| (ESTIMATED DISTRIBUTION 6 CENTS ON THE DOLLAR ) SUBTOTAL=$14,895.92 | | | |
| **PROJECTED TOTAL =** | $3,624,490.30 | | $4,299,902.69 |

*AS STATED IN FORECLOSURE COMPLAINT; INTEREST TO BE CALCULATED UPON CONSULTATION WITH CITY, WHICH HAS BEEN REQUESTED.*
*PROJECTED ALLOWED CLAIMS; ALL RIGHTS RESERVED; ALL NUMBERS ARE ESTIMATES SUBJECT TO VERIFICATION AND RECONCILIATION AS OF CLOSING.*
*(+) DENOTES AN AFFILIATE OF THE DEBTOR*

## **Exhibit 5.2**

**All rights of action are preserved post-Effective Date including the following:**

| Summary Description |
| --- |
| Tax Certiorari |