UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                              Chapter 11

PARK MONROE HOUSING DEVELOPMENT            Case No. 1-19-40820 (CEC)
    FUND CORPORATION, *et al.,*                  (Jointly Administered)

       Debtors.

-------------------------------------------------------------x


## AMENDED CHAPTER 11 PLAN OF
## <u>NORTHEAST BROOKLYN PARTNERSHIP</u>


Dated: October 28, 2019


ARCHER & GREINER, P.C.
630 Third Avenue
New York, New York 10017
Tel: (212) 682-4940
Allen G. Kadish
Harrison H.D. Breakstone
Email: akadish@archerlaw.com
hbreakstone@archerlaw.com

*Counsel for Northeast Brooklyn Partnership,*
*Debtor and Debtor-in-Possession*

# ARTICLE I

# INTRODUCTION[1]

Northeast Brooklyn Partnership, debtor and debtor-in-possession, proposes this Plan, as follows.

# ARTICLE II

# DEFINITIONS

Unless the context otherwise requires (i) the following terms shall have the following meanings when used in this Plan; (ii) any capitalized term that is used in this Plan and not defined in this Article I but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning set forth therein; (iii) terms stated in the singular shall include the plural and vice versa; (iv) pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter; (v) all section, article and exhibit references in this Plan are to the respective section of, article of or exhibit to this Plan; (vi) any reference to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions, means that such document shall be substantially in such form or substantially on such terms and conditions except as stated otherwise in this Plan; (vii) any reference to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented; (viii) the words "herein", "hereof", "hereto" or "hereunder" and other words of similar import refer to this Plan in its entirety rather than to only a particular portion of this Plan; (ix) the headings in this Plan are for convenience of reference only and will not limit or otherwise affect the provisions of this Plan (x) the rules of construction set forth in section 102 of the Bankruptcy Code shall govern construction of this Plan; and (xi) any reference contained herein to the Bankruptcy Code, or to any section of the Bankruptcy Code, refers to the Bankruptcy Code, or such section of the Bankruptcy Code, as it is existing and effective on the Petition Date, except to the extent, if any, that any post-Petition Date amendment to the Bankruptcy Code applies retroactively to cases filed on the Petition Date.

2.1     "**Administrative Bar Date**" shall have the meaning set forth in section 3.3 of this Plan.

2.2     "**Administrative Expense" or "Administrative Claim**" means any cost or expense of administration of the Case allowable under sections 503(b) of the Bankruptcy Code.

2.3     "**Administrative Tax Claim**" means an Administrative Claim for a tax due to a Governmental Unit.

2.4     "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

---

[1] This Plan was amended to provide for solicitation and voting. The original Plan assumed payment in full of all Classes. The Debtor projects less than full payment to Creditors in Class 4.

2.5      "**Allowed**" when used with "Claim" or "Administrative Expense" means a Claim or Administrative Expense against the Debtor that has not been disallowed pursuant to a Final Order and is not a Disputed Claim and (i) with respect to which a Proof of Claim or a request for payment of Administrative Expense has been timely filed with the clerk of the Bankruptcy Court or, (ii) if no Proof of Claim has been filed, that  has been or hereafter is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent.

2.6      "**Avoidance Claims**" means any and all rights, claims, causes of action or rights to avoid any transfer or incurrence of debt that may be asserted or recovered by one or more of the Debtor in their respective capacity as debtor-in-possession pursuant to Chapter 5 of the Bankruptcy Code.

2.7      "**Bankruptcy Code**" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in Sections 101 et seq. of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

2.8      "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of New York or the United States District Court for the Eastern District of New York to the extent it withdraws the reference over all or any portion of the Case pursuant to section 157(d) of title 28 of the United States Code.

2.9      "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of New York, the Local Rules of Civil Practice and Procedure of the United States District Court for the Eastern District of New York, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Cases and as amended from time to time.

2.10     "**Bar Date**" means the date set by Order of the Bankruptcy Court by which a Proof of Claim or Proof of Interest must have been filed.

2.11     "**City**" means the City of New York, holder of the City Secured Claim.

2.12     "**City Mortgages**" means the following notes and mortgage between the Debtor and the City:

> (i) Note dated June 27, 1991 for $2,432,706.00 recorded on August 13, 1991 at Reel 2729 Page 1076. The note and mortgage were thereafter modified by Mortgage and Note Modification Agreement dated July 31, 2012 and recorded August 30, 2012 at CRFN 2012000244851.

> (ii) Note dated July 31, 2012 for $416,137.00 recorded on August 30, 2012 at CRFN 2012000344853.

2.13     "**City Secured Claim**" means the City's secured claim resulting from the City

Mortgages.

2.14    "**Business Day**" means any day other than a Saturday, Sunday or any legal holiday under federal law or the State of New York.

2.15    "**Cash**" means legal tender of the United States of America and equivalents thereof.

2.16    "**Causes of Action**" means all claims, actions, causes of action, choses in action, Avoidance Claims, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims of any of the Debtor, and/or their Estates that are or may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date against any entity, based in law or equity, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date.

2.17    "**Chapter 11 Case**" or "**Case**" means the Debtor's case under Chapter 11 of the Bankruptcy Code, Case No. 19-40822 (CEC), jointly administered Case No. 19-40820 (CEC) on the docket of the Bankruptcy Court.

2.18    "**Claim**" means claim as defined in section 101(5) of the Bankruptcy Code.

2.19    "**Claimant**" means the holder of a Claim against the Debtor.

2.20    "**Class**" means a category of substantially similar Claims as established pursuant to Article IV of this Plan.

2.21    "**Collateral**" means any property or interest in property of one or more of the Debtor' Estates subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

2.22    "**Confirmation**" or "**Confirmation Date**" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

2.23    "**Confirmation Hearing Date**" means the date the Bankruptcy Court first sets for the conduct of a hearing to consider approval and confirmation of this Plan.

2.24    "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

2.25    "**Creditor**" means creditor as defined in section 101(10) of the Bankruptcy Code.

2.26    "**Cure**" means the obligations required to be paid or honored in connection with assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if

at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the Distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an Executory Contract or Unexpired Lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law

2.27    "**Debtor**" means Northeast Brooklyn Partnership, a New York limited partnership.

2.28    "**Disallowed**" means, when referring to a Claim, a Claim or any portion thereof, that (a) has been disallowed or expunged, in whole or in part, by a Final Order; (b) has been withdrawn by agreement between the Debtor and the Holder thereof, in whole or in part; (c) has been withdrawn, in whole or in part, by the Holder thereof; (d) is listed in the Schedules as zero or as disputed, contingent or unliquidated and in respect of which a Proof of Claim has not been timely filed or deemed timely filed pursuant to this Plan, the Bankruptcy Code or any Final Order of the Bankruptcy Court; (e) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any Proof of Claim; or (f) is evidenced by a Proof of Claim which has been filed, or which has been deemed to be filed under applicable law or order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court, but as to which such Proof of Claim was not timely or properly filed. In each case a Disallowed Claim is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

2.29    "**Disclosure Statement**" means the written disclosure statement or any supplements thereto (including the Plan Supplement and all schedules thereto or referenced therein) that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time, all as approved by an order of the Bankruptcy Court pursuant to sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3017.

2.30    "**Disclosure Statement Order**" means the Order entered by the Bankruptcy Court approving the Disclosure Statement as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto.

2.31    "**Disputed**" means, with respect to any Claim: (a) listed on the Schedules as unliquidated, disputed or contingent, unless a proof of Claim has been timely filed; (b) as to which a Debtor has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules; or (c) as otherwise disputed by a Debtor in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

2.32    "**Disputed Claim Reserve**" means, the reserve established for Disputed Claims.

2.33    "**Distribution**" means any payment of Cash called for under this Plan.

2.34    "**Effective Date**" means the first day after the conditions to effectiveness of this Plan provided in section 9.2 hereof have been satisfied.

2.35    "**Entity**" means entity as defined in section 101(15) of the Bankruptcy Code.

2.36    "**Estate**" means the estate of the Debtor created on the Petition Date pursuant to section 541 of the Bankruptcy Code.

2.37    "**Exculpated Claim**" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtor' restructuring, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, this Plan, the Plan Supplement, or any other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of this Plan, the administration, consummation, and implementation of this Plan, the Distribution of property under this Plan, the settlement of Claims, or the negotiation of, or any transaction contemplated by, this Plan or Disclosure Statement, or in furtherance thereof.

2.38    "**Exculpated Parties**" means, collectively, each of the following in their respective capacities as such: (i) the Debtor, (ii) the Reorganized Debtor, and (iii) with respect to each of the above-named Entities described in (i) and (ii), such Entity's respective predecessors, successors and assigns and current and former officers, directors, managers, shareholders, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

2.39    "**Executory Contract**" means any contract to which any of the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

2.40    "**Final Order**" means an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for reargument or rehearing will then be pending or as to which any right to appeal, petition for certiorari, reargument, or rehearing will have been waived in writing, in form and substance, satisfactory to the Debtor or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court will have been determined by the highest court to which such order was appealed, or certiorari reargument or rehearing will have been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed with respect to such order will not cause such order not to be a Final Order.

2.41    "**Foreclosure Action**" means the action entitled *City of New York v. Northeast Brooklyn Partnership, New York State Department of Taxation and Finance, New York City Environmental Control Board; City of New York Department of Finance; Betty J. Cox d/b/a JS*

*Secretarial Services; and "John Does" #'s 1-100 (No. 521090/2017)* in the Supreme Court of the State of New York, County of Kings.

2.42    "**General Bar Date**" means July 1, 2019 at 5:00 p.m. in accordance with the *Order Establishing Deadline for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 51].

2.43    "**Governmental Bar Date**" means August 12, 2019 at 5:00 p.m. in accordance with the *Order Establishing Deadline for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 51].

2.44    "**Governmental Unit**" means governmental unit as defined in section 101(27) of the Bankruptcy Code.

2.45    "**General Unsecured Claim**" means any Claim other than a Priority Tax Claim, Priority Non-Tax Claim, a Secured Claim, or an Administrative Expense Claim. "Holder" means the holder of any Claim.

2.46    "**Impaired**" means, when used in reference to a Claim or a class thereof, a Claim or class thereof that is impaired within the meaning of section 1124 of the Bankruptcy Code.

2.47    "**Implementation Funds**" means the funds necessary to implement this Plan, the principal source of which shall be the proceeds of the Sale.

2.48    "**Legal Holiday**" means a Legal Holiday as that term is defined in Bankruptcy Rule 9006(a).

2.49    "**Lien**" means lien as defined in section 101(37) of the Bankruptcy Code.

2.50    "**NEB**" means Northeast Brooklyn Housing Development Corporation, a New York not-for-profit corporation, the managing sole member of Cheryl's Villa Housing Corporation and North Hill 1 LLC, the general and limited partners of the Debtor.

2.51    "**Objection**" means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, establish the priority of, expunge, subordinate, or estimate any Claim (including the resolution of any request for payment of any Administrative Expense Claim), other than a Claim that is Allowed.

2.52    "**Order**" means an order of the Bankruptcy Court.

2.53    "**Petition Date**" means February 11, 2019, the date on which the Case was commenced by the filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code by the Debtor.

2.54    "**Plan**" means this Chapter 11 Plan, as it may be amended, supplemented or modified from time to time, including any exhibits or schedules annexed hereto or required to be filed

with the Bankruptcy Court pursuant hereto

2.55    "**Plan Supplement**" means that certain contemplated supplement or supplements to this Plan containing such additional documents and agreements as are necessary to bring this Plan effective, to be filed with the Bankruptcy Court, including, and any schedules to this Plan.

2.56    "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

2.57    "**Professionals**" means the professionals retained by the Debtor under section 327 of the Bankruptcy Code and to be compensated pursuant to sections 327, 328, 330, 331, or 503(b)(2), (4) or (5) of the Bankruptcy Code.

2.58    "**Professional Fees**" means compensation for services rendered, and reimbursement of expenses incurred, by Professionals, as awarded by Final Order following application, in accordance with sections 330 and 331 of the Bankruptcy Code.

2.59    "**Proof of Claim**" means a proof of Claim filed pursuant to section 501 of the Bankruptcy Code and applicable Bankruptcy Rules.

2.60    "**Property**" means the real property of the Debtor consisting of five residential buildings and a vacant lot located in Brooklyn, New York at 671 Halsey Street, 675 Halsey Street, 397 Kosciusko Street, 399 Kosciusko Street, 403 Kosciusko Street and 409 Kosciusko Street.

2.61    "**Purchaser**" means 27 BED STUY LLC, as set forth in the Sale Contract.

2.62    "**Reorganized Debtor**" means the Debtor or any successors thereto, on and after the Effective Date.

2.63    "**Representatives**" means, with regard to any Entity, its current and former officers, directors, employees, shareholders, members, managers, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, members and professionals).

2.64    "**Represented Tenants"** means, the certain tenants represented by counsel as set forth in the notice of motion filed on July 23, 2019 [Docket No. 101].

2.65    "**Sale**" means the sale transaction between the Debtor and the Purchaser according to the Contract of Sale.

2.66    "**Sale Contract**" means the *Contract of Sale* attached as Exhibit "A."

2.67    "**Schedules**" mean the *Schedules of Assets and Liabilities, the List of Holders of Interests,* and the *Statement of Financial Affairs* filed by the Debtor, as may be amended.

2.68    "**Secured Claim**" means any Claim, to the extent reflected in the Schedules or a Proof of Claim as being secured and properly perfected, which is secured by a timely perfected Lien on Collateral, to the extent of the value of the Estate's interest in such Collateral, as determined as of the relevant determination date.

2.69    "**Secured Tax Claim**" means a Secured Claim for taxes or assessments held by a Governmental Unit.

2.70    "**Unsecured Claim**" means an Allowed Claim, including any Deficiency Claim, that is not an Administrative Claim, a Bankruptcy Fee, a Priority Tax Claim, or a Secured Claim.

2.71    "**Unexpired Lease**" **or "Lease"** means a lease of real or personal property to which the Debtor is a party, that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

2.72    "**Unimpaired**" means, when used in reference to a Claim or a class thereof, a Claim or a class thereof that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

## ARTICLE III

## TREATMENT OF UNCLASSIFIED CLAIMS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, this Plan does not classify Administrative Claims or Allowed Priority Tax Claims. Such Claims, to the extent Allowed, shall receive the treatment provided in this Article III in full satisfaction and release thereof.

3.1    **Administrative Claims**. Each Allowed Administrative Claim (except for Professional Fee Claims) except to the extent any entity entitled to payment has received payment on account of such Claim prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Administrative Claim shall receive Cash from the Debtor in an amount equal to such Allowed Claim by the later of either (i) the Effective Date or as soon thereafter as is reasonably practicable, (ii) the date that is 14 days after the Administrative Claim is Allowed; or (iii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such Allowed Administrative Claim; provided, however, that any Allowed Administrative Claim incurred by the Debtor in the ordinary course of its business shall be paid in full or performed by the Debtor in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto.

3.2    **Administrative Bar Date.** Except for Professional Fee Claims, and as otherwise provided herein, requests for payment of Allowed Administrative Claims must be filed no later than the Administrative Claim Bar Date as set forth in the Confirmation Order. Holders of Allowed Administrative Claims that do not file requests for the payment on or before the Administrative Claim Bar Date, shall be forever barred from asserting such Allowed Administrative Expense Claims against the Debtor or its property.

3.3      **Claims for Professional Fees.**  All Professionals seeking payment of Professional Fees incurred through and including the Effective Date shall file their respective final applications on or before the date that is 30 days after the Confirmation Date.  Any such application timely filed shall be deemed to be an Allowed Administrative Expense Claim, subject to the entry of a Final Order by the Bankruptcy Court approving such application.

      Objections to any Professional's application for compensation or reimbursement must be timely filed and served upon such Professional, and upon the Debtor, in accordance with the Bankruptcy Rules or any order entered by the Bankruptcy Court.  Upon entry of a Final Order approving an application, the Professional Fees Claims, as Allowed by the Bankruptcy Court, shall be paid within seven days thereafter or otherwise in accordance with this Plan, as agreed to by the Professional and the Debtor, or as ordered by the Court.

      Funds shall be reserved on the Effective Date for anticipated Professional Fees that may be due and payable after the Effective Date.

3.4      **Administrative Tax Claims**.  All Administrative Tax Claims held by Governmental Units shall be paid, in Cash, in full either (i) on or prior to the Effective Date, or (ii) upon such other terms as may be agreed to, in writing, between the Debtor and such Governmental Unit as of the Effective Date.  These Claims are not classified and do not vote.

3.5      **Priority Tax Claims**.  In full satisfaction and release of Priority Tax Claims, and except as may be otherwise mutually agreed in writing between the Debtor and such Governmental Units, each Priority Tax Claim shall be paid in full as of the Effective Date.  These Claims are not classified and do not vote.

3.6      **Statutory Fees**.  On the Effective Date, the Debtor shall make all payments required to be paid to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6).  All fees payable pursuant to 28 U.S.C. § 1930(a)(6) after the Effective Date shall be paid by the Reorganized Debtor on a quarterly basis until the Case is closed, converted, or dismissed.

## ARTICLE IV

## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS

      Except as may otherwise be provided in Article III, Allowed Claims are classified as set forth in this Article IV for all purposes, including voting, confirmation, and Distribution pursuant to this Plan.  A Claim is in a particular Class designated herein only to the extent such Claim (i) fits within the description of such Class and is in such other and different Class or Classes to the extent that the remainder thereof fits within the description of such other Class or Classes and (ii) has not been paid, released or otherwise satisfied prior to the Effective Date.

4.1      **Class 1 – Priority Claims** (other than Priority Tax Claims and Administrative Claims) shall be paid in full by the Debtor on the Effective Date, or as soon as practicable after such Claims become Allowed Claims.  Such Claims are unimpaired and do not vote.

4.2     **Class 2 – City Secured Claim** shall be either (i) paid by the Debtor, in Cash, in full on the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holder of such City Secured Claim.  Such Claim is unimpaired and does not vote.

4.3     **Class 3** – **Remaining Secured Claims besides City Secured Claim** shall be either (i) paid by the Debtor, in Cash, in full on the Effective Date, or as soon as practicable after such Claim becomes an Allowed Claim; or (ii) treated as may be otherwise mutually agreed in writing between the Debtor and the holders of such Claims.  Such Claims are unimpaired and do not vote.

4.4     **Class 4 – General Unsecured Claims** shall be paid by the Debtor, in Cash, on a pro-rata basis, either (i) on the Effective Date; or as soon as practicable after such claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holders of such General Unsecured Claims.  Such Claims are Impaired and are entitled to vote.  Based on certain assumptions, there is an estimated distribution of approximately 6 cents on the dollar on General Unsecured Claims, which includes certain Claims of affiliates of the Debtor.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1     **Treatment of Executory Contracts and Unexpired Leases.**  To the extent not (i) assumed in the Case prior to the Effective Date, (ii) rejected in the Case prior to the Effective Date, or (iii) specifically rejected pursuant to this Plan, the Confirmation Order shall constitute an Order authorizing the assumption, as of the Effective Date, of all Executory Contracts and Unexpired Leases not previously assumed or rejected.

     (a)     The provisions (if any) of each Executory Contract or Unexpired Lease to be assumed and assigned under this Plan which is or may be in default shall be satisfied in the matter set forth herein.  In the event of a dispute regarding (i) the nature or the amount of any Cure, (ii) the ability of the Purchaser to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption and assignment, the Cure shall occur as soon as practicable following agreement of the parties or the entry of a Final Order resolving the dispute and approving the assumption of the Executory Contract or Unexpired Lease.

     (b)     Notwithstanding anything otherwise to the contrary, (i) nothing contained herein shall constitute or be deemed to constitute a waiver or relinquishment of any right of the Debtor to object to any Cure and it shall retain, reserve and be entitled to assert any objection or legal or equitable defense to any Cure, and (ii) if a dispute relating to Cure remains unresolved or is resolved in a manner that the Debtor determines, in its sole discretion, does not protect its interests, the Debtor shall be entitled to reject the Executory Contract or Unexpired Lease to which such Cure dispute relates.

(c)     Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any Executory Contract or Unexpired Lease to be assumed and assigned, pursuant to this Plan, the Debtor shall, consistent with the requirements of section 365 of the Bankruptcy Code, before the Confirmation Hearing, file and serve on parties to executory contracts or unexpired leases to be assumed and other parties in interest (the "Cure Notice") listing the proposed cure (including amounts of compensation for actual pecuniary loss) to be paid in connection with the assumption of all Executory Contracts or Unexpired Leases to be assumed.  The parties to such Executory Contracts or Unexpired Leases to be assumed and assigned will have such time as may be set by the Bankruptcy Court to object in writing to the Cure amount proposed by the Debtor, and to propose an alternative cure amount. In the event that no objection is timely filed, the applicable party shall be deemed to have consented to the Cure proposed (including amounts of compensation for actual pecuniary loss) by the Debtor and shall be forever enjoined and barred from seeking any additional amount on account of the Debtor's cure obligations under section 365 of the Bankruptcy Code from the Debtor, its Estate, or any assignee of the contract or lease.  If an objection is timely filed with respect to an Executory Contract or Unexpired Lease, the Bankruptcy Court shall hold a hearing to determine the amount of any disputed Cure amount not settled by the parties.

5.2     **Rejection Claims.**  Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtor pursuant to Section 5.1 of this Plan shall be treated as General Unsecured Claims.

5.3     **Bar to Rejection Claims.**  A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease pursuant to Sections 5.1 of this Plan shall not be timely unless it is filed with the Bankruptcy Court and served so that it is received by the Debtor within such time as may be set by the Bankruptcy Court.  Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtor, its successors or properties.

5.4     **Tenant Leases**.

(a)     The existing claims of the tenants under the Unexpired Leases with the Debtor shall be addressed and paid through the Cure process, including any judicial determinations thereof, associated with the Debtor's assumption of the Unexpired Leases with the Debtor and assignment to the Purchaser.  The tenants under the Unexpired Leases shall not have any continuing obligations to the Debtor following the assumption and assignment of their leases to the Purchaser.  Any Claims of the tenants against the Debtor which are not addressed through the Cure process shall be treated in accordance with the terms of the Plan.  Nothing in the Plan or the Cure process shall prejudice the tenants' rights against the Purchaser in respect of (a) any unremedied conditions or repair issues in their apartments as of the closing of the Sale (excluding any Claims for damages in respect thereof arising prior to the closing of the Sale, which claims would be dealt with through the Cure process), and (b) any Claims arising after the closing of the sale for rent overcharges and any related statutory claims.  The Purchaser shall assume all obligations of the Debtor as landlord, under all assigned leases and shall be responsible for any obligations owed to tenants and shall bear any Cure costs that may be due.

(b)    Each of the Represented Tenants who filed a proof of claim against the Debtor shall have an allowed Claim estimated solely for voting purposes in the amount of $15,000 per Claim; provided that all rights of the Debtor and its Estate to object to such claims for allowance, distribution, Cure or any other purposes shall be fully preserved and nothing contained herein will be deemed to constitute an admission by the Debtor or the Represented Tenants as to the Allowed amount of any Represented Tenant's Claim for allowance, distribution, Cure or any other purposes.

## ARTICLE VI

## **IMPLEMENTATION OF THIS PLAN**

6.1    **Means of Implementation**.

(a)    The Debtor and the Purchaser shall close on the Sale of the Property on the terms set forth and according to the documents attached as Exhibit "A" hereto including the Sale Contract.  The Sale proceeds are the principal source of the Implementation Funds and therefore, all distributions depend upon the closing and funding of the Sale. The Sale Contract provides for the Sale of the Property on an "as is" "where is" basis.  The Sale shall be for all of Debtor's right, title and interest in and to the Property, together with all related fixtures, improvements and development rights, and subject to all regulatory, zoning and other potential restrictions.  The Sale shall include the Debtor's assumption and assignment of all residential leases designated by the Purchaser with any cure payments to be paid by the Purchaser.  The Sale shall not include the Debtor's other property including books and records (except building and tenant records), Cash, deposits with third parties, intellectual property, goodwill, tax attributes, claims and causes of action.  The Sale shall be free and clear of all liens, claims, interests, taxes and non-permitted encumbrances pursuant to sections 363(b) and (f) and 1123(a)(5)(D) of the Bankruptcy Code, the Sale shall not be free and clear of any rights of tenants who are parties to the Unexpired Leases that are being assumed by the Debtor and assigned to the Purchaser, pursuant to section 363(b) and (f) of the Bankruptcy Code, or any subsections thereof, section 365, or any subsections thereof, section 1123(a)(5)(D) of the Bankruptcy Code, or otherwise.  The Purchaser is closing and consummating the Sale subject to the leasehold interests and the rights of the tenants in the Unexpired Leases that are being assumed and assigned.  The Purchase Price is as set forth in the Sale Contract.

The Debtor and the Purchaser shall bear their respective closing costs and expenses consistent with customary practices.  The Debtor shall pay all brokerage fees from the Sale proceeds upon Court approval as appropriate.  To the extent any closing costs or obligations are not capable of being paid at closing, amounts therefore out of the Sale proceeds shall be escrowed or retained upon the agreement of the parties or otherwise as the Court may direct, to be paid promptly as allowed or fixed and held in accordance with the escrow terms set forth in the Sale Contract.

(b)    **Rent Proceeds and Cash on Hand.**  Rent proceeds and Cash on hand

are property of the Debtor and may also be used as Implementation Funds to fund and implement this Plan as available.

6.2     **Implementation.**

     (a)     Payment of Allowed Administrative Claims and Allowed Professional Fees Claims shall be made from the Implementation Funds on the Effective Date; to the extent Allowed Administrative Claims require Bankruptcy Court approval, payment shall be made upon the later of the Effective Date and the date of Bankruptcy Court approval.

     (b)     Payment of all Allowed Priority Tax Claims shall be made from the Implementation Funds on the Effective Date; to the extent Allowed Priority Tax Claims require Bankruptcy Court approval, payment shall be made upon the later of the Effective Date and the date of Bankruptcy Court approval.

     (c)     Payment of all Priority Claims (other than Allowed Priority Tax Claims and Allowed Administrative Expense Claims) shall be made from the Implementation Funds on the Effective Date; to the extent Priority Claims require Bankruptcy Court approval, payment shall be made upon the later of the Effective Date and the date of Bankruptcy Court approval.

     (d)     Payment of the City Secured Claim shall be made from the Implementation Funds.  The City Secured Claim shall be either (i) paid by the Debtor, in Cash, in full on the Effective Date, or as soon as practicable after such claim becomes an Allowed Claim; or (ii) treated as may be otherwise mutually agreed in writing between the Debtor and the holder of such City Secured Claim.

     (e)     Payment of the Remaining Secured Claims besides the City Secured Claim shall be made from the Implementation Funds and shall be (i) paid by the Debtor, in Cash, in full on the Effective Date, or as soon as practicable after such claim becomes an Allowed Claim; or (ii) treated as may be otherwise mutually agreed in writing between the Debtor and the holders of such Claims.

     (f)     Payment of all General Unsecured Claims shall be made from the Implementation Funds and shall be paid by the Debtor, in Cash, on a pro-rata basis, either (i) on the Effective Date; or as soon as practicable after such claim becomes an Allowed Claim; or (ii) as may be otherwise mutually agreed in writing between the Debtor and the holders of such General Unsecured Claims.  Such Claims are Impaired and are entitled to vote.  Based on certain assumptions, there is an estimated distribution of approximately 6 cents on the dollar on General Unsecured Claims, which includes certain Claims of affiliates of the Debtor.  Such Claims are Impaired and are entitled to vote.

6.3     **Disputed Claims Reserve.**  As soon as practicable following the Effective Date, the Disputed Claims Reserve shall be established by the Debtor from the Implementation Funds in an amount equal to the Disputed Claims; provided, however, that the Debtor shall have no obligation to fund the Disputed Claims Reserve unless and until a distribution occurs to holders

of Allowed Claims.  The Disputed Claims Reserve shall be held separately from other assets held by the Debtor, subject to an allocable share of all expenses and obligations of the Estate, on account of Disputed Claims.  The Debtor shall remove funds from the Disputed Claims Reserve as Disputed Claims are resolved, which funds shall be distributed as provided in this Plan.

6.4    **Execution of Documents**. On the Effective Date, the Debtor, and all necessary parties, shall execute, release and deliver all documents reasonably necessary to consummate the transactions contemplated by the terms and conditions of this Plan.

6.5    **Filing of Documents**.  Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every Government Unit, including federal, state and local governmental agency or department, is directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by this Plan, and any and all notices of satisfaction, release or assignment of any Lien, Claim or encumbrance not expressly preserved by this Plan.

6.6    **Preservation of Rights of Action**.  Except as otherwise provided in this Plan or in any contract, instrument, release or other agreement entered into in connection with this Plan, the Debtor shall retain, and in accordance with its determination of the best interest of the Estate, and may enforce any claims, rights and causes of action (i) arising under sections 510 and 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtor or the Estate as of the Petition Date, and arising under any provision of state or federal law, or any theory of statutory or common law or equity, including, but not limited to, any cause of action asserted, or which may hereafter be asserted.

    (a)    Any recovery received by the Debtor through the prosecution, settlement or collection of any such claim, right or cause of action, shall be retained by the Debtor following the satisfaction of all other Allowed Claims under the terms of this Plan.

    (b)    To the extent rights of action are preserved a non-exclusive schedule of specific rights of action preserved is attached hereto as Exhibit "B".

    (c)    Notwithstanding any provision of this Plan to the contrary, definitions and descriptions contained herein respecting pre-Petition Date documents, agreements or Claims are provided solely for the purpose of identification and classification thereof and do not constitute an admission by the Debtor of the existence, validity allowance, or amount of any such claim, document or agreement.

## ARTICLE VII

## DISTRIBUTIONS

7.1    **Distributions**.  All distributions under this Plan shall be made by the Debtor or Reorganized Debtor with no requirement to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

7.2     **Rights and Powers of the Reorganized Debtor**.  The Reorganized Debtor shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan, (ii) make all Distributions contemplated hereby, (iii) employ and compensate professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Reorganized Debtor by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Reorganized Debtor to be necessary and proper to implement the provisions hereof.  After the Effective Date, and even upon closing of the Case, the Reorganized Debtor shall remain as a reorganized entity free of the constraints of the Bankruptcy Code and operating under applicable state law.  The authorized representatives, Jeffrey Dunston and Nathaniel Montgomery, shall remain as post-Effective Date authorized representatives of the Debtor.  NEB shall continue to administer daily operations of the Debtor post-Effective Date unless otherwise provided in the Sale Contract.

7.3     **Timing of Certain Distributions Under this Plan**.  Any payments, distributions or other performance to be made pursuant to this Plan on account of any Disputed Claim shall be deemed to be timely made if made on or within five days following the latest of (i) the Effective Date, (ii) the expiration of any applicable objection deadline with respect to such Disputed Claim or (iii) such other times provided in this Plan.  To the extent distribution is required on or as of the Effective Date, such distributions may be made as soon thereafter is practicable.

7.4     **Method of Payment.**  Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to this Plan shall be made by wire or check drawn on a domestic bank.

7.5     **Objection Deadline**.  Unless otherwise ordered by the Bankruptcy Court, the Debtor may file and serve any objection to any Unsecured Claim at any time, but in no event after the later of (i) 90 days after the Effective Date or (ii) 90 days after the date proof of such Claim or a request for payment of such Claim is filed.  This deadline may be extended by Bankruptcy Court order(s).

7.6     **Prosecution of Objections.** After the Effective Date, the Reorganized Debtor shall have the sole authority to file, settle, compromise, withdraw or litigate to judgment objections to Disputed Claims (other than Disputed Claims of insiders (as defined in section 101(31) of the Bankruptcy Code)) in accordance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

7.7     **No Distribution Pending Allowance.**  Notwithstanding any other provision of this Plan, no payment or distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order.

7.8     **Distribution After Allowance**.  Within 15 days after the entry of a Final Order resolving an objection to a Disputed Claim, the Reorganized Debtor shall distribute all Cash or other property, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any formerly Disputed Claim that has become an Allowed Claim.

7.9     **Delivery of Distributions**.  Except as provided in Sections 6.7 and 6.8 of this Plan,

distributions to holders of Allowed Claims shall be made: (1) at the addresses set forth on the respective Proofs of Claim by such holders; (2) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no Proof of Claim is filed and the Disbursing Agent has not received a written notice of a change of address.

7.10    **Undeliverable Distributions**.

(a)    If the distribution to the holder of any Claim is returned to the Reorganized Debtor undeliverable, no further distribution shall be made to such holder unless and until the Reorganized Debtor is notified in writing of such holder's then current address. Undeliverable distributions shall remain in the possession of the Reorganized Debtor until the earlier of (i) such time as a distribution becomes deliverable or (ii) such undeliverable distribution becomes an unclaimed distribution pursuant to section 7.11 of this Plan.

(b)    Until such time as an undeliverable distribution becomes an unclaimed distribution pursuant to section 7.11 of this Plan, within 30 days after the end of each calendar quarter following the Effective Date, the Reorganized Debtor shall make distributions of all Cash and property that has become deliverable during the preceding quarter. Each such distribution shall include the net return yielded from the investment of any undeliverable Cash, from the date such distribution would have been due had it then been deliverable to the date that such distribution becomes deliverable.

(c)    Nothing contained in this Plan shall require the Reorganized Debtor to attempt to locate any holder or an Allowed Claim.

7.11    **Unclaimed Distributions**.  Any Cash or other property to be distributed under this Plan shall revert to the Debtor if it is not claimed by the Entity entitled thereto within three months after the date on which such Cash or other property is distributed by the Reorganized Debtor, and such Entity's claim shall be deemed to be reduced to zero.

7.12    **Set-offs.**  The Reorganized Debtor may, but shall not be required to, set off against the distributions to be made pursuant to this Plan the claims, obligations, rights, causes of action and liabilities of any nature that the Debtor may hold against the holder of an Allowed Claim, provided, however, that neither the failure to effect such a set-off nor the allowance of any claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claims, obligations, rights, causes of action and liabilities that the Debtor or the Reorganized Debtor has or may have against such holder.

7.13    **Prepayment.**  The Debtor or the Reorganized Debtor may prepay any of the payments required to be made under this Plan, all without penalty or interest that has not yet accrued thereon as of the time of such prepayment.

# ARTICLE VIII

## INJUNCTION AND RELEASES

8.1     **Injunction**.

(a)       Except (i) as otherwise provided in this Plan, (ii) as otherwise provided under a Final Order entered by the Bankruptcy Court or (iii) with respect to the Debtor's obligations under this Plan, the occurrence of the Effective Date shall forever stay, restrain and permanently enjoin on and after the Effective Date (1) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Property or the Debtor's other assets, to prevent or stay any person from carrying out the transactions set forth in this Plan or to interfere with any such transactions, (2) the creation, perfection or enforcement of any lien or encumbrance against the Property or the Debtor's other assets, or (3) any Claim released under the Confirmation Order, this Plan or pursuant to section 1141(d)(1) of the Bankruptcy Code as against the Property or the Debtor's other assets.

(b)       Except as otherwise provided in this Plan, the Confirmation Order and the *Order Granting Tenants Relief From Automatic Stay* dated September 3, 2019 [Docket No. 144] the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act, to collect, recover or offset from the Property or the Debtor's other assets.

(c)       Nothing contained in this Article, any other provision of this Plan or the Confirmation Order shall, enjoin, limit or restrict in any manner the Reorganized Debtor, from administering, enforcing, attaching, collecting or taking any other action after the Effective Date.

(d)       Any violation of the foregoing provisions by any party shall subject the offending party to appropriate sanctions for violation of the within injunction, including, without limitation, damages, attorneys' fees, costs and disbursements.

(e)       The Bankruptcy Court shall retain exclusive jurisdiction, and the Confirmation Order confirming this Plan shall provide that jurisdiction of the Bankruptcy Court shall survive the confirmation of this Plan for the purpose of enforcing all of this Plan's provisions, including, without limitation, disputes relating to the interpretation and enforcement of Plan provisions.

8.2     **Limitation of Liability**.  Pursuant to section 1125(e) of the Bankruptcy Code, neither the Debtor, nor any of its respective members, officers, managers, directors, agents or employees (acting in such capacity) nor any attorney or other Professional employed by any of them, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, prosecution, dissemination, confirmation, consummation or administration of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or the distribution of property under this Plan, except as may be expressly provided for in such agreements or documents, and except for willful misconduct or gross negligence.  Furthermore, nothing in this

Plan shall limit the liability of Professionals of the Debtor to their respective clients for malpractice pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

8.3     **Plan and Confirmation Order as Release.**  From and after the Effective Date, a copy of the Confirmation Order and this Plan shall constitute and may be submitted as a complete defense to any claim or liability enjoined or released pursuant to this Article VIII.

8.4     **Releases.**

(a)     <u>Releases in Favor of the Debtor</u>.  Each Creditor, except the Represented Tenants (the treatment of the Claims of which are set forth in the Plan), shall be deemed to have irrevocably waived and released the Debtor from and against any and all claims, liabilities, suits, actions, threatened actions, whether in law or in equity, that may have existed from the beginning of time to the Effective Date including all claims or liabilities arising in connection with the formulation and efforts to confirm the Plan; provided, however, that the foregoing release shall not constitute a release of the Debtor from any of its obligations under the Plan.  The Plan also provides that on the Effective Date, the tenants under the Unexpired Leases (except the Represented Tenants), shall be deemed to have irrevocably waived and released any of the Debtor's respective officers, managers, directors, employees, members, partners, representatives, attorneys, Professionals, predecessors, successors and assigns (together with the Debtor, the "Debtor Released Parties") from and against any and all claims, liabilities, suits, actions, threatened actions, whether in law or in equity, that may have existed from the beginning of time to the Effective Date, to the extent they are obligations of the Debtor, including all claims or liabilities arising in connection with the formulation and efforts to confirm the Plan.  Additionally, the Plan provides that on the Effective Date, each Creditor, except the tenants under the Unexpired Leases, shall be deemed to have irrevocably waived and released any of the Debtor Released Parties from and against any and all claims, liabilities, suits, actions, threatened actions, whether in law or in equity, that may have existed from the beginning of time to the Effective Date, to the extent they are related to the Debtor, including all claims or liabilities arising in connection with the formulation and efforts to confirm the Plan.

(b)     <u>Exculpation</u>.  Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting the Debtor Release (as described above), and except as otherwise specifically provided in this Plan, the Debtor Released Parties shall be exculpated by and with respect to all parties (including the Debtor and the Creditors) from claims, liabilities, suits, actions and threatened actions, whether in law or in equity, that may have existed prepetition or action taken postpetition or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, implementing, or consummating this Plan or the Case.

## ARTICLE IX

## <u>CONDITIONS TO THE EFFECTIVE DATE</u>

9.1     The following shall be conditions to the Effective Date of this Plan:

(a)    The Confirmation Order, in form and substance satisfactory to the Debtor and the Purchaser, shall have been entered and become a Final Order (or the Debtor and the Purchaser shall have unanimously waived the requirement of a Final Order); and

(b)    All actions required to be taken to implement this Plan and the Confirmation Order shall have occurred.

9.2    The Effective Date shall be the date of the "Closing" and the "Closing Date" as set forth in the Sale Contract.

## ARTICLE X

## <u>MISCELLANEOUS PROVISIONS</u>

10.1    **Orders in Aid of Consummation**.  Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of Confirmation directing the implementation of matters or actions required by this Plan.

10.2    **Compliance with Tax Requirements**.  In connection with this Plan, the Debtor and the Reorganized Debtor, shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions  under this Plan shall be subject to such withholding and reporting requirements; provided, however, that the transfer of any Cash, property or other interest hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code.

10.3    **Due Authorization by Creditors.**  Each and every Creditor who accepts a distribution provided for under this Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in this Plan and that there are no outstanding Liens, encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, conveyed or modified by this Plan, or obligations undertaken by such Creditor under this Plan.

10.4    **Amendments.**  This Plan may be altered, amended or modified by the Debtor, in writing and signed by the Debtor, at any time before the substantial consummation of this Plan, as provided in sections 1101(a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

10.5    **Revocation.**  The Debtor may revoke or withdraw this Plan at any time prior to entry of the Confirmation Order.  If this Plan is revoked or withdrawn or if no Confirmation Order is entered, this Plan shall be null and void, and nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, the Debtor; or (ii) prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor or its Estate.

10.6    **Filing of Additional Documents.**  Except as otherwise provided in this Plan, on or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and

other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

10.7     **Section Headings.**  The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of this Plan.

10.8     **Computation of Time.**  In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

10.9     **Successors and Assigns.**  The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign of such Entity.

10.10     **Notices.**  All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been given or made when mailed or as otherwise set forth herein:

<div align="center">

**If to the Debtor, at:**

Northeast Brooklyn Partnership
Attn:  Authorized Representative
132 Ralph Avenue
Brooklyn, New York 11233

-and-

Archer & Greiner, P.C.
*Counsel for Northeast Brooklyn Partnership*
Attn: Allen G. Kadish
     Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017

**If to the Purchaser, at:**

Hirschen Singer & Epstein LLP
*Counsel for 27 BED STUY LLC*
Attn: Russel A. Kivler
902 Broadway, 13th Floor
New York, New York 10010

</div>

Notices to any Creditor shall be at (i) the addresses set forth on the respective Proofs of Claim filed by such holder; (ii) the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor after the date of any related Proof of Claim; (iii) the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Reorganized Debtor has not received a written notice of a change of address; or (iv) the address reflected in the Schedules

if no Proof of Claim is filed and the Reorganized Debtor has not received a written notice of a change of address.

10.11    **Governing Law**.  Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other Federal law are applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

10.12    **Other Actions**.  On the Effective Date, and without limitation by any other provision of this Plan, the amendment of the Debtor's bylaws as may be appropriate, the bylaws of Reorganized Debtor, and all other actions and documents contemplated to be taken or executed on the Effective Date, shall be authorized and approved in all respects pursuant to this Plan.  In order to effectuate the transactions set forth in this Plan the Reorganized Debtor may reincorporate or a new entity may be formed, consistent with this Plan and the transactions set forth in Article IV and Article VI, to serve as the Reorganized Debtor.  All matters provided for in this Plan involving the corporate structure of the Debtor or Reorganized Debtor, and any corporate action required by the Debtor or Reorganized Debtor in connection with this Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by officers, directors and employees of the Debtor or Reorganized Debtor. On the Effective Date, the appropriate officers and directors of the Reorganized Debtor are authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by this Plan in the name of and on behalf of Reorganized Debtor without the need for any required approvals, authorizations, or consents, except and solely to the extent provided for in this Plan. Nothing contained herein shall prevent the Debtor from taking such actions as may be reasonably necessary to consummate this Plan, although such actions may not specifically be provided for within this Plan.

10.13    **Severability**.  In the event any provision of this Plan is determined to be unenforceable such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of this Plan.

10.14    **Business Day**.  In the event that this Plan requires an act to be performed on a day that is not a Business Day, such act shall be performed on the first Business Day thereafter.

10.15    **Tax Exemption.**    Pursuant to the fullest application of section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, this Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under this Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in this Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document

recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment including without limitation New York City Real Property Transfer Tax and New York State Documentary Tax.

10.16    **Amendment of Bylaws.**  Pursuant to section 1123(a)(5)(I) of the Bankruptcy Code, the Debtor's bylaws and operating budget cash requirements shall be deemed amended as of the Effective Date, to the extent necessary, to implement the terms of this Plan.

10.17    **Reorganized Debtor.**  The Debtor, on and after the Effective Date shall be referred to as the Reorganized Debtor.

## ARTICLE XI

## <u>RETENTION OF JURISDICTION</u>

11.1    **Retention of Jurisdiction**. Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, until the Case is closed, the Bankruptcy Court shall retain and have original, but not exclusive, jurisdiction to:

(a)    Ensure that this Plan is consummated, and to enter any Order pursuant to section 1142(b) of the Bankruptcy Code, to compel the Debtor and any other necessary party, to take such action and execute such documents to effectuate this Plan;

(b)    Consider any modification of this Plan proposed pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019;

(c)    Allow, disallow, determine, liquidate, classify or establish the priority, secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Expense, the resolution of any and all objections to the allowance or priority of Claims, and the resolution of any adversary proceeding;

(d)    Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for any period ending on or before the Effective Date;

(e)    Resolve any motions pending on the Effective Date to assume, assume and assign or reject any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and if necessary, liquidate, any and all Claims arising therefrom;

(f)    Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(g)    Decide or otherwise resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters or grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(h)         Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan or the Disclosure Statement or to enforce all orders, judgments, injunctions, and rulings entered in connection with the Case, including, but not limited to, any Order necessary to enforce the provisions of this Plan;

(i)         Resolve any and all controversies, suits or issues that may arise in connection with the consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

(j)         Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, or to modify the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with this Plan or the Disclosure Statement;

(k)         Remedy any defect or omission or reconcile any inconsistency in any Order, this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with this Plan, to the extent authorized herein or in the Bankruptcy Code;

(l)         Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)         Determine any dispute arising under or related to this Plan, including, without limitation, any dispute concerning the scope or effect of any release provided for by this Plan or the Confirmation Order;

(n)         Determine any other matters that may arise in connection with or related to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Disclosure Statement;

(o)         Enter an Order or final decree concluding the Case.

11.2      **Post-Effective Date Jurisdiction.**  Notwithstanding the entry of the Confirmation Order, the occurrence of the Effective Date, a final decree, or an Order closing the Case, the Bankruptcy Court shall retain and have original, but not exclusive, jurisdiction (including to reopen the Case) for the purpose of enforcing, by injunction or otherwise, the terms of this Plan, the Confirmation Order and any final decree, including, without limitation, the enforcement of any rights of the Reorganized Debtor.

Dated:  New York, New York                    NORTHEAST BROOKLYN PARTNERSHIP
        October 28, 2019                    Debtor and Debtor-in-Possession

By _____
    Jeffrey E. Dunston
    *Authorized Representative*

ARCHER & GREINER, P.C.


By: _s/ Allen G. Kadish_____
    Allen G. Kadish
    Harrison H.D. Breakstone
630 Third Avenue
New York, New York 10017
Tel:  (212) 682-4940
Email:    akadish@archerlaw.com
        hbreakstone@archerlaw.com

*Counsel for Northeast Brooklyn Partnership,*
*Debtor and Debtor-in-Possession*

## Index to Exhibits

| | |
|---|---|
| **Exhibit A:** | **Contract of Sale** |
| **Exhibit B:** | **Causes of Action** |

## Exhibit A

**Contract of Sale**

**AGREEMENT**

**OF**

**PURCHASE AND SALE**

**DATED AUGUST 13,  2019**

# TABLE OF CONTENTS

**Page No**.

ARTICLE 1 - Basic Information ................................................................................................... 1

   1.1    Certain Basic Terms. ........................................................................................... 1
   1.2    Closing Costs ...................................................................................................... 2
   1.3    Notice Addresses: ............................................................................................... 3

ARTICLE 2 - Property ................................................................................................................. 3

   2.1    Property Description. .......................................................................................... 3

ARTICLE 3 - Earnest Money ...................................................................................................... 4

   3.1    Deposit. ............................................................................................................... 4
   3.2    Form; Failure to Deposit ..................................................................................... 5
   3.3    Disposition of Earnest Money ............................................................................. 5
   3.4    Duties of Escrow Agent ...................................................................................... 5

ARTICLE 4 - Due Diligence ....................................................................................................... 6

   4.1    Due Diligence ..................................................................................................... 6
   4.2    Service Contracts and Other Contracts ............................................................... 6
   4.3    Proprietary Information; Confidentiality ............................................................. 6
   4.4    No Representation or Warranty by Seller ........................................................... 7
   4.5    Purchaser's Responsibilities ............................................................................... 7
   4.6    Purchaser's Agreement to Indemnify ................................................................. 8

ARTICLE 5 - Title and Survey ................................................................................................... 8

ARTICLE 6 - Operations and Risk of Loss ................................................................................ 9

   6.1    Ongoing Operations. ........................................................................................... 9
   6.2    Damage ............................................................................................................. 10
   6.3    Condemnation. .................................................................................................. 11

ARTICLE 7 - Closing ............................................................................................................... 12

   7.1    Closing ............................................................................................................. 12
   7.2    Conditions to Parties' Obligation to Close ....................................................... 12
   7.3    Seller's Deliveries. ............................................................................................ 12
   7.4    Purchaser's Deliveries ...................................................................................... 15
   7.5    Closing Statements ........................................................................................... 15
   7.6    Possession ......................................................................................................... 15
   7.7    Delivery of Books and Records……………………………………………………15

ARTICLE 8 - Prorations, Deposits, Commissions .................................................................. 15

   8.1    Prorations. ......................................................................................................... 15
   8.2    Closing Costs .................................................................................................... 16
   8.3    Final Adjustment After Closing ....................................................................... 16
   8.4    Tenant Deposits. ............................................................................................... 16

8.5    Commissions......................................................................................................... 16

ARTICLE 9 - Representations and Warranties .............................................................17

9.1    Seller's Representations and Warranties.................................................. 17
9.2    Purchaser's Representations and Warranties. ......................................... 22
9.3    Survival of Representations and Warranties. ......................................... 23

ARTICLE 10 - Default and Remedies .........................................................................24

10.1    Seller's Remedies. .................................................................................. 24
10.2    Purchaser's Remedies. ............................................................................ 24

ARTICLE 11 - Disclaimers, Release and Indemnity ..................................................24

11.1    Disclaimers By Seller.............................................................................. 24
11.2    Sale "As Is, Where Is."........................................................................... 25
11.3    Seller Released from Liability ................................................................ 26
11.4    "Hazardous Materials" Defined. ............................................................ 26
11.5    Survival. .................................................................................................. 26

ARTICLE 12 - Miscellaneous .....................................................................................27

12.1    Parties Bound; Assignment. ................................................................... 27
12.2    Headings. ................................................................................................. 27
12.3    Invalidity and Waiver.............................................................................. 27
12.4    Governing Law. ...................................................................................... 27
12.5    Survival. .................................................................................................. 27
12.6    Entirety and Amendments....................................................................... 27
12.7    Reserved................................................................................................... 28
12.8    Confidentiality ........................................................................................ 28
12.9    Notices. .................................................................................................... 28
12.10    Construction. .......................................................................................... 28
12.11    Calculation of Time Periods................................................................... 28
12.12    Execution in Counterparts. ..................................................................... 29
12.13    No Recordation........................................................................................ 29
12.14    Further Assurances. ................................................................................. 29
12.15    Discharge of Obligations. ....................................................................... 29
12.16    No Third Party Beneficiary ..................................................................... 29
12.17    [omitted.] ................................................................................................. 29
12.18    Seller's Cooperation with Purchaser………………………………………….30
12.19    Limited Partner Consent…..………………………………………………….30

JOINDER BY ESCROW AGENT...............................................................................32

LIST OF EXHIBITS ...................................................................................................33

EXHIBIT A – Property Description .......................................................................... A - 1

EXHIBIT B – Service Contracts................................................................................ B - 1

EXHIBIT C – Property Documents ........................................................................... C - 1

EXHIBIT D – Bargain and Sale Deed ........................................................................ D - 1

EXHIBIT E – Assignment of Leases, Rents and Arrears ........................................... E - 1

EXHIBIT F – Notice To Tenants ................................................................................ F - 1

EXHIBIT G – Residential and Commercial Rent Roll .............................................. G - 1

# AGREEMENT OF PURCHASE AND SALE

This Agreement of Purchase and Sale ("Agreement") is made and entered into by and between Purchaser and Seller.

## RECITALS

**A.** Defined terms are indicated by initial capital letters. Defined terms shall have the meaning set forth herein, whether or not such terms are used before or after the definitions are set forth.

**B.** Purchaser desires to purchase the Property and Seller desires to sell the Property, all upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual terms, provisions, covenants and agreements set forth herein, as well as the sums to be paid by Purchaser to Seller, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Purchaser and Seller agree as follows:

## ARTICLE 1 - Basic Information

### 1.1 Certain Basic Terms.

The following defined terms shall have the meanings set forth below:

**1.1.1** **Seller**: Northeast Brooklyn Partnership ( "Seller"), a New York limited partnership.

**1.1.2** **Purchaser: 27 BED STUY LLC**.

**1.1.3** **Purchase Price:** $4,300,000.00, (i.e. $107,500.00 per unit).

**1.1.4** **Earnest Money**: $300,000.00 (the "Earnest Money")

**1.1.5** **Title Company**:

All New York Title Agency, Inc.
222 Bloomingdale Road, Ste. 306
White Plains, NY 10605

Attention: Joseph S. Petrillo, Esq.
Telephone: 914-686-5600
Email: jpetrillo@allnyt.com

**1.1.6** **Escrow Agent**:

Abrams Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP

1 MetroTech Center, Suite 1701

| | | Brooklyn, NY  11201 |
| --- | --- | --- |
| | Attention: | Mark J. Caruso, Esq. |
| | Telephone: | 718-215-5300 X 504 |
| | Email: | mcaruso@abramslaw.com |

**1.1.7    Broker**:

| | | CPEX Real Estate LLC |
| --- | --- | --- |
| | | 81 Willoughby Street, 8th Floor |
| | | Brooklyn, NY 11201 |
| | Attention: | Stephen Safina |
| | Telephone: | (718) 687-4201 |
| | Email: | ssafina@cpexre.com |

**1.1.8    Effective Date**: August        , 2019.

    **1.1.9    Closing  Date**: On the forty-fifth (45th) Calendar day after the issuance of an Order from the Bankruptcy Court approving the Contract and authorizing the sale under its terms as more fully described below, at 11:00am at the office of Seller's attorney, Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP.; 1 MetroTech Center, Suite 1701, Brooklyn, New York 11201, TIME OF THE ESSENCE, but in no event earlier than October 31, 2019 unless otherwise consented to by Seller in its sole discretion.

## 1.2 Closing Costs.

    Closing costs shall be allocated and paid as follows:

| Cost | Responsible Party |
| --- | --- |
| Title Commitment | Purchaser |
| Premium for Title Policy | Purchaser |
| Costs of Survey and/or any revisions, modifications or recertifications thereto | Purchaser |
| Costs for UCC Searches | Purchaser |
| Recording Fees | Purchaser |
| New York City and State Transfer Tax | Seller |
| Real Estate Sales Commission to Broker | Seller |

**1.3 Notice Addresses:**

| | | | |
|---|---|---|---|
| Purchaser: | 27 BED STUY LLC<br>C/O ELH MGMT LLC.<br>16 Court Street, Suite 800<br>Brooklyn, NY 11241<br>Attention: Larry Hirschfield<br>Telephone: (718) 885-5620<br>Email: larry@elhmgmt.com | Copy to: | Hirschen Singer & Epstein LLP<br>902 Broadway, 13th Floor<br>New York, New York 10010<br>Attention:  Russell A. Kivler, Esq.<br>Telephone: 212-598-3216<br>Email: rkivler@hseny.com |
| Seller: | NORTHEAST BROOKLYN PARTNERSHIP<br>c/o NEBHDCo.<br>132 Ralph Avenue<br>Brooklyn, NY 11233<br>Attention: Jeffrey Dunston, CEO<br>Telephone: (718) 453-9490<br>Email: jdunston@nebhdco.org | Copy to: | Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP.<br>1 MetroTech Center<br>Suite 1701<br>Brooklyn, NY 11201<br>Attn: Stephen D. Chiaino, Esq.<br>Mark J. Caruso, Esq.<br>Telephone: (718) 215-5300<br>Email:<br>SChiaino@Abramslaw.com<br>MCaruso@Abramslaw.com |

## ARTICLE 2 - Property

**2.1 Property Description**.

Subject to the terms and conditions of this Agreement, Seller agrees to sell to  Purchaser, and Purchaser agrees to purchase from Seller, the following property (collectively, the  "Property"):

**Real Property**. The land described in Exhibit A attached hereto (the "Land"), together with all  of Seller's rights, title and interest in and to (i) all improvements located thereon ("Improvements"),  (ii) all  the  rights,  benefits,  privileges,  easements,  tenements, hereditaments,  and appurtenances thereon or in any way appertaining thereto, and (iii) without warranty, all  right, title, and interest of Seller, if any, in and to all strips and gores and any land lying in the  bed of any street, road or alley, open or proposed, adjoining such Land and (iv) all right, title and  interest of the Seller in and to any award made or to be made in lieu thereof and in and to any  unpaid award for damage to said Property by reason of  change of  grade of any street ((i) – (iv)  collectively, the "Real Property").

This sale also includes all air and development rights, if any. Seller makes no representation  as  to  the  existence  of  same  except  that  Seller  has  not  previously

transferred or encumbered any such rights.

      **2.1.1    Leases**. All of Seller's right, title and interest, without warranty, in all leases of the Real Property, including leases which may be made by Seller after the Effective Date and prior to Closing as permitted by this Agreement (the "<u>Leases</u>").

      **2.1.2    Tangible Personal Property**. All of Seller's right, title and interest, without warranty, in the equipment, machinery, furniture, furnishings, supplies and other tangible personal property, if any, owned by Seller and now or hereafter located in and used in connection with the operation, ownership or management of the Real Property including those tools and equipment used in connection with repair, maintenance and operation of the Improvements, but specifically excluding any items of personal property owned by tenants and/or manager, if any, at or on the Real Property and further excluding any items of personal property owned by third parties and/or leased to Seller (collectively, the "<u>Tangible Personal Property</u>").

      **2.1.3    Intangible Personal Property**. All of Seller's right, title and interest, if any, without warranty, in all intangible personal property related to the Real Property and the Improvements, including, without limitation: all trade names and trademarks associated with the Real Property and the Improvements, including Seller's rights and interests, if any, in the name of the Real Property; the plans and specifications and other architectural and engineering drawings for the Improvements, if any (to the extent assignable without cost to Seller); warranties (to the extent assignable without cost to Seller); contract rights related to the construction, operation, ownership or management of the Real Property, if any (but only to the extent assignable without cost to Seller and Seller's obligations thereunder are expressly assumed by Purchaser pursuant to this Agreement); governmental permits, approvals and licenses, if any (to the extent assignable without cost to Seller) (collectively the "<u>Intangible Personal Property</u>").

      **2.1.4    Licenses and Permits.** All right, title and interest of Seller, if any, in and to any licenses and permits owned or held by Seller (including any certificates of occupancy) to the extent such are assignable and related to or arising out of or used directly in connection with the ownership or operation of the Property (collectively, "<u>Licenses and Permits</u>").

      **2.1.5    Excluded Property**. Notwithstanding anything to the contrary herein, the Seller shall transfer to Purchaser, without any adjustment of the Purchase Price therefor, all reserve and escrow accounts (including the security deposit escrow accounts and rents paid more than thirty (30) days in advance of the due date, if any).

      **2.1.6**    Seller shall convey and Purchaser shall accept fee simple title to the Property in accordance with the terms of this Agreement, subject to Section 5.1.1.

## <u>ARTICLE 3 - Earnest Money</u>

### 3.1 Downpayment.

      3.1.1 (a) All sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment" or "Earnest Money") shall be paid by good check or checks drawn to the order of and delivered to Seller's attorney ("Escrow Agent"). The Escrow Agent shall hold the proceeds thereof in escrow in a special bank account at Northfield Bank located at 112 Court

Street, Brooklyn, NY 11201 (or as otherwise agreed in writing by Seller, Purchaser and Escrow Agent) until the Closing or sooner termination of this contract and shall pay over or apply such proceeds in accordance with the terms of this section. Escrow Agent shall hold such proceeds in its IOLA account, and neither party shall receive interest thereon. Escrow Agent shall not be responsible for any interest on the Downpayment to either party. At the Closing, the Downpayment, shall be paid by Escrow Agent to Seller and applied as a credit against the Purchase Price due from Purchaser. If for any reason the Closing does not occur and either party makes a written demand upon Escrow Agent for payment of such amount, Escrow Agent shall give written notice to the other party of such demand. If Escrow Agent does not receive a written objection from the other party to the proposed payment within ten (10) business days after the giving of such notice, Escrow Agent is hereby authorized to make such payment. If Escrow Agent does receive such written objection within such ten (10) business day period or if for any other reason Escrow Agent in good faith shall elect not to make such payment, Escrow Agent shall continue to hold such amount until otherwise directed by written instructions from the parties to this contract or a final and non appealable judgment of a court. However, Escrow Agent shall have the right at any time to deposit the escrowed proceeds with the clerk of the Supreme Court of the county in which the Premises is located. Escrow Agent shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)     The parties acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the duties of Escrow Agent hereunder are purely ministerial in nature and shall be expressly limited to the safekeeping and disposition of the Downpayment in accordance with the provisions of this contract, that Escrow Agent shall not be deemed to be the agent of either of the parties, and that Escrow Agent shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith, in willful disregard of this contract or involving gross negligence on the part of Escrow Agent.

All attorneys' fees and costs and Escrow Agent's costs and expenses incurred in connection with such interpleader shall be assessed against the party that is not awarded the Earnest Money, or if the Earnest Money is distributed in part to both parties, then in the inverse proportion of such distribution.

(c)     Escrow Agent has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this contract.

(d)     If Escrow Agent is Seller's attorney, Escrow Agent or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrow Agent is in possession of the Downpayment and continues to act as Escrow Agent.

## ARTICLE 4 - Due Diligence

### 4.1    Due Diligence.

Purchaser acknowledges that this Agreement is not subject to a due diligence period and except as otherwise expressly provided for herein, the Property shall be purchased by Purchaser "AS-IS, WHERE IS, WITH ALL FAULTS as of the date hereof less reasonable wear and tear and casualty loss" as more particularly provided for in Section 11.2 of this Agreement.

### 4.2    Service Contracts and Other Contracts.

**4.2.1**    The schedule of service, maintenance, supply and management contracts ("Service Contracts") attached hereto as Exhibit B lists all such contracts affecting the Property, and the information set forth therein is accurate as of the date hereof, all of which are terminable in accordance with their respective terms, except for those indicated as non-terminable (the "Non-Terminable Contracts") on Exhibit B.

**4.2.2**    Seller shall deliver at Closing notices of termination of all Service Contracts that are not assumed in writing by Purchaser to the extent such Service Contracts have not otherwise expired. Effective as of the Closing, Purchaser hereby assumes the obligations arising from and after the Closing Date under the Non-Terminable Contracts and any other service contracts that Purchaser has agreed to assume in writing.

### 4.3    Proprietary Information; Confidentiality.

Purchaser acknowledges that all information and materials given by Seller to Purchaser in connection with the Property, including, without limitation, the materials described in Exhibit C attached hereto (collectively, the "Property Documents") are proprietary and confidential and were delivered to Purchaser solely to assist Purchaser in determining the feasibility of purchasing the Property. Purchaser shall not use the Property Documents for any purpose other than as set forth in the preceding sentence. Purchaser shall not use or disclose the contents of the Property Documents or this Agreement, and Purchaser shall not disclose the fact that negotiations have taken place between Purchaser and Seller in connection with the Property, in each case, to any person other than to those persons who were responsible for determining the feasibility of Purchaser's acquisition of the Property or third parties (including investors, applicable governmental agencies, lenders, and the Title Company) engaged by Purchaser (or its affiliates) to assist in Purchaser's acquisition of the

Property (collectively, "Permitted Outside Parties"). Purchaser shall not divulge or use the contents of the Property Documents and other information except in accordance with the express terms of Section 4.3 or as otherwise required by law. In permitting Purchaser to review the Property Documents or any other information, Seller has not waived any privilege or claim of confidentiality with respect thereto, and no third party benefits or relationships of any kind, either express or implied, have been offered, intended or created.

### 4.4    No Representation or Warranty by Seller.

Purchaser acknowledges that except as expressly set forth herein, Seller has not made nor makes any warranty or representation regarding the truth, accuracy or completeness of the Property Documents or the source(s) thereof. Purchaser further acknowledges that some if not all of the Property Documents were prepared by third parties other than Seller. Seller

expressly disclaims any and all liability for representations or warranties, express or implied, statements of fact and other matters contained in such information, or for omissions from the Property Documents, or in any  other written or oral communications transmitted or made available to Purchaser, whether on, prior to, or subsequent to the date hereof. Except as provided for herein, Purchaser shall rely solely upon its own investigation with respect to the Property, including, without limitation, the Property's physical, environmental or economic condition, compliance or lack of compliance with any ordinance, order, permit, law or regulation or any other attribute or matter relating thereto. Seller has not undertaken any independent investigation as to the truth, accuracy or completeness of the Property Documents furnished by any third party other than those prepared by or furnished by Seller and are providing any such Property Documents solely as an accommodation to Purchaser.

## ARTICLE 5 - Title and Survey

**5.1.1** Purchaser has obtained or shall obtain: (i) a current preliminary title report for the Real Property issued by the Title Company; (ii) copies of all underlying title documents described in the Title Commitment (collectively, "Title Commitment"); and (iii) if Purchaser so elects, a survey of the Real Property (the "Survey"). Purchaser shall accept title to the Property AS IS, and subject to any and all existing Violations provided however that Seller shall pay all monetary fines and penalties in connection with any violation, Orders, Notices and  Regulatory Agreements except that (a) on or prior to the Closing Date, Seller shall remove and clear all Voluntary Encumbrances (as defined below), (b) on the Closing Date, Seller shall, subject to the Pre-  Closing Lien Cap (as defined below), either pay in full amounts owed on all Pre-Closing Liens  (as defined below) or, at Seller's sole election, deduct such amounts in full from the Purchase  Price.

For the purposes of this Section 5.1.1, "Pre-Closing Liens" shall solely mean any Environmental Control Board ("ECB") violations or judgments, in each case, resulting in a monetary lien  or other monetary encumbrance against the Real Property as of the Closing in an aggregate  amount  not  to  exceed  One  Hundred  Thousand  Dollars  and  00/100 ($100,000.00) (the  "Pre-  Closing Lien Cap").

In the event that the aggregate amount of the Pre-Closing Liens, if any, exceeds the Pre-Closing Lien Cap, at Purchaser's sole election, either (a) at the Closing, Seller shall pay an amount equal to the Pre-Closing Lien Cap (which shall, at Seller's sole election, be deemed paid in full by Seller if Seller elects to deduct such amount from the Purchase Price at Closing) and Purchaser shall pay the amount in excess of the Pre-Closing Lien Cap or (b) in the event Seller fails to pay the amount in excess of the Pre Closing Lien Cap, Purchaser may  elect to terminate this Agreement and the sole liability of Seller shall be the release of the Earnest Money to Purchaser. Upon such release, this Agreement shall be null and void and the  parties hereto shall be relieved of all further obligations and liability with respect to the subject  matter of this Agreement.

The term "Voluntary Encumbrances" as used in this Agreement shall solely mean any mortgages (excluding the HPD/HDC Mortgages (as defined below)), use restrictions (excluding currently existing use restrictions related to the HPD/HDC Mortgages), and mechanic's liens encumbering the Property as of the Closing.

If Seller shall be unable to convey title to the Property at the Closing in accordance

with the provisions of this Section 5.1.1 or should the cost to clear title exceed $500,000.00 with respect to all title issues except for Voluntary Encumbrances and Pre-Closing Liens, if Purchaser shall have any other grounds under the express terms of this Agreement for refusing to consummate the purchase provided for herein, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey without any other credit or liability on the part of Seller, provided, however, that Purchaser shall be entitled to a credit not to exceed $500,000.00. If Purchaser shall not so elect, Purchaser may terminate this Agreement and the sole liability of Seller shall be the release of the Earnest Money to Purchaser. Upon such release, this Agreement shall be null and void and the parties hereto shall be relieved of all further obligations and liability with respect to the subject matter of this Agreement.

## ARTICLE 6 - Operations and Risk of Loss

**6.1 Ongoing Operations.**

From the Effective Date through Closing:

**6.1.1   Leases and Service Contracts.** Seller will continue to operate the Property in the ordinary course of business and make all repairs and improvements necessary to comply with all governmental rules and regulations, any mortgages or regulatory agreements.

**6.1.2   New Contracts.** Other than lease renewals required under the New York State Rent Stabilization Law and provided such renewals charge the maximum rent permitted thereunder, Seller will not, on or after the Effective Date, enter into any new contract without Purchaser's consent that will be an obligation affecting the Property subsequent to the Closing including, but not limited to, mortgages, restrictive covenants and/or contracts placing use restrictions on the Property, except that the restrictions in this Section 6.1.2 shall not include contracts entered into in the ordinary course of business that are terminable without cause and without the payment of any termination penalty on not more than thirty (30) days' prior notice.

**6.1.3   Maintenance of Improvements; Removal of Personal Property.** Subject to Sections 6.2 and 6.3, Seller shall maintain all Improvements substantially in their present condition (ordinary wear and tear and casualty excepted) and shall maintain its current insurance on the Property, all in a manner consistent with Seller's maintenance of, and insurance on, the Improvements during Seller's period of ownership and shall satisfy all accounts payable on or prior to the Closing Date. Seller will not remove any Tangible Personal Property except as in the ordinary course of business or as may be required for necessary repair or replacement, and replacement shall be of approximately equal quality and quantity as the removed item of Tangible Personal Property.

**6.1.4   Application of Security Deposits.** Seller shall not, between the date hereof and the Closing Date, apply any of such security deposits with respect to any tenant in occupancy of the Closing Date, unless Seller is entitled to do so under the terms of the lease and provides notice to Purchaser.

**6.1.5   Vacant Residential and Commercial Space.** Between the Effective Date

and the Closing Date, except as required by applicable laws and the regulatory agreement, Seller shall not re-let an apartment or commercial space which is currently or becomes vacant without notifying Purchaser of such vacancy and if Purchaser instructs Seller to keep the apartment vacant, the Seller shall receive a credit at Closing for lost rent resulting from such vacancy in an amount equal to, in the case of a residential space, the maximum amount of rent legally permissible for such unit as of the date of such vacancy and, in the case of a commercial space, the amount of rent that is commensurate with the market rate for such commercial space as of the date of such vacancy. Seller does not warrant that any particular Lease or tenancy will be in force or effect as of the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease prior to Closing by reason of the tenant's default thereunder shall not affect the obligations of Purchaser under this Agreement or entitle Purchaser to any credit or abatement against the Purchase Price or give rise to any other claim. True copies of all Leases, to the extent in Seller's possession or control, will be delivered or made available to Purchaser upon Purchaser's request and after execution of this Agreement. Seller will not be obligated to enter into and, other than lease renewals in accordance with Section 6.1.2, will not enter into any leases without first obtaining the Purchaser's prior written consent. In the event Purchaser does not consent to the entry by Seller into a residential or commercial lease which is on terms that are commensurate with the market, Purchaser shall, at the Closing, reimburse Seller for the amount of rent that Seller would have earned between the date of such rejection and the Closing Date, which, in the case of a residential space, shall be calculated based on the maximum amount of monthly rent legally permissible for such unit during such period and, in the case of a commercial space, shall be calculated based on the amount of monthly rent that is commensurate with the market rate for such commercial space as of the date of Seller's request for Purchaser's consent to enter into a commercial lease for such space.

### 6.2 Damage.

If prior to Closing the Property is damaged by fire or other casualty, Seller shall estimate the cost to repair and the time required to complete repairs and will provide Purchaser written notice of Seller's reasonable estimation of the cost to repair (the "<u>Casualty Notice</u>") as soon as reasonably possible after the occurrence of any casualty.

6.2.1    **Material.** In the event of any Material Damage (as defined below) to or destruction of the Property or any portion thereof prior to Closing, either Purchaser or Seller at their option, may terminate this Agreement by delivering written notice to the other on or before the expiration of thirty (30) calendar days after the date Seller delivers the Casualty Notice to Purchaser (and if necessary, the Closing Date shall be extended to give the parties the full thirty-day period to make such election and to obtain insurance settlement agreements with Seller's insurers). Upon any such termination, the Earnest Money shall be returned to Purchaser and the parties hereto shall have no further rights or obligations hereunder, other than those that by their terms survive the termination of this Agreement. Upon such release, this Agreement shall be null and void and the parties hereto shall be relieved of all further obligations and liability with respect to the subject matter of this Agreement. If neither party terminates this Agreement within said thirty (30) day period, then the parties shall proceed under this Agreement and close on schedule (subject to extension of Closing as provided above), and as of Closing Seller shall assign to Purchaser, without representation or warranty by or recourse against Seller, all of Seller's rights in and to any resulting insurance proceeds (including any rent loss insurance applicable to any period on and after the Closing Date) due Seller as a result of such damage or destruction and Purchaser shall assume full responsibility for all needed repairs,

and Seller shall receive a credit at Closing for any deductible amount under such insurance policies. For the purposes of this Agreement, "Material Damage" and "Materially Damaged" means damage which, in Seller's reasonable estimation, exceeds, in the aggregate, $3,000,000.00 to repair or which, in Seller's reasonable estimation, will take longer than one hundred and eighty (180) days to repair.

**6.2.2    Not Material.** If the Property is not Materially Damaged, then neither Purchaser nor Seller shall have the right to terminate this Agreement, and Seller shall, at its sole option, either (i) repair the damage before the Closing in a manner reasonably satisfactory to Purchaser, or (ii) credit Purchaser at Closing for the reasonable cost to complete the repair (in which case Seller shall retain all insurance proceeds and Purchaser shall assume full responsibility for all needed repairs).

**6.3 Condemnation.**

If proceedings in eminent domain are instituted with respect to the Property or any portion thereof, excluding temporary takings and takings that result in a decrease in the appraised value of less than 5% and do not interfere with the ability to use the remainder of the Property for its current use, either Purchaser or Seller may, at their option, by written notice to the other given within ten (10) days after notification of such proceedings (and if necessary the Closing Date shall be automatically extended to give the party the full ten-day period to make such election), either: (i) terminate this Agreement, in which case the Earnest Money shall be immediately returned to Purchaser and the parties hereto shall have no further rights or obligations, other than those that by their terms survive the termination of this Agreement, or (ii) proceed under this Agreement, in which event Seller shall, at the Closing, assign to Purchaser its entire right, title and interest in and to any condemnation award, and Purchaser shall have the sole right after the Closing to negotiate and otherwise deal with the condemning authority in respect of such matter. If the electing party does not give the other written notice of its election within the time required above, such party shall be deemed to have elected option (ii) above. It is a condition of closing that no condemnation proceedings shall be pending or threatened.

## ARTICLE 7 - Closing

**7.1 Closing.**

The consummation of the transaction contemplated herein ("Closing") shall occur on the Closing Date at the offices of Seller's counsel  (or  such other location as may be mutually agreed upon by Seller and Purchaser).

**7.2 Conditions to Parties' Obligation to Close**.

In addition to all other conditions set forth herein, the obligation of Seller, on the one hand, and Purchaser, on the other hand, to consummate the transactions contemplated hereunder are conditioned upon the following:

**7.2.1    Representations and Warranties.** The other party's representations and warranties contained herein shall be true and correct in all material respects as of the date of this Agreement and the Closing Date except for changes resulting from passage of time (provided that either party may waive the requirement with respect to the other party); and

**7.2.2    Deliveries.** As of the Closing Date, the other party shall have tendered all deliveries described in <u>Sections 7.3</u> and <u>7.4</u> to be made at Closing.

**7.2.3    Bankruptcy Court Approval of Contract and Sale.** The Seller's and Purchaser's respective obligations under this Contract of Sale are subject to approval and order of the United States Bankruptcy Court in the Seller's Chapter 11 case, In re Northeast Brooklyn Partnership, pending in the United States Bankruptcy Court for the Eastern District of New York under Chapter 11 Case No 19-40822 (CEC). In the event such approval is not obtained by June 30, 2020, for any reason, Purchaser may terminate this Agreement and the Earnest Money shall be immediately returned to Purchaser. In the event that the approval is denied by the Bankruptcy Court, this Contract shall automatically be deemed null and void and the Earnest Money shall be returned to Purchaser. Notwithstanding anything to the contrary, in the event the Order of the Bankruptcy Court is not obtained by June 30, 2020 or the Bankruptcy Court does not approve this Agreement or orders a sale to another purchaser, this Contract shall be automatically deemed null and void and the Contract Deposit shall be refunded to the Purchaser.

**7.3 Seller's Deliveries.** On the Closing Date, Seller shall deliver to Purchaser the following:

**7.3.1    Deed.** A bargain and sale deed in the form of <u>Exhibit D</u> attached hereto without covenants in a form acceptable for recordation, executed and acknowledged by Seller including Lien Law 13 provision, conveying to Purchaser Seller's interest in the Real Property (the "<u>Deed</u>");

**7.3.2    Assignment of Leases, Rents and Arrears.** An Assignment of Leases, Rents and Arrears in the form of <u>Exhibit E</u> attached hereto (the "<u>Assignment</u>"), executed and acknowledged by Seller, vesting in Purchaser, without warranty, Seller's right, title and interest in and to the property described therein free of any claims, if any, that are described as a Seller obligation to clear in Section 5.1.1;  Purchaser shall assume all obligations of Seller as landlord under any lease or tenancy;

**7.3.3    Deed and Conveyancing or Transfer Tax Forms or Returns.** At the Closing, Seller shall execute, acknowledge, deliver and file all such returns (or, if required by ACRIS E-tax procedures, an electronic version thereof) as may be necessary to comply with Article 31 of the Tax Law of the State of New York and the regulations applicable thereto, and the New York City Real Property Transfer Tax Law (Admin. Code Article 21) and the regulations applicable thereto (collectively, as the same may be amended from time to time, the "<u>Transfer Tax Laws</u>"). The transfer taxes payable pursuant to the Transfer Tax Laws shall collectively be referred to as the "<u>Transfer Taxes</u>". Seller shall pay (or cause to be paid) to the  appropriate governmental authority the Transfer Taxes payable in connection with the  consummation of the transactions contemplated by this Agreement; provided however, Seller  and/or Purchaser shall have the right to claim, and make use of, any exemption from payment of  Transfer Taxes that may be available to Seller and/or Purchaser and/or its affiliates (including, without limitation, exemptions available pursuant to the United States Bankruptcy Code) and the  parties agrees to cooperate with one another in such claim of exemption;

**7.3.4    FIRPTA.** A Foreign Investment in Real Property Tax Act affidavit executed by Seller;

**7.3.5    Notice to Tenants.** Seller and Purchaser shall deliver to each tenant immediately after the Closing a notice regarding the sale of the Property in substantially the form attached hereto as Exhibit F (the "Notice to Tenants"), or such other form as may be required by applicable state law;

**7.3.6    Possession.** Possession of the Real Property in the condition required by this Agreement, subject to the Leases, and keys therefore;

**7.3.7    Assignment.** A blanket assignment, without recourse or representation, of all Seller's right, title and interest, if any, to all contractors', suppliers', materialmen's and builders' guarantees and warranties of workmanship and/or materials in force and effect with respect to the Property on the Closing Date and a true and complete copy of each thereof;

**7.3.8    Additional Documents.** Any additional documents that the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement (provided, however, no such additional document shall expand any obligation, covenant, representation or warranty of Seller or result in any new or additional obligation, covenant, representation or warranty of Seller under this Agreement beyond those expressly set forth in this Agreement). In addition, the Seller shall deliver the following:

(i)    A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

(ii)    A schedule of all security deposits.

(iii)    To the extent in Seller's possession, a list setting forth the dates and extent of the last painting and decorating in each of the apartments painted by the Seller.

(iv)    The Section 8 contract to the extent in Seller's possession or control, but in any event the voucher showing the case number or voucher number for the Section 8 tenant.

(v)    An assignment of all rent arrears and landlord/tenant causes of action and an assignment of all of Seller's rights in and to the Lease containing, among other provisions, Seller's agreement indemnifying and agreeing to defend Purchaser from and against any claims made by tenants with respect to any failure to perform its obligations prior to the Closing.

**7.3.9    Estoppel Certificates and Subordination Agreements.** Seller shall request and use commercially reasonable efforts to obtain and deliver to Purchaser prior to Closing, written estoppel certificates, from each of the commercial tenants (a signed certificate is referred to herein as a "Tenant Estoppel"). The receipt of any Tenant Estoppels shall not be a condition precedent to Purchaser's obligation to proceed to Closing under this Agreement.

**7.4 Purchaser's Deliveries.**  On the Closing Date, Purchaser shall deliver to Seller the following:

**7.4.1    Assignment of Leases, Rents and Arrears.** The Assignment executed

and acknowledged by Purchaser. Purchaser shall assume all obligations of Seller as landlord under any lease or tenancy;

        **7.4.2    Conveyancing or Transfer Tax Forms or Returns.** At the Closing, Purchaser shall execute, acknowledge and deliver to Seller all such returns (or, if required by ACRIS E-tax procedures, an electronic version thereof) as may be necessary to comply with the Transfer Tax Laws. The parties agree to cooperate in such claim of exemption from Transfer Taxes as described in Section 7.3.3;

        **7.4.3    Additional Documents.** Any additional documents that Seller or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement (provided, however, no such additional document shall expand any obligation, covenant, representation or warranty of Purchaser or result in any new or additional obligation, covenant, representation or warranty of Purchaser under this Agreement beyond those expressly set forth in this Agreement);

        **7.4.4    Purchase Price.** At or before 5:00 p.m. local time on the Closing Date, Purchaser shall deliver to Seller the Purchase Price, less the Earnest Money that is applied to the Purchase Price, plus or minus applicable prorations, if any, in immediately available U.S. federal funds wired for credit into Seller's account. Adjustments may be paid by attorney escrow checks; and

        **7.4.5    Notice to Tenants.** Following the transfer of title to Purchaser, Purchaser shall deliver to each Tenant the Notice to Tenants or such other form as may be required by applicable state law.

### 7.5 Closing Statements.

        Seller and Purchaser shall agree to adjustments and a form of closing statement at least two (2) business days prior to Closing. As of or prior to the Closing Date, Seller and Purchaser shall deliver to the other executed closing statements consistent with this Agreement.

### 7.6 Possession.

        Seller shall deliver possession of the Property to Purchaser at the Closing in the condition required pursuant to the express terms of this Agreement.

### 7.7 Delivery of Books and Records.

        On or before the Closing Date, Seller shall deliver to the offices of Purchaser's property manager to the extent in Seller's or its property manager's possession or control: lease files; maintenance records and warranties; plans and specifications; licenses, permits and certificates of occupancy; copies or originals of all books and records of account, contracts, and copies of correspondence with tenants and suppliers; receipts for deposits, unpaid bills and other papers or documents which pertain to the Property; all advertising materials; booklets, keys, and other items, if any, used in the operation of the Property. Seller shall make available to the Purchaser, prior to and/or after the Closing of title at any time upon reasonable notice, at the Seller's office, all records of the Seller, or the Seller's agents, in connection with the

management and operation of the Property, and to loan to the Purchaser all paid bills, vouchers, cancelled checks, and other documentation as may be reasonably requested by Purchaser. Purchaser shall reimburse Seller for all reasonable out of pocket costs incurred by Seller.

## ARTICLE 8 - Prorations, Deposits, Commissions

### 8.1 Prorations.

**8.1.1**    As of the close of business on the day prior to the Closing, the following items shall be prorated with all items of income and expense for the Property being borne by Purchaser from and after (but including) the date of Closing: Rents and other income and rents that have been collected by Seller as of Closing; transferable licenses or permits, fees and assessments, prepaid expenses and obligations under and Non-Terminable Contracts and Service Contracts assumed in writing by Purchaser; real estate taxes ("Taxes"), if any; water and sewer and utility charges; and all other items customarily apportioned in connection with the sale of properties similarly located. With respect to any Rents that have not been collected, the parties agree that Purchaser shall purchase any of Seller's rent  arrears by paying to Seller an amount equal to the following amount of the arrears: 75% for arrears that are less than thirty (30) days past due; 50% for arrears that are more than thirty (30) days but less than sixty-one (61) days; 12.5% for arrears that are more than sixty (60) days but less than ninety (90) days; and 0% for arrears that are more than ninety (90) days.

**8.1.2    Taxes.** Seller shall pay any and all real property taxes owed related to commercial square footage portions of the Property from prior and as of the closing date. Any and all payments made pursuant to this Section shall be separate and apart from the Purchase Price.

**8.1.3    Utilities.** Purchaser shall take all steps necessary to effectuate the transfer of all utilities to its name as of the Closing Date, and where necessary, post deposits with the utility companies. Seller shall ensure that all utility meters are read as of the Closing Date, provided that if meter readings are not available, the adjustment will be estimated based on prior usage. Seller shall be entitled to recover any and all deposits held by any utility company as of the Closing Date.

### 8.2 Closing Costs.

Closing costs shall be allocated between Seller and Purchaser in accordance with Section 1.2.

**8.3 Final Adjustment After Closing**.

If final bills are not available or cannot be issued prior to Closing for any item being prorated under Section 8.1, then Purchaser and Seller agree to allocate such items on a fair and equitable basis as soon as such bills are available, final adjustment to be made as soon as reasonably possible after the Closing. Payments in connection with the final adjustment shall be due within thirty (30) days of written notice. All such rights and obligations shall survive the Closing for a period of three (3) months.

**8.4 Tenant Deposits.**

All tenant security deposits, for residential tenants, and security received by the Seller and  not applied by Seller (and interest thereon if required by law or contract) shall be transferred to  Purchaser at Closing or credited against the Purchase Price, except for those security deposits  applied by Seller in accordance with the terms of the applicable lease. As of the Closing, Purchaser shall assume Seller's obligations related to tenant security deposits. Seller shall not  apply any security deposits unless the tenant has vacated the space.

**8.5 Commissions.**

Seller shall be responsible to Broker for a real estate sales commission at Closing in accordance with a separate agreement between Seller and Broker. Broker may share its commission with any other licensed broker involved in this transaction, but the payment of the

commission by Seller to Broker shall fully satisfy any obligations of Seller to pay a commission hereunder. Under  no circumstances shall Seller  owe  a commission or  other  compensation directly to any other broker, agent or person. Any cooperating broker shall not be an affiliate, subsidiary or related in any way to Purchaser. Neither party engaged with any other broker and if representation is not true, said party will indemnify the other party from any claims for commissions, fees or other compensation or reimbursement for expenses made by a broker engaged by or claiming to have dealt such party in connection with this Agreement.

## ARTICLE 9 - Representations and Warranties

**9.1 Seller's Representations and Warranties.**

To Seller's knowledge, Seller represents and warrants to Purchaser as follows, which shall be true, complete and accurate as of the date hereof and on the Closing Date, except for changes resulting from the passage of time:

**9.1.1    Organization and Authority.** Seller has been duly organized, is validly existing and in good standing in the state in which it was formed. Seller has the full right and authority and has obtained any and all consents required to  enter into this Agreement and to consummate or cause to be consummated the transactions  contemplated hereby. All of the documents to be  delivered by Seller at the Closing will be authorized and executed will constitute, as appropriate,  the valid and binding obligation of Seller, enforceable in accordance with their

terms.

       **9.1.2   Conflicts and Pending Actions.** There is no agreement to which Seller is a party or, to Seller's knowledge, that is binding on Seller which is in conflict with this Agreement. Except as provided in Section 12.19, to Seller's knowledge, the execution and delivery by Seller of, and the performance and compliance by Seller with the terms and provisions of, this Agreement do not violate any of the terms, conditions or provisions of (i) its agreement of limited partnership, or (ii) its other limited partnership organizational documents. Subject to the terms of those certain Land Disposition Agreements, the Regulatory Agreements (the "Regulatory Agreements"), the execution and delivery of this Agreement and the performance of its obligations hereunder by Seller will not conflict with any provision of any law or regulation to which Seller is subject or any agreement or instrument to which Seller is a party or by which it is bound or any order or decree applicable to Seller or result in the creation or imposition of any lien on any of Seller's assets or property which would materially and adversely affect the ability of Seller to carry out the terms of this Agreement, provided that Seller has or will have obtained any consent, approval, authorization or order of the City of New York, any court or governmental agency or body, in each case, if and to the extent required for the execution, delivery or performance by Seller of this Agreement.

       **9.1.3   Notices from Governmental Authorities.** To Seller's knowledge, Seller has not received from any governmental authority written notice of any material violation of any laws applicable (or alleged to be applicable) to the Property, or any part thereof, that has not been corrected, except (i) as may be reflected by the Property Documents and/or the Report of Title or otherwise disclosed in writing to Purchaser or (ii) violations that Purchaser has agreed to take subject to in accordance with Article 5.

       **9.1.4   Litigation.** Seller has not received any notice of (nor to its knowledge are) any actions, suits, or legal proceedings pending or expressly threatened in writing against or affecting Seller (in respect of the Property) or the Property, at law or equity which might materially and adversely affect Seller's ability to transfer the Property in accordance with this Agreement.

       **9.1.5   Work Order by Seller.** At the time of Closing, all work ordered by Seller with regard to the Premises shall have been paid for and no mechanic's lien(s) shall be filed either prior to Closing or in the future against the Premises as a result of work performed at the request of Seller or if filed shall be removed of record by bonding.

       **9.1.6   Residential Rent Rolls.** To the best of Seller's knowledge, all residential tenancies under Leases at the Property as of the date set forth on Exhibit G ("Residential and Commercial Rent Roll"), the apartment leased, the security deposits held by Seller, expiration dates, rental concessions, the rental amounts, arrears in excess of thirty (30) days and the payment of rents more than thirty (30) days in advance of the date due, if any, are identified on Exhibit G. The information concerning written leases and any tenancies in the Property not arising out of the Leases (collectively, "Tenancies") is accurate as of the date set forth therein and there are no Leases or Tenancies of any space in the Property other than those set forth therein. Such Exhibit sets forth with respect to each Lease (i) the rent control/rent stabilization status of each of the apartment and whether any of the apartments are vacant or occupied by Tenants paying market rents and (ii) whether any apartment qualifies for a SCRIE or DRIE or is subject to a Section 8 tenancy. The rents set forth on the Rent Schedule are the current rents

being billed to the Tenants and are currently being collected by the Seller as landlord and there are no rentals more than thirty (30) days past due except as shown on the Rent Schedule. Except as shown on the Rent Schedule with respect to the preferential rents, no tenant has been given any concession or consideration for the rental of any space; no utilities are included in any rent; each tenant pays his, her or its own electric; gas for the apartments is master metered; and none of the apartments are rented furnished or for professional purposes.

      **9.1.7**    In addition Seller further warrants and represents that Seller has paid, or shall have paid at Closing, all costs required to be paid by the landlord in connection with the leasing and preparation of space and has paid all such obligations for brokerage commissions and finders' fees incurred in entering into the leases of the tenants listed on the Rent Schedule) and there is no agreement with any third party that will require any payment in connection with the renewal of any of the Leases. Except as otherwise set forth in the Rent Schedule or elsewhere in this Agreement:

      (a)    all of the Leases are in full force and effect and none of them has been modified, amended or extended;

      (b)    no renewal or extension option or options for additional space have been granted to tenants, other than as required by Law with respect of any renewals required of any tenant of a residential unit;

      (c)    no tenant has an option to purchase the Property or a right of first refusal or first offer with respect to a sale of the Property;

      (d)    there are no security deposits other than those set forth in the Rent Schedule and the security deposits are consistent with the amounts set forth in the Leases;

      (e)    true and complete copies of the Leases have been delivered to Purchaser or its counsel and initialed by representatives of Purchaser and Seller and there are no Leases or Tenancies of any space in the Property other than those set forth therein and the Leases represent the entire agreement between Seller, as landlord, and the tenant thereunder for the apartment or space covered by the respective Lease;

      (f)    [omitted];

      (g)    Seller has not been notified that it is in default of its obligations under the Leases has been given or to the knowledge of Seller is pending;

      (h)    Except as required by law and in accordance with Section 6.1.2, the Seller agrees not to execute a Lease without the express written consent of Purchaser. In the event Purchaser does not consent to the entry by Seller into a residential or commercial lease which is on terms that are commensurate with the market, Purchaser will reimburse Seller for the amount of rent that Seller would have earned between the date of such rejection and the Closing Date.

      (i)    Except as ordered by the court or other governmental entity (and other than any NYC Disability Rent Increase Exemption ("DRIE") program  and NYC Senior Citizen Rent Increase  Exemption ("SCRIE")  program benefits received by any tenant as set forth in the attached Exhibit "G"), no Tenant is entitled to rental concessions or abatements for any period  subsequent to the Closing Date;

(j)    Seller has not made any material alterations or additions to the Property or the apartments without compliance with all applicable law;

(k)    Seller has received no notice that as to any tenant any action or proceeding, voluntary or involuntary, is pending against any tenant under any bankruptcy or insolvency act;

(l)    All requisite fees in connection with any HCR filings have been or will be paid therewith have been paid to the HCR, Seller has complied with all applicable HCR regulations and the rent restrictions set forth in the Regulatory Agreements and the New York State Rent Stabilization Law. The Seller will re-register the rents for the apartments at the Property with the HCR, if required, and will cause all other required registrations to be made between the date of this Agreement and the date of closing of title, and shall pay all requisite fees in connection therewith. Seller will deliver at closing of title all registration forms, proof of mailing or delivery to each tenant and proof of payment of all requisite fees described above for each year that filing was required by law to the extent in Seller's possession or under its control. Seller agrees to provide Purchaser or Purchaser's attorney with written authorization allowing the HCR to release rent registration records, including records related to the MBR's and MCR's to Buyer or its attorneys for examination prior to closing of title. To the best of Seller's knowledge, since the said registrations, there have been no diminutions of services and equipment and none will be suffered by the Seller through the Closing; to the best of Seller's knowledge no tenant has been given any concession or consideration for the rental of any space, no utilities are included in any rent and that none of the apartments are rented furnished or for professional purposes;

(m)    All rents being charged do not materially exceed the amount that is permitted by law, including the Regulatory Agreement;

(n)    Seller is not aware of any tenants are entitled to abatements as senior citizens except as may be set forth in the Rent Schedule;

(o)    Except as otherwise set forth in the Rent Schedule attached hereto, each apartment contains a range and a refrigerator, and all of the ranges and refrigerators and all of the items of personal property (or replacements thereof) are and on the Closing will be owned by Seller free of liens and encumbrances and shall be in working order;

(p)    In all cases where rents have been increased by reason of additional services, equipment, or renovations, same have actually been furnished and installed and fully paid for and none of the rentals reflect or include a sum allowed for increased occupancy or subleasing;

(q)    Seller has not been notified that any tenant in the Property is not an Eligible Tenant as required pursuant to the Regulatory Agreement nor has the City of New York notified Seller that the City of New York has elected to enforce any rights it might have under the Regulatory Agreement;

(r)    To Seller's actual knowledge, there are no pending harassment proceedings before any administrative agency or any court of competent jurisdiction, and there

have been no harassments filed against the Property or Seller during the two (2) years prior to the date of this Agreement;

(s)    There are no union contracts affecting any employees. Seller will not enter into any union contract or other union agreement that will be binding upon Purchaser at Closing. The non-union resident superintendent occupies an apartment in connection with his employment as a superintendent and is not entitled to occupancy as a rent regulated tenant.

(t)    For the past twelve (12) months there has been no organized rent strike or joint action by tenants' groups to withhold rent from any Seller;

(u)    Seller will timely file all necessary financial statements, including, without limitation, New York City Real Property Income and Expense Statement with the City of New York, if the same are due prior to Closing, and if Seller does not file by the Closing, it shall be responsible for any fines or penalties that are incurred as a result thereof.

**9.1.8**    If there is any litigation pending for the reduction of any of the rentals or a complaint alleging a reduction of services or if any are filed prior to the closing of title the Seller will notify Purchaser of same prior to Closing at the Seller's own cost and expense.

**9.1.9    Commercial Rent Rolls.** To the best of Seller's knowledge, all commercial tenancies under Leases at the Property as of the date set forth on Exhibit H, the unit leased, the security deposits held by Seller, expiration dates, rental concessions, the rental amounts, arrears in excess of thirty (30) days and the payment of rents more than thirty (30) days in advance of the date due, if any, are identified on Exhibit H. Seller further warrants and represents Seller has paid, or shall have paid at Closing, all costs required to be paid by the landlord in connection with the leasing and preparation of space and has paid all such obligations for brokerage commissions and finders' fees incurred in entering into the leases of the tenants listed on the Rent Schedule and there is no agreement with any third party that will require any payment in connection with the renewal of any of the Leases.

**9.1.10    No Assessments.** Except as set forth on tax bills for the Property, there are no special or other assessments for public improvements now affecting the Property, nor, to Seller's knowledge, are there any pending or threatened special assessments which would affect the Property.

**9.1.11    No Condemnation.** Seller has not received written notice of any pending or threatened condemnation or eminent domain proceedings relating to or affecting the Property.

**9.1.12    FIRPTA**. Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the **"**Code**"**).

**9.1.13    OFAC**. Seller is not, and will not become, a person or entity with whom United States persons or entities are restricted or prohibited from doing business under regulations of the Office of Foreign Asset Control (**"**OFAC**"**) of the Department of the Treasury (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or

transactions or be otherwise associated with such persons or entities.

**9.1.14  Existing Mortgage**. Intentionally Omitted.

**9.1.15  Environmental Laws.** Other than with respect to environmental control board violations, Seller has not received any written notice from any governmental unit that it or the Property is not in compliance with any environmental law or that it has any liability with respect thereto, and there are no administrative, regulatory or judicial proceedings pending or to the best of Seller's knowledge threatened with respect to the Property alleging any violations of, or liability under any environmental law.

## 9.2 Purchaser's Representations and Warranties.

Purchaser represents and warrants to Seller that:

**9.2.1    Organization and Authority.** Purchaser has been duly organized and is validly existing as a limited liability company in good standing in the State of New York and is qualified to do business in the state of New York. Purchaser has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Purchaser at the Closing will be, authorized and properly executed and constitute, or will constitute, as appropriate, the valid and binding obligation of Purchaser, enforceable in accordance with their terms.

**9.2.2**    Purchaser is not now nor shall it be at any time prior to or at the Closing an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity (collectively, a "Person") with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "U.S. Person"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC "Specially Designated Nationals and Blocked Persons") or otherwise. Neither Purchaser nor any Person who owns an interest in Purchaser (other than the owner of publicly traded shares) (collectively, a "Purchaser Party") is now nor shall be at any time prior to or at the Closing a Person with whom a U.S. Person, including a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended ("Financial Institution"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

9.2.2.1.1        Neither Purchaser nor any Purchaser Party, nor any Person

providing funds to Purchaser: (A) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined); (B) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (C) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. For purposes of this Subsection (f), the term "Anti-Money Laundering Laws" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

**9.2.3 Conflicts and Pending Action.** There is no agreement to which Purchaser is a party or to Purchaser's knowledge binding on Purchaser which is in conflict with this Agreement. There is no action or proceeding pending or, to Purchaser's knowledge, threatened against Purchaser which challenges or impairs Purchaser's ability to execute or perform its obligations under this Agreement.

**9.3 Survival of Representations and Warranties.**

The representations and warranties set forth in this Article 9 are made as of the date of this Agreement and are remade as of the Closing Date and shall not be deemed to be merged into or waived by the instruments of Closing. Terms such as "to Seller's knowledge," "to the best of Seller's knowledge" or like phrases mean the actual present and conscious awareness or knowledge of Seller ("Property Manager" or "Manager"), without any duty of inquiry or investigation; provided that so qualifying Seller's knowledge shall in no event give rise to any personal liability on the part of Property Manager or any other officer or employee of Seller, on account of any breach of any representation or warranty made by Seller herein. Said terms do not include constructive knowledge, imputed knowledge, or knowledge Seller or such persons do not have but could have obtained through further investigation or inquiry. No broker, agent, or party other than Seller is authorized to make any representation or warranty for or on behalf of Seller.

## <u>ARTICLE 10 - Default and Remedies</u>

**10.1    Seller's Remedies.**

If Purchaser fails to perform its obligations pursuant to this Agreement at or prior to Closing and fails to close for any reason except failure by Seller to perform hereunder, Seller

shall be entitled, as its sole remedy in any and all events (except as provided in Section 4.6 hereof), to terminate this Agreement and retain the Earnest Money as liquidated damages. Seller shall be entitled to retain such Earnest Money as liquidated damages and not as penalty, in full satisfaction of claims against Purchaser hereunder. Seller and Purchaser agree that Seller's damages resulting from Purchaser's default are difficult, if not impossible, to determine and the Earnest Money is a fair estimate of those damages which has been agreed to in an effort to cause the amount of such damages to be certain.

### 10.2    Purchaser's Remedies.

If Seller fails to perform its obligations pursuant to this Agreement for any reason except failure by Purchaser to perform hereunder, Purchaser shall elect, as its sole remedy, either to (i) terminate this Agreement by giving Seller timely written notice of such election prior to or at Closing and Purchaser shall be entitled to a return of the Earnest Money or (ii) waive said failure or breach and proceed to Closing without reduction in the Purchase Price except as otherwise provided for herein or (iii) bring an action for specific performance. Purchaser's remedies shall be limited to those described in this Section 10.2 hereof. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IN NO EVENT SHALL SELLER'S OR PURCHASER'S DIRECT OR INDIRECT PARTNERS, MEMBERS, SHAREHOLDERS, OWNERS OR AFFILIATES, ANY OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF SELLER OR THE FOREGOING, OR ANY AFFILIATE OR CONTROLLING PERSON THEREOF HAVE ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROPERTY, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE.

### 10.3    Notice and Right to Cure.

In the event that either Purchaser or Seller declares a default against the other, notice of default shall be given in accordance with the Notice provision of this Agreement and the recipient of the default notice shall have ten (10) days from the date the notice is given to cure the default.

### ARTICLE 11 - Disclaimers, Release and Indemnity

### 11.1    Disclaimers By Seller.

Except as expressly set forth in this Agreement, it is understood and agreed that Seller has not at any time made and is not now making, and it specifically disclaims, any warranties or representations of any kind or character, express or implied, with respect to the Property, including, but not limited to, warranties or representations as to (i) matters of title, (ii) environmental matters relating to the Property or any portion thereof, including, without limitation, the presence of Hazardous Materials in, on, under or in the vicinity of the Property, (iii) geological conditions, including, without limitation, subsidence, subsurface conditions, water table, underground water reservoirs, limitations regarding the withdrawal of water, and geologic faults and the resulting damage of past and/or future faulting, (iv) whether, and to the extent to which the Property or any portion thereof is affected by any stream (surface or underground) body of water, wetlands, flood prone area, flood plain, floodway or special flood hazard, (v) drainage, (vi) soil conditions, including the existence of instability, past soil repairs, soil additions or conditions of soil fill, or susceptibility to landslides, or the sufficiency of any

undershoring, (vii) the presence of endangered species or any environmentally sensitive or protected areas, (viii) zoning or building entitlements to which the Property or any portion thereof may be subject, (x) usages of adjoining property, (xi) access to the Property or any portion thereof, (xii) the value, compliance with the plans and specifications, size, location, age, use, design, quality, description, suitability, structural integrity, operation, title to, or physical or financial condition of the Property or any portion thereof, or any income, expenses, charges, liens, encumbrances, rights or claims on or affecting or pertaining to the Property or any part thereof, (xiii) the condition or use of the Property or compliance of the Property with any or all past, present or future federal, state or local ordinances, rules, regulations or laws, building, fire or zoning ordinances, codes or other similar laws, (xiv) the existence or non-existence of underground storage tanks, surface impoundments, or landfills, (xv) the merchantability of the Property or fitness of the Property for any particular purpose, (xvi) the truth, accuracy or completeness of the Property Documents, (xvii) tax consequences, or (xviii) any other matter or thing with respect to the Property.

**11.2    Sale "As Is, Where Is."**

Purchaser acknowledges and agrees that upon Closing, Seller shall sell and convey to Purchaser and Purchaser shall accept title and the Property "AS IS, WHERE IS, WITH ALL FAULTS as of the date hereof less reasonable wear and tear and casualty loss" subject to all restrictions and regulations. Purchaser has not relied and will not rely on, and Seller has not made and is not liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Property or relating thereto (including specifically, without limitation, Property information packages distributed with respect to the Property) made or furnished, whether on, prior to or subsequent to the Effective Date, by Seller, or any real estate broker, agent or third party representing or purporting to represent Seller, to whomever made or given, directly or indirectly, orally or in writing. Purchaser represents that it is a knowledgeable, experienced and sophisticated purchaser of real estate and that, except as expressly set forth in this Agreement, it is relying solely on its own expertise and that of Purchaser's consultants in purchasing the Property and shall make an independent verification of the accuracy of the Property Documents provided by Seller. Purchaser will conduct such inspections and investigations of the Property as Purchaser deems necessary, including, but not limited to, the physical and environmental conditions thereof, and shall rely upon same; provided, however, that in no event shall Purchaser's right to conduct inspections or investigations have any effect on the limitations provided in Section 4.1. Purchaser acknowledges that Seller has afforded Purchaser a full opportunity to conduct such investigations of the Property as Purchaser deemed necessary to satisfy itself as to the condition of the Property and the existence or non-existence or curative action to be taken with respect to any Hazardous Materials (as defined below) on or discharged from the Property, and will rely solely upon same and not upon any information provided by or on behalf of Seller or its agents or employees with respect thereto, other than such representations, warranties and covenants of Seller as are expressly set forth in this Agreement. As of the Effective Date, Purchaser hereby assumes the risk that adverse matters, including, but not limited to, adverse physical or construction defects or adverse environmental, health or safety conditions, may not have been revealed by Purchaser's inspections and investigations or the title report prepared by the Title Company described in Section 1.1.5.

### 11.3    Seller Released from Liability.

Purchaser acknowledges that it had the opportunity to inspect the Property prior to the date of this Agreement, and during such period, observe its physical characteristics and existing conditions and the opportunity to conduct such investigation and study on and of the Property and adjacent areas as Purchaser deems necessary, and Purchaser hereby FOREVER RELEASES AND DISCHARGES Seller from all responsibility and liability, including without limitation, liabilities under the Comprehensive Environmental Response, Compensation and Liability Act Of 1980 (42 U.S.C. Sections 9601 et seq.), as amended ("CERCLA"), the New York State Environmental Quality Review Act (N.Y. Environmental Conservation Law § 8 (McKinney 2011), et seq.), as amended ("SEQR") and the New York City Environmental Quality Review (2 RCNY § 1-04 et seq .), as amended ("CEQR") regarding the condition (including, without limitation, the presence in the soil, air, structures and surface and subsurface waters, of Hazardous Materials or other materials or substances that have been or may in the future be determined to be toxic, hazardous, undesirable or subject to regulation and that may  need to be specially treated, handled and/or removed from the Property under current or future  federal, state and local laws, regulations or guidelines), valuation, salability or utility of the  Property, or its suitability for any purpose whatsoever. Purchaser further hereby WAIVES any  and all objections to or complaints regarding (including, but not limited to, federal, state and  common law based actions), or any private right of action under, state and federal law to which  the Property is or may be subject, including, without limitation, structural and geologic conditions, subsurface soil and water conditions and solid and hazardous waste and Hazardous  Materials on, under, adjacent to or otherwise affecting the Property. Purchaser further hereby  assumes the risk of changes in applicable laws and regulations relating to past, present and future environmental conditions on the Property and the risk that adverse physical characteristics and conditions, including, without limitation, the presence of Hazardous Materials or other contaminants, may not have been revealed by its investigation.

### 11.4    "Hazardous Materials" Defined.

For purposes hereof, "Hazardous Materials" means "Hazardous Material," "Hazardous Substance," "Pollutant or Contaminant," and "Petroleum" and "Natural Gas Liquids," as those terms are defined or used in Section 101 of CERCLA, SEQR or CEQR and any  other substances regulated under federal, state or local law because of their effect or  potential effect on public health and the environment, including, without limitation, PCBs, lead paint, mold, fungi, asbestos, urea formaldehyde, radioactive materials, putrescible, and infectious materials.

### 11.5    Survival.

The terms and conditions of this Article 11 shall expressly survive the Closing, not merge with the provisions of any closing documents and effective as of the Closing shall hereby be automatically deemed incorporated into the Deed without further action needed.

Purchaser acknowledges and agrees that the disclaimers and other agreements set forth herein are an integral part of this Agreement and that Seller would not have agreed to sell

the Property to Purchaser for the Purchase Price without the disclaimers and other agreements set forth above.

## ARTICLE 12 - Miscellaneous

**12.1    Parties Bound; Assignment.**

This Agreement, and the terms, covenants, and conditions herein contained, shall inure to the benefit of and be binding upon the heirs, personal representatives, successors, and permitted assigns of each of the parties hereto. Notwithstanding anything to the contrary, Purchaser may not assign this Agreement, or any of its rights hereunder, in whole or in part, or any direct or indirect ownership interests in Purchaser without written consent of Seller, which consent may be granted or denied by Seller in its sole discretion; provided that no consent shall be required for any assignment to (i) an entity in which Larry Hirschfeld has a controlling interest(ii) an entity in which Larry Hirschfeld is the managing member or (iii) an Article XI Housing Development Fund Company which Purchaser controls.

**12.2    Headings.**

The article, section, subsection, paragraph and/or other headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

**12.3    Invalidity and Waiver.**

If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and, to the greatest extent legally possible, effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

**12.4    Governing Law.**

This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the State of New York.

**12.5    Survival.**

Only obligations which are expressly stated in this Agreement to survive Closing shall survive delivery of the deed to Purchaser.

**12.6    Entirety and Amendments.**

This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property.  This Agreement

may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

**12.7    Reserved.**

**12.8    Confidentiality.**

Neither party shall make any public announcement or disclosure of any information related to this Agreement to outside brokers or third parties, before or after the Closing, without the prior written specific consent of the other party; provided, however, that Purchaser may, subject to the provisions of <u>Section 4.8</u>, make disclosure of this Agreement to its Permitted Outside Parties as necessary to perform its obligations hereunder and as may be required under laws or regulations applicable to Purchaser and/or investors interested in this transaction.

**12.9    Notices.**

All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in <u>Section 1.3</u>. Any such notices shall, unless otherwise provided herein, be given or served (i) by depositing the same in the United States mail, postage paid, certified and addressed to the party to be notified, with return receipt requested, (ii) by overnight delivery using a nationally recognized overnight courier or (iii) by personal delivery**.** Notice deposited in the mail in the manner hereinabove described shall be effective on the third (3rd) business day after such deposit. Notice given in any other manner shall be effective only if and when received by the party to be notified between the hours of 8:00 a.m. and 5:00 p.m. of any business day with delivery made after such hours to be deemed received the following business day. A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice. Notices given and received by counsel to the Purchaser shall be deemed given or received by Purchaser and notices given or received by counsel to the Seller shall be deemed given or received by Seller.

**12.10    Construction.**

The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and agree that the normal rule of construction – to the effect that any ambiguities are to be resolved against the drafting party – shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

**12.11    Calculation of Time Periods.**

Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday for national banks in New York, in which event the period

shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday.  The last day of any period of time described herein shall be deemed to end at 5:00 p.m.

### 12.12   Execution in Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. To facilitate execution of this Agreement, the parties may execute and exchange by e-mail PDF counterparts of the signature pages, provided that executed originals thereof are forwarded to the other party on the same day by any of the delivery methods set forth in Section 12.9 other than facsimile.

### 12.13   No Recordation.

Without the prior written consent of Seller, there shall be no recordation of either this Agreement or any memorandum hereof, or any affidavit pertaining hereto, and any such recordation of this Agreement or memorandum or affidavit by Purchaser without the prior written consent of Seller shall constitute a default hereunder by Purchaser, whereupon Seller shall have the remedies set forth in Section 10.1 hereof, provided, however, that Purchaser may file a memorandum of contract at any time after an uncured default by Seller hereunder.

### 12.14   Further Assurances.

In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by either party at Closing, each party agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Property to Purchaser.

### 12.15   Discharge of Obligations.

The acceptance of the Deed by Purchaser shall be deemed to be a full performance and discharge of every representation and warranty made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except those which are herein specifically stated to survive Closing.

### 12.16   No Third Party Beneficiary.

The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing, except that a tenant of the Property may enforce Purchaser's indemnity obligation.

12.17        To the extent that the Seller has copies of original renovation plans for any of the Premises, Seller shall provide the same to the Purchaser at or prior to Closing.

SIGNATURE PAGE TO AGREEMENT
OF PURCHASE AND SALE
BY AND BETWEEN

Northeast Brooklyn Partnership,

AND

27 BED STUY LLC

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year written below.

**SELLER:**

NORTHEAST BROOKLYN PARTNERSHIP
By: Cheryl's Villa Housing Corporation, as General Partner

_____

By: Jeffrey Dunston, President

**PURCHASER:**

27 BED STUY LLC

By: _____
Name:   Larry Hirschfield
Title:    President

## JOINDER BY ESCROW AGENT

Escrow Agent has executed this Agreement in order to confirm that Escrow Agent has received and shall hold the Earnest Money required to be deposited under this Agreement and the interest earned thereto, in escrow, and shall disburse the Earnest Money, and the interest earned thereon, pursuant to the provisions of this Agreement.

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN,
FORMATO, FERRARA, WOLF & CARONE, LLP

By_____
   Mark J. Caruso, Esq.
   Partner

## LIST OF EXHIBITS

A.      Property Description

B.      List of Service Contracts

C.      Property Documents

D.      Bargain and Sale Deed

E.      Assignment of Leases, Rents and Arrears

F.      Notice to Tenants

G.      Residential and Commercial Rent Roll

**EXHIBIT A – Property Description (the "Land")**

| Limited Partnership (Seller) | Address | Block | Lot | County | Subject to Tax Lot Reapportionment |
|---|---|---|---|---|---|
| Northeast Brooklyn/Cheryl's Villa | 399 Kosciuszko Street | 1601 | 55 | Kings | |
| Northeast Brooklyn/Cheryl's Villa | 399 Kosciuszko Street | 1601 | 55 | Kings | |
| Northeast Brooklyn/Cheryl's Villa | 403 Kosciuszko Street | 1601 | 53 | Kings | |
| Northeast Brooklyn/Cheryl's Villa | 409 Kosciuszko Street | 1601 | 50 | Kings | |
| Northeast Brooklyn/Cheryl's Villa | 675 Halsey Street | 1663 | 86 | Kings | |
| Northeast Brooklyn/Cheryl's Villa | 671 Halsey Street | 1663 | 88 | Kings | |

## **EXHIBIT B – Service Contracts**

None.

## **EXHIBIT C – Property Documents**

<u>Part of CPEX Bid Package</u>

1. Combined Portfolio Income and Expenses
2. Overview, Income and Expenses per entity (Northeast Brooklyn Partnership aka Cheryl's Villa,
3. NEBHDCo. Property Roll-Up (includes a list of all properties, residential units, commercial units, total building sq.ft., total lot sq.ft. and air rights, if any)
4. Combined Portfolio Residential Unit Count
5. Combined Portfolio Bedroom Count
6. Retail Rental Summary
7. Historical Residential Turnover Analysis
8. Low Income Housing Tax Credit (LIHTC) Rent and Income Limits (2016)
9. Superintendents Apartment Summary

<u>Provided Separately to Purchaser</u>

1. Retail Leases
2. Retail Lease Abstracts
3. Current DHCR's
4. Regulatory Agreements (Northeast Brooklyn Partnership aka Cheryl's Villa,
5. Certificate of Occupancy's (Northeast Brooklyn Partnership aka Cheryl's Villa,
6. Property violations summary
7. Current Profit and Loss Statements
8. Current Unaudited Financials
9. Curent Audited Financials
10. NEBHDCo. Year 15 Underwriting
11. Capital Improvement Documentation (Northeast Brooklyn Partnership aka Cheryl's Villa,
12. J51 Abatement Documentation (Northeast Brooklyn Partnership aka Cheryl's Villa)

## EXHIBIT D – Bargain and Sale Deed

## DEED

**This Indenture**, made [                    ], 2019, between NORTHEAST BROOKLYN PARTNERSHIP, A New York State limited partnership, c/o NEBHDCo. 132 Ralph Avenue, Brooklyn, NY 11233, Attention: Jeffrey Dunston, CEO, party of the first part, and 2 7 B E D S T U Y   L L C ,   c / o   ELH Mgmt. LLC, a New York State limited liability company with offices at 16 Court Street, Suite 800, Brooklyn, NY 11241,

**Witnesseth**, that the party of the first part, in consideration of One Dollar ($1.00) and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County, City and State of New York and as more particularly described in Schedule A annexed hereto and hereby made a part hereof;

Said Premises also being commonly known as and by street addresses: As set forth on annexed schedules.

Said Premises being the Premises conveyed to the Grantor herein by deed, dated  [June 27, 1991, recorded August 13, 1991, in the Office of the City Register of the City of New York, County of Kings, in Reel 2729 Page 1063]

**Together** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; **Together** with the

appurtenances and all the estate and rights of the party of the first part in and to said premises; **To Have And To Hold** the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

And the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

And this conveyance has been made with the affirmative consent of the holders of all of the outstanding shares of the general partners of the party of the first part and the applicable regulatory bodies.

*[Remainder of page intentionally left blank]*

**In Witness Whereof**,  this deed has been duly executed the day and year first above written.

> Northeast Brooklyn Partnership
> By its General Partner, Cheryl's Villa Housing Corporation
> Jeffrey Dunston, President]
>
> _____
>
> [

STATE OF NEW YORK          )
                           ) SS:
COUNTY OF_____)

On the        day of_____, 2019, before me, the undersigned, personally appeared Jeffrey Dunston, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
            Notary Public

# SCHEDULE A

## LEGAL DESCRIPTION

[To be inserted]

**DEED**

_____

[

**NORTHEAST BROOKLYN PARTNERSHIP**
**TO**


**27 BED STUY LLC,**

_____


**PREMISES:**

| **ADDRESS** | **BLOCK** | **LOT** |
| [To be inserted] | | |

| | |
| **City of:** | **New York** |
| **State of:** | **New York** |
| **County of:** | **Kings** |
| **Borough of:** | **Brooklyn** |


**RECORD AND RETURN TO:**

Hirschen Singer  & Epstein LLP
902 Broadway, 13th Floor
New York, NY  10010
Attn:  Russell A. Kivler, Esq.

<u>**EXHIBIT E – Assignment of Leases, Rents and Arrears**</u>

<u>**ASSIGNMENT OF LEASES, RENTS AND ARREARS**</u>

This **ASSIGNMENT** (the "**Assignment**"), is made as of the [    ] day of [          ], 2019, by  [Northeast Brooklyn Partnership, a New York State limited partnership with offices at c/o NEBHDCo., 132 Ralph Avenue, Brooklyn, NY 11233 (the "**Seller**") and, 27 BED STUY LLC, a New York State limited  liability company with offices at c/o ELH MGMT. LLC, 16 Court Street, Suite 800, Brooklyn, NY 11241, , (the "**Purchaser**").

## RECITALS

**WHEREAS**, the Seller is the owner of the premises set forth in Schedule A (the "Property") and the landlord under all leases relating to the Property;

**WHEREAS**, the Seller and the Purchaser have entered into that certain Agreement of Purchase and Sale, dated as of the date hereof, (the "**Purchase Agreement**") whereby the Seller has agreed to sell and the Purchaser has agreed to purchase the Property upon the terms and conditions set forth in the Purchase Agreement and in consideration of the sum of   Dollars (the "**Purchase Price**") paid by  Purchaser to  Seller; and

**WHEREAS,** the Purchase Agreement provides that Purchaser shall purchase any of Seller's rent arrears by paying to Seller an amount equal to the following amount of the arrears: 75% for arrears that are less than thirty (30) days past due; 50% for arrears that are more than thirty (30) days but less than sixty-one (61) days; 12.5% for arrears that are more than sixty (60) days but less than ninety (90) days; and 0% for arrears that are more than ninety (90) days (the "**Arrears Acquisition Price**"); and

**WHEREAS**, as part of the consideration for paying the Purchase Price and the Arrears Acquisition Price, the Seller has agreed, in addition to executing the Purchase Agreement and the other purchase documents evidencing the mutual obligations between Purchaser and Seller (all such documents hereinafter referred to as the "**Purchase Documents**"), also to execute and deliver this Assignment as additional consideration for the payment of the Purchase Price.

**NOW, THEREFORE**, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Seller hereby assigns to the Purchaser all of the rents, issues and profits due and to become due from the Property, together with all leases, agreements, service contracts and insurance policies affecting the Property, upon the terms and conditions set forth below.

1.    **Collection of Rents and Arrears**

From this date forward, the Purchaser shall have the power and authority to enter upon and take possession of the Property and to demand, collect and receive from the tenants, lessees or other occupants now or at any time hereafter in possession of the Property or from any part thereof, rents and/or rental arrears now due or to become due, to endorse the name of the Seller or any subsequent owner of the Property on any checks, notes, or other instruments for the payment of money, to deposit the same in bank accounts, to give any and all acquittances or any other instruments in relation thereto in the name of the Seller or in the name of the Purchaser and, either in its own name or in the name of the Seller, to institute, prosecute, settle or compromise any summary or legal proceedings for the recovery of such rents or profits or to recover the whole or any part of the Property, and to institute, prosecute, settle or compromise any other proceedings for the protection of the Property, for the recovery of any damages done to the Property, or for the abatement of any nuisance thereon. The Purchaser shall also have the power to defend any legal proceedings brought against the Seller, Purchaser or against any subsequent owner arising out of the operation of the Property.

2.    **Authority to Lease**

From this date forward, the Purchaser shall have the power to lease or rent the Property or any part thereof, to employ an agent to rent and manage the Property, to make any changes or improvements deemed by it, in its sole discretion, to be necessary or expedient for the leasing or renting of the Property, to keep and maintain the Property in tenantable and rentable condition, as well as in a good state of repair, to purchase all equipment or supplies necessary or desirable in the operation and maintenance of the Property, to pay for all gas, electricity, power, painting, repairs, wages of employees and other items for maintenance of the Property, to pay taxes, assessments, water rates and meter charges and sewer rents now due and unpaid or which may hereafter become due and a charge or lien against the Property, to pay the principal and/or interest required to be paid under the Loan Documents now due or hereafter to become due, to pay the premiums on all policies of insurance now in effect or hereafter effected by the Seller, to comply with orders of any governmental departments having jurisdiction against the Property, to remove any mechanic's liens, security interests or other liens against the Property and, in general, to pay all charges and expenses incurred in the operation of the Property.

3.    **Payment of Expenses**

The Purchaser shall have the authority to pay the cost of all of the matters herein mentioned out of the rents and other revenues received from the Property. The cost of any such expenditures and of any payments which may be made by the Purchaser under the provisions of this Assignment, including expenses and charges for reasonable counsel fees, shall be charged to the Purchaser and for all purposes shall be deemed to be secured hereby and such costs may be retained by the Purchaser out of the rents and other revenues received from the Property.

4.    **Liability**

Except for its acts or failure to act due to its gross negligence or willful malfeasance, the Purchaser shall in no way be liable for any act done or anything omitted by it in connection with this Assignment but shall be liable only to account for all moneys that it may receive hereunder. Except for its acts or failure to act due to its gross negligence or willful malfeasance, the Seller shall in no way be liable for any act done or anything omitted by it in connection with this Assignment and nothing herein contained shall be construed so as to prejudice any right which the Seller may have by reason of any default, present or future, under the terms of the Purchase Documents.

5.    **Transfer of Leases**

(a)    Effective immediately, the Seller assigns, transfers and sets over to the Purchaser all leases or subleases made to the various tenants in the buildings at the Property and all of its right, title and interest therein and the Seller authorizes and empowers the Purchaser to continue present leases or to demise any one or more apartments or spaces therein upon such terms and conditions as the Purchaser may, in its sole discretion, deem just and proper and, if necessary, to execute, acknowledge and deliver any and all instruments in writing necessary to effectuate this Assignment. The Purchaser shall have full power and authority to do and perform all acts or things necessary and requisite to be done in and about the Property as fully, and to all intents and purposes, as the Seller might or could do if present, with full power of substitution and revocation. The Seller ratifies and confirms all that the Purchaser shall lawfully do or cause to be done by virtue hereof.

(b)    Purchaser shall assume all obligations of Seller as landlord, under all leases and shall be responsible for any obligations owed to tenants and shall bear any cure costs that may be due.

6.    **Modification of Leases**

The Purchaser may, without the prior written consent of the Seller: (i) cancel, modify or surrender any lease now existing with respect to any portion of the Property; (ii) reduce any rents or change, modify or waive any provision of any existing lease; and (iii) enter into any lease on any portion of the Property.

7.    **Failure to Account**

Except for its acts or failure to act due to its gross negligence or willful malfeasance, the Seller shall in no way be responsible or liable from this date forward for any prior failure to account for any rents collected by any agent or collector of the Property whom it may have designated or appointed to collect or manage the Property, nor shall the Lender be in any way liable for the failure or refusal on its part to have made repairs to the Property. The Seller shall in no way be personally responsible for any debt by Purchaser incurred on the date hereof and moving forward with respect to the Property.

8.    **Events of Default**

Anything in this Assignment to the contrary notwithstanding, the amount due to the Seller under the Purchase Documents shall, at the option of the Seller, become immediately due and payable if a default occurs and is continuing beyond the applicable notice and/or grace period, if any, under the Purchase Documents.

9.    **Further Assignment**

The Purchaser is given the privilege of assigning all of its right, title and interest in and to this Assignment to any person, firm or corporation to whom the Purchase Documents are assigned and in such manner so that the holder of the Purchase Documents shall have all of the rights and privileges given herein to the Purchaser as if such Purchaser were originally named herein as the Purchaser.

10.    **Authorization**

If the Seller is a corporation, the Seller certifies and represents that this Assignment was authorized by the board of directors of the Seller and there is no requirement under its certificate of incorporation or its by-laws for consent of shareholders to this transaction. If the Seller is a partnership, the execution and delivery of this Assignment has been duly authorized by the partners of the Seller pursuant to its partnership agreement. If the Seller is a limited liability company, the execution and delivery of this Assignment has been duly authorized pursuant to its operating agreement.

12.    **Description**

The Property is more particularly described on Schedule A annexed hereto.

13.    **Conflict**

Whenever the terms, provisions, covenants and conditions of this Assignment conflict in any way with the terms, provisions, covenants or conditions of Purchase Documents, the terms, provisions, covenants and conditions of the Purchase Documents shall control and prevail. All terms not expressly defined herein shall have the meaning ascribed thereto in the Purchase Documents.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment as of the date first above written.

<div style="margin-left:40%">

Northeast Brooklyn Partnership
By: Cheryl's Villa Housing Corporation, as General
Partner

_____

By: Jeffrey Dunston, President]

</div>

STATE OF NEW YORK    )
                              )ss.:
COUNTY OF NEW YORK   )

On the [__] day of [_ ], 2019, before me, the undersigned, personally appeared Jeffrey Dunston, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

<div style="margin-left:50%">

_____

Notary Public

</div>

SCHEDULE A


[Legal description to be inserted]

**NORTHEAST BROOKLYN PARTNERSHIP**

- to -

**27 BED STUY LLC,**

**ASSIGNMENT OF LEASES, RENTS AND ARREARS**

**Premises:**     The property affected by this instrument lies within the:
Borough:      Brooklyn
County:       Kings

Address:                              Block:                    Lot:

[To be inserted]

**EXECUTION VERSION**

### EXHIBIT F – Notice To Tenants

_____, 2019


Dear Tenant:

You are hereby notified that [Name of LP], a New York limited partnership ("Seller"), the current owner of _____, Brooklyn, New York (the "Property") and the current owner of the landlord's interest in your lease in the Property, has sold the Property to ELH Mgmt. LLC 27 BED STUY LLC ("New Owner"), as of the above date. In connection with such sale, Seller has assigned and transferred its interest in your lease and any and all security deposits in the sum of $_____thereunder or relating thereto to New Owner, and New Owner has assumed and agreed to perform all of the landlord's obligations under your lease (including any obligations set forth in your lease to repay or account for any security deposits thereunder) from and after such date.

Accordingly, (a) all your obligations under the lease from and after the date hereof, including your obligation to pay rent, shall be performable to and for the benefit of New Owner, its successors and assigns, and (b) all the obligations of the landlord under the lease, including any obligations to repay or account for any security deposits hereunder, shall be the binding obligation of New Owner and its successors and assigns. Unless and until you are otherwise notified in writing by New Owner, the address of New Owner for all purposes under your lease is:

_____

_____

_____


Very truly yours,

**SELLER:**                              **NEW OWNER**:

[Name of LP]                             ELH Mgmt. LLC
                                         27 BED STUY
                                         LLC

By: [Name of GP]


By: _____          By: _____

Name:                                    Name:
Title:                                   Title:

F - 1

**EXECUTION VERSION**

## **EXHIBIT G – Residential and Commercial Rent Roll**

See separate attachment.

## Exhibit B

**All rights of action are preserved post-Effective Date including the following:**

| Summary Description |
| --- |
| Tax Certiorari |